**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

FRITO-LAY NORTH AMERICA, INC.
"ALL NATURAL" LITIGATION

CASE NO. 1:12-CV-408-RRM-RLM; 1:12-MD-02413-RRM-RLM

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

ECF Case

ORAL ARGUMENT REQUESTED

------------------------------------------------------- x

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................... 1

II.     SUMMARY OF ALLEGED FACTS ....................................................................... 4

III.    REGULATORY BACKGROUND ........................................................................... 6

        A.      "NATURAL" AND "ORGANIC" CLAIMS ON FOOD LABELS .................... 6

                1.      FTC ...................................................................................................... 7

                2.      USDA .................................................................................................. 8

                3.      FDA ..................................................................................................... 9

                4.      States .................................................................................................. 11

                5.      Industry and Consumer Groups ........................................................ 12

        B.      LABELING OF FOOD GROWN WITH BIOENGINEERING
                TECHNOLOGY ........................................................................................ 13

IV.     LEGAL STANDARD .............................................................................................. 15

V.      ARGUMENT ........................................................................................................... 16

        A.      THE PLAINTIFFS' SUBJECTIVE UNDERSTANDING OF FRITO-
                LAY'S LABELS CONFLICTS WITH OBJECTIVELY REASONABLE
                CONSUMER EXPECTATIONS .................................................................. 16

        B.      THE COMPLAINT SHOULD BE DISMISSED UNDER OBSTACLE
                PREEMPTION OR THE PRIMARY JURISDICTION DOCTRINE ............... 21

        C.      THE MMWA CLAIM MUST BE DISMISSED .............................................. 24

        D.      THE FDUTPA AND GBL CLAIMS MUST BE DISMISSED UNDER
                STATUTORY SAFE HARBOR PROVISIONS, AND THE UCL, FAL,
                AND CLRA CLAIMS MUST BE DISMISSED UNDER COMMON LAW
                SAFE HARBOR DOCTRINE ..................................................................... 26

        E.      THE STATE WARRANTY CLAIMS MUST BE DISMISSED ...................... 28

        F.      THE INTENTIONAL MISREPRESENTATION, FAL, UCL, CLRA, AND
                FDUTPA CLAIMS MUST BE DISMISSED BECAUSE THE
                PLAINTIFFS FAILED TO SATISFY THE RULE 9(B) PLEADING
                STANDARD ............................................................................................. 29

        G.      THE CLAIMS ASKING FOR EQUITABLE RELIEF—OR
                REQUESTING NO RELIEF—SHOULD BE DISMISSED BECAUSE
                THE PLAINTIFFS HAVE AN ADEQUATE REMEDY AT LAW .................. 31

        H.      THE NEW YORK LAW CLAIMS MUST BE DISMISSED TO THE
                EXTENT THEY APPLY TO NON-NEW YORK CONSUMERS ................... 32

i

**TABLE OF CONTENTS**
(continued)

Page

I.    THE PLAINTIFFS HAVE NO STANDING TO BRING CLAIMS FOR PRODUCTS THAT THEY DID NOT PURCHASE ........................................... 33

J.    THE CLAIMS AGAINST PEPSICO, INC. MUST BE DISMISSED ............... 34

VI.    CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*1659 Ralph Ave. Laundromat Corp. v. Ben David Enters., L.L.C.,*
762 N.Y.S.2d 288 (2d Dep't 2003) .................................................................. 31, 32

*Abraham v. Volkswagen of Am., Inc.,*
795 F.2d 238 (2d Cir. 1986) ........................................................................... 26

*Alvarez v. Chevron Corp.,*
656 F.3d 925 (9th Cir. 2011) .......................................................................... 27

*Am. Home Prods. Corp. v. Johnson & Johnson,*
672 F. Supp. 135 (S.D.N.Y. 1987) .................................................................. 26

*Amchem Prods.. Inc. v. Windsor,*
521 U.S. 591 (1997) ....................................................................................... 34

*Anderson v. Bungee Int'l Mfg. Corp.,*
44 F. Supp. 2d 534 (S.D.N.Y. 1999) ............................................................... 28

*Anderson v. Deloitte & Touche,*
56 Cal. App. 4th 1468 (Cal. App. 1st Dist. 1997) ........................................... 30

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................. 15, 35

*Astiana v. Dreyer's Grand Ice Cream, Inc.,*
No. C-11-2910, 2012 WL 2990766 (N.D. Cal. July 20, 2012) ......................... 25

*Astiana v. Hain Celestial Group, Inc.,*
No. C-11-6342 PJH, 2012 WL 5873585 (N.D. Cal. Nov. 19, 2012) ................. 24

*Baltazar v. Apple, Inc.,*
No. CV-10-3231, 2011 WL 588209 (N.D. Cal. Feb. 10, 2011) ......................... 16

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) .................................................................................. 15, 35

*Berenguer v. Warner-Lambert Co.,*
No. 02-05242, 2003 WL 24299241 (Fla. Cir. Ct. July 31, 2003) .................. 26, 27

*Blum v. Yaretsky.*
457 U.S. 991 (1982) ....................................................................................... 34

*Borchardt v. Mako Marine Int'l, Inc.,*
No. 08-61199-CIV, 2009 WL 3856678 (S.D. Fla. Nov. 17, 2009) ..................... 28

*Cardona v. Target Corp.,*
No. 12-1148, 2013 WL 1181963 (N.D. Cal. Mar. 20, 2013) ......................... 16, 18

*Carrea v. Dreyer's Grand Ice Cream. Inc.,*
No. C 10-01044 JSW, 2011 WL 159380 (N.D. Cal. Jan. 10, 2011) ................... 34

*Chiste v. Hotels.com L.P.,*
756 F. Supp. 2d 382 (S.D.N.Y. 2010) ............................................................. 16

*Cohen v. JP Morgan Chase & Co.,*
498 F.3d 111 (2d Cir. 2007) ........................................................................... 16

## TABLE OF AUTHORITIES
(continued)

Page

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................... 33, 34

*Degelmann v. Advanced Med. Optics Inc.*,
   659 F.3d 835 (9th Cir. 2011) .................................................................................... 23

*Druyan v. Jagger*,
   508 F. Supp. 2d 228 (S.D.N.Y. 2007) ...................................................................... 19

*Dvora v. General Mills, Inc.*,
   No. CV 11-1074-GW(PLAx), 2011 WL 1897349 (C.D. Cal. May 16, 2011) ......... 16

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ................................................................................................... 21

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ........................................................... 23

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ............................................................................... 16, 19

*Gaul v. N.Y. State Dep't of Envtl. Conservation*,
   884 N.Y.S.2d 314 (N.Y. Sup. Ct. 2009) .................................................................. 32

*Goshen v. Mut. Life Ins. Co.*,
   98 N.Y.2d 314 (2002) ............................................................................................... 32

*Goya Foods, Inc. v. Tropicana Prods., Inc.*,
   846 F.2d 848 (2d Cir. 1988) .................................................................................... 24

*Guerrero v. Target Corp.*,
   889 F. Supp. 2d 1348 (S.D. Fla. 2012) .................................................................... 26

*Hairston v. S. Beach Beverage Co.*,
   No. CV 12-1429-JFW (DTBx), 2012 U.S. Dist. LEXIS 74279 (C.D. Cal. May
   18, 2012) ....................................................................................................... 16, 19, 25

*Hairston v. South Beach Beverage Co., Inc.*,
   No. CV 12-1429, 2012 WL 1893818 (C.D. Cal. May 18, 2012) ...................... 16, 33

*Heighley v. J.C. Penney Life Ins. Co.*,
   257 F. Supp. 2d 1241 (C.D. Cal. 2003) .............................................................. 31, 32

*Hill v. Hoover Co.*,
   No. 1:06-cv-00096-SPM, 2012 WL 4510855 (N.D. Fla. Oct. 1, 2012) .................. 29

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ................................................................................................... 21

*Holk v. Snapple Beverage Corp.*,
   575 F.3d 329 (3d Cir. 2009) .................................................................................... 23

*Horowitz v. Stryker Corp.*,
   No. CV-07-1572 (DGT), 613 F. Supp. 2d 271 (E.D.N.Y. Feb. 20, 2009) .............. 28

*In re ConAgra Foods Inc.*,
   No. 11–05379, 2012 WL 5995454 (C.D. Cal. Nov. 15, 2012) .......................... 19, 26

*In re Grand Theft Auto Video Game Consumer Litig.*,
   251 F.R.D. 139 (S.D.N.Y. 2008) ............................................................................. 33

**TABLE OF AUTHORITIES**
(continued)

Page

*Jones v. Conagra Foods, Inc.*,
    No. C-12-01633-CRB, 2012 WL 6569393 (N.D. Cal. Dec. 17, 2012) ................................... 25

*Jovine v. Abbott Labs., Inc.*,
    795 F. Supp. 2d 1331 (S.D. Fla. 2011) ................................................................... 29

*Kanter v. Warner-Lambert Co.*,
    99 Cal. App. 4th 780 (2002) ............................................................................ 25

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ................................................................... 29, 30

*Larsen v. Trader Joe's Co.*,
    No. 11-cv-5188, 2012 WL 5458396 (N.D. Cal. June 14, 2012)....................................... 25, 34

*Lewis v. Casev*.
    518 U.S. 343 (1996)..................................................................................... 34

*Liberty Mut. Ins. Co. v. WAWA Tours, Inc.*,
    CV-07-0880 (CPS), 2007 WL 2743500 (E.D.N.Y. Sept. 18, 2007) ............................... 29, 31

*Littlehale v. The Hain Celestial Group, Inc.*,
    No. C 11–6342 PJH, 2012 WL 5458400 (N.D. Cal. July 2, 2012) ........................................ 25

*Lopez v. Nissan N. Am., Inc.*,
    201 Cal. App. 4th 572 (Cal. Ct. App. 2011) ............................................................ 28

*Magnus v. Fortune Brands, Inc.*,
    41 F. Supp. 2d 217 (E.D.N.Y. 1999) .................................................................... 33

*Matthews v. American Honda Motor Co., Inc.*,
    No. 12-60630-CIV, 2012 WL 2520675 (S.D. Fla. June 6, 2012)....................................... 31, 32

*Maurizio v. Goldsmith*,
    230 F.3d 518 (2d Cir. 2000) ............................................................................ 16

*Maxwell v. Unilever U.S. Inc.*,
    No. 5:12-cv-01736-EJD (N.D. Apr. 9, 2013) ........................................................... 25

*Mazzuocola v. Thunderbird Prods. Corp.*,
    No. 90-CV-405 (ARR), 1995 WL 311397 ............................................................... 33

*McAdam v. State Nat'l Ins. Co.*,
    No. 12cv1333, 2012 WL 4364655 (S.D. Cal. Sept. 24, 2012) .......................................... 32

*Moxie Indus., Inc. v. Hayden*,
    677 F. Supp. 187 (S.D.N.Y. 1988) ...................................................................... 29

*Nat'l Comm'cns Ass'n, Inc. v. Am. Tel. & Tel. Co.*,
    46 F.3d 220 (2d Cir. 1995) ............................................................................. 24

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    89 F. App'x 287 (2d Cir. 2004) ......................................................................... 32

*Olszewski v. Scripps Health*,
    30 Cal. 4th 798 (2003) ................................................................................. 28

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20 (1995) ................................................................................... 16

## TABLE OF AUTHORITIES
(continued)

Page

*Pom Wonderful LLC v. Coca-Cola Co.*,
  679 F.3d 1170 (9th Cir. 2012) ................................................................... 24

*Prudential Home Mortg. Co. v. Super. Ct.*,
  66 Cal. App. 4th 1236 (1998) ................................................................... 31

*Roach v. T.L. Cannon Corp.*.
  889 F. Supp. 2d 364 (N.D.N.Y. 2012) ...................................................... 34

*Roberts v. Ball. Hunt. Hart. Brown & Baerwitz*,
  57 Cal. App. 3d 104 (Cal. App. 1976) ...................................................... 30

*Roohparvar v. Fairchild Semiconductor of CA*.
  No. C-05-04222-JW, 2006 WL 294797 (N.D. Cal. Feb. 7, 2006) .............. 30

*Rooney v. Cumberland Packing Corp.*,
  No. 12-CV-0033, 2012 WL 1512106 (S.D. Cal. Apr. 16, 2012) ................. 16

*Ross v. Bolton*,
  904 F.2d 819 (2d Cir. 1990) ..................................................................... 30

*S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*,
  84 F.3d 629 (2d Cir. 1996) ....................................................................... 16

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ..................................................................... 30

*Stires v. Carnival Corp.*,
  243 F. Supp. 2d 1313 (M.D. Fla. 2002) .................................................... 29

*Sugawara v. Pepsico, Inc.*,
  No. 2:08-cv-1335-MCE-JFM, 2009 WL 1439115 (E.D. Cal. May 21, 2009) ........ 16

*Szymczak v. Nissan N. Am., Inc.*,
  No. 10 CV 7493, 2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) ................. 32

*T.W.M. v. Am. Med. Sys., Inc.*,
  886 F. Supp. 842 (N.D. Fla. 1995) ........................................................... 29

*Thomas v. Costco Wholesale Corp.*,
  No. 5:12-cv-02908-EJD, 2013 WL 1435292 (N.D. Cal. Apr. 9, 2013) ....... 25

*United States v. W. Pac. R.R. Co.*,
  352 U.S. 59 (1956) .................................................................................... 22

*Verzani v. Costco Wholesale Corp.*,
  No. 09 Civ. 2117, 2010 WL 3911499 (S.D.N.Y. Sept. 28, 2010) .............. 19

*Wal-Mart Stores. Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) .............................................................................. 34

*Warth v. Seldin*.
  422 U.S. 490 (1975) .................................................................................. 34

*Weaver v. Opera Tower, LLC*,
  No. 07-23332-CIV, 2008 WL 4145520 (S.D. Fla. Aug. 1, 2008) .............. 16

*Weiss v. Johansen*,
  898 So. 2d 1009 (Fla. Dist. Ct. App. 2005) ............................................... 29

## TABLE OF AUTHORITIES
(continued)

Page

*Werbel ex rel. v. Pepsico, Inc.,*
No. 09-04456, 2010 WL 2673860 (N.D. Cal. July 2, 2010) ........................................... 16, 28

*Williams v. Beechnut Nutrition Corp.,*
185 Cal. App. 3d 135 (1986) .............................................................................................. 28

*Williams v. Dow Chem. Co.,*
255 F. Supp. 2d 219 (S.D.N.Y. 2003) ................................................................................ 16

*Wilson v. Frito-Lay North America, Inc.,*
No. 3:12-cv-1586, 2013 WL 1320468 (N.D. Cal. Apr. 1, 2013) ......................................... 25

*Zlotnick v. Premier Sales Grp. Inc.,*
480 F.3d 1281 (11th Cir. 2007) ......................................................................................... 16

**Statutes**

15 U.S.C. § 2301 ................................................................................................................ 6, 24, 25

15 U.S.C. § 2310 ................................................................................................................ 26

15 U.S.C. § 2311 ................................................................................................................ 25

21 U.S.C. § 301 .................................................................................................................. 9

21 U.S.C. § 321 .................................................................................................................. 13

21 U.S.C. § 332 .................................................................................................................. 27

21 U.S.C. § 393 .................................................................................................................. 22, 27

28 U.S.C. § 2072 ................................................................................................................ 34

Cal. Bus. & Prof. Code § 17200 ........................................................................................ 6

Cal. Bus. & Prof. Code § 17500 ........................................................................................ 6

Cal. Civ. Code § 1750 ........................................................................................................ 6

Cal. Health & Safety Code § 110820 ................................................................................ 11

Cal. Health & Safety Code § 110885 ................................................................................ 11, 18, 28

Cal. Health & Safety Code §§ 110425-111223 ................................................................. 12

California Commercial Code § 2-313 ................................................................................. 6

Fla. Stat. § 501.212 ........................................................................................................... 26, 27

Fla. Stat. § 672.313 ........................................................................................................... 6

Fla. Stat. § 672.607 ........................................................................................................... 29

Florida Deceptive And Unfair Trade Practices Act § 501.201 .......................................... 6

N.Y. Gen. Bus. Law § 349 ................................................................................................. 6, 26, 27, 32

N.Y. Gen. Bus. Law § 350 ................................................................................................. 6, 26, 32

N.Y. U.C.C. § 2-313 .......................................................................................................... 6

N.Y. U.C.C. § 2-607 .......................................................................................................... 29

Organic Foods Production Act of 1990, 7 U.S.C. § 6501 .................................................. 8

## TABLE OF AUTHORITIES
(continued)

Page

Proposition 37, Right to Know Genetically Engineered Food Act § 110809.1 ........................... 12

**Regulations & Rules**

7 C.F.R. § 205.102 .......................................................................................... 8

7 C.F.R. § 205.105 .......................................................................................... 11

7 C.F.R. § 205.2 ............................................................................... 8, 11, 15, 18

7 C.F.R. § 205.300 .......................................................................................... 8

7 C.F.R. § 205.301 .......................................................................................... 8

7 C.F.R. § 205.302 .......................................................................................... 8

7 C.F.R. § 205.303 .......................................................................................... 8

7 C.F.R. § 205.304 .......................................................................................... 8

7 C.F.R. § 205.305 .......................................................................................... 8

7 C.F.R. § 205.306 .......................................................................................... 8

7 C.F.R. § 205.307 .......................................................................................... 8

7 C.F.R. § 205.308 .......................................................................................... 8

7 C.F.R. § 205.309 .......................................................................................... 8

7 C.F.R. § 205.310 .......................................................................................... 8

7 C.F.R. § 205.311 .......................................................................................... 8

21 C.F.R. § 1.1 ........................................................................................... 2, 9

21 C.F.R. § 10.85 .......................................................................................... 27

21 C.F.R. § 101.22 .......................................................................................... 8

39 Fed. Reg. 39,842 ........................................................................................ 7

39 Fed. Reg. 39,849 ........................................................................................ 7

48 Fed. Reg. 23,270 ...................................................................................... 7, 8

56 Fed. Reg. 60,421 ....................................................................................... 10

56 Fed. Reg. 60,466 ............................................................................. 10, 17, 24

56 Fed. Reg. 60,467 .................................................................................. 11, 24

57 Fed. Reg. 22,986 .................................................................................. 15, 24

57 Fed. Reg. 22984 ................................................................................... 13, 24

57 Fed. Reg. 22985 ........................................................................................ 24

57 Fed. Reg. 22991 ................................................................................... 13, 14

58 Fed. Reg. 2302 .......................................................................................... 9

58 Fed. Reg. 2407 ................................................................................... passim

58 Fed. Reg. 2408 .......................................................................................... 9

71 Fed. Reg. 70,503 ........................................................................................ 8

## TABLE OF AUTHORITIES
(continued)

Page

105 Mass. Code Regs. 520.116.................................................................................. 11

Fed. R. Civ. P. 9(b) .................................................................................................. 29

## I.    INTRODUCTION

The plaintiffs' theory of this case is that consumers may bring suit for food labeled "natural" solely based on their subjective belief that "natural" means that food was not grown with the benefit of bioengineering technology. That theory is objectively unreasonable. But for the last thirty years, every federal regulator with responsibility for food labeling and marketing—from the Food and Drug Administration ("FDA"), to the Federal Trade Commission ("FTC"), to the U.S. Department of Agriculture ("USDA"), as well as the organic and conventional food industry—has stated that a "natural" label is permissible so long as no unexpected artificial or synthetic additive has been added to the product <u>after harvesting</u>, without regard to whether the product has been grown using scientific methods. Frito-Lay North America, Inc. ("Frito-Lay") followed that guidance diligently.

The "natural" stamp that Frito-Lay uses on its products is wholly consistent with guidance on the use of the term "natural" on a food label. Moreover, Frito-Lay <u>also</u> surrounds the term "made with all natural ingredients" with the phrase "No MSG – No Preservatives – No Artificial Flavors," (*see* Compl. ¶ 37), making no representations about how the food was grown. Frito-Lay's marketing materials—quoted in the plaintiffs' own complaint—make this same point, explaining to consumers that "products made with all natural ingredients do not have any artificial or synthetic ingredients, and they do not contain any artificial flavors or artificial preservatives, or ingredients such as monosodium glutamate (MSG)." Compl. ¶ 31.

The plaintiffs do not argue that Frito-Lay adds any artificial or synthetic additives or ingredients to Tostitos, SunChips, and Fritos Bean Dip. Nor do they allege that Frito-Lay labels these products as "organic," "non-GMO," "non-GMO corn," "GMO-free," "not bioengineered," or "not genetically engineered." The plaintiffs also do not allege that Frito-

Lay makes any affirmative statement about how the ingredients used in these products are grown.  Instead, their theory is that Frito-Lay's statement that its products are made with "all natural ingredients" contains an implicit representation that those ingredients were grown using "organic" techniques, which exclude use of bioengineering technology.  In light of the deeply-entrenched meaning of the term "natural" in food labeling as referring only to what happens to a crop after harvesting—and the specific context of the Frito-Lay label, which explains "No MSG – No Preservatives – No Artificial Flavors"—the plaintiffs' subjective expectations that a natural label promises a "GMO-free" or "non-GMO" product is not a legally cognizable claim.  All of the plaintiffs' claims thus must be dismissed on both federal and state law grounds.

Frito-Lay has diligently followed every piece of guidance promulgated for more than three decades by federal regulators concerning "natural" labeling.  The plaintiffs do not allege that Frito-Lay violated any statement, rule, guidance, regulation, or other directive regarding natural claims or bioengineered claims.  This suit is an attempt, in effect, to imbue the word "natural" with a subjective meaning that contradicts settled industry guidance, practice, and objectively reasonable consumer expectations.  "Natural" on food labeling does not mean "organic" or "non-GMO" or "GMO-free."  It is not a statement about bioengineering at all.  But the plaintiffs' subjective view that natural should mean "non-GMO" or "GMO-free" is the entire, non-cognizable premise of this lawsuit.

The plaintiffs' state law claims must also be dismissed because they are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, or, in the alternative, under the primary jurisdiction doctrine.  The FDA—the agency to which Congress gave plenary power over food labeling—has provided guidance on the meaning of

2

the term "natural" in a food-labeling context, which directly contradicts the plaintiffs' complaint.  It would create an obstacle to the FDA's policy if a state, through its tort system, were allowed to impose liability on a company's "natural" labeling practice that is unquestionably consistent with how the FDA has stated that term may be used.  Alternatively, this Court should dismiss this case under the primary jurisdiction doctrine.  If this Court believes that certain states can prohibit—through their general consumer protection statutes or common law—the use of "natural" labeling where, as here, that labeling is permitted under federal law, it should request that the FDA bring its expertise to resolve that significant conflict.

The plaintiffs' claims also must be dismissed for other independent reasons.  Their first and primary claim—for violations of the Magnuson Moss Warranty Act—has been dismissed with prejudice by every court to have confronted the claim in the food-labeling context.  Their claims under consumer protection statutes fail because, under New York, Florida, and California law, a state lawsuit cannot challenge conduct that is permitted under federal law.  The "grab bag" of additional claims—that Frito-Lay's packaging is a "written warranty," that Frito-Lay has engaged in "intentional misrepresentation," and so forth—fail either as a matter of law or because the plaintiffs' fraud-based claims lack the particularity required under Rule 9(b).  Finally, the plaintiffs' allegations against PepsiCo, Inc. are plainly insufficient to state a claim for products sold by Frito-Lay, and the plaintiffs lack standing under Supreme Court precedent to bring claims for products that they never purchased or identified.

## II.   SUMMARY OF ALLEGED FACTS

The plaintiffs bring this action against Frito-Lay for labeling 20 Tostitos, SunChips and Fritos Bean Dip products as "made with all natural ingredients" because those products contain corn grown using bioengineering techniques.  Compl. ¶¶ 3, 5.  The copies of Frito-Lay's labels that the plaintiffs include in their complaint show that Frito-Lay surrounds its "made with all natural ingredients" claim with a ring that states that the products contain "No MSG – No Preservatives – No Artificial Flavors."



*Id.* ¶ 37.  And the Frito-Lay press release that the plaintiffs quote in their complaint explains that "products made with all natural ingredients do not have any artificial or synthetic ingredients, and they do not contain any artificial flavors or artificial preservatives, or ingredients such as monosodium glutamate (MSG)."  *Id.* ¶ 31.

The plaintiffs' complaint simply ignores the explanatory ring and the clear language of this press release, and instead focuses exclusively on the word "natural."  Contrary to the explanation on the ring and the press release, the plaintiffs assert that because Frito-Lay's labels use the word "natural," those labels contain an implicit representation that the products contained corn grown without using bioengineering techniques.  *Id*. ¶¶ 62-67.  Their only support for this view of the meaning of the word "natural" in the food-labeling context is

inapposite, out-of-context statements by Monsanto Company, Romer Labs, the World Health Organization ("WHO"), and the Environmental Protection Agency ("EPA"), none of which purport to define "natural" for purposes of food labeling, or even discuss the matter. *Id*. ¶¶ 43-46. <u>Nowhere in their complaint do the plaintiffs mention the guidance provided by the FDA, USDA, FTC, or state and industry actors regarding the meaning of "natural" in the food-labeling context</u>, or how that term differs from the term "organic."

Plaintiff Chris Shake resides in the State of New York, and claims that he purchased Tostitos, SunChips and Fritos Bean Dip products "approximately once per month in 2011" at local supermarkets and convenience stores. *Id*. ¶ 17. Shake does not specify which Tostitos, SunChips and Fritos Bean Dip products he purchased. *Id*. <u>No other plaintiff purports to have purchased any Fritos Bean Dip product</u>. Plaintiff Julie Gengo resides in California, and alleges that she purchased seven different Tostitos and SunChips products "[f]rom approximately 2010 until September 2011 . . . approximately once per month for her own and her family's consumption." *Id*. ¶ 18. Plaintiff Valerie Zuro also lives in California and alleges that "[f]rom 2010 until December 2011" she purchased eleven different Tostitos and SunChips products. *Id*. ¶ 19. Finally, Plaintiff Lisa Summerlin lives in Florida and claims that she purchased Tostitos Restaurant Style Tortilla Chips and Tostitos Scoops Tortilla Chips "approximately once per month . . . from at least 2010 until November 2011." *Id*. ¶ 20. The plaintiffs provide no details regarding the dates of their purchases, the particular advertisements they allege they saw in their "home[s]" (*id*. ¶¶ 17-20), the products they purchased during each visit, or the prices they paid. They also plead no facts to support their claim that Frito-Lay believed its products are not "made with all natural ingredients."

The plaintiffs assert three categories of claims, all of which are based upon their

theory that Frito-Lay's labels implicitly promised them products grown without the benefit of bioengineering technology.   First, they bring breach of express warranty claims for money damages under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, California Commercial Code § 2-313, N.Y. U.C.C. § 2-313, and Fla. Stat. § 672.313(1)(a).   Compl. ¶¶ 83-90, 146-66.   Second, they seek equitable relief such as restitution, disgorgement, and injunctive relief under New York General Business Law § 349 ("GBL § 349"), New York General Business Law § 350 ("GBL § 350"), Cal. Business & Professions Code § 17500 ("FAL"), Cal. Business & Professions Code § 17200 ("UCL"), Cal. Civil Code § 1750 ("CLRA"), and the Florida Deceptive And Unfair Trade Practices Act § 501.201 ("FDUTPA"). Compl. ¶¶ 91-145.   Finally, they allege that Frito-Lay engaged in intentional misrepresentation under California, New York, and Florida common law.   Compl. ¶¶ 167-90. They assert their MMWA claim on behalf of a nationwide class; their Florida and California claims on behalf of Florida and California purchasers, respectively; and their New York claims alternatively on behalf of New York purchasers, a three-state class of New York, Florida, and California purchasers, or a nationwide class.   Compl. ¶¶ 68-73.

### III.      REGULATORY BACKGROUND

### A.      "NATURAL" AND "ORGANIC" CLAIMS ON FOOD LABELS

Three federal agencies, as well as state and industry actors, have carefully studied the meaning of "natural" and "organic" claims in the food-labeling context.   All have agreed and explained that, for food labeling purposes, whether a food can properly be labeled "natural" depends on what was done with that food <u>after</u> the crop was harvested, including whether synthetic or artificial additives were added to the harvested crop during processing.   All of these regulators agree that how the crop was <u>grown</u> plays no part in the "natural" inquiry.   At the same time, all agree that whether a food is "organic" depends, at least in part, on whether

the food's ingredients were grown using certain (organic) techniques, including exclusion of bioengineering methods. This dichotomy between "natural" and "organic"—one applying post-harvest, the other applying to pre- and post-crop methods—is deeply entrenched in regulatory guidance and industry practice.

1.   *FTC.*  The FTC was the first agency to study the terms "natural" and "organic," in order to address concerns that food labels using these terms were difficult to understand. *See* 39 Fed. Reg. 39,842, 39,849 (Nov. 11, 1974) (Request for Judicial Notice ("RJN"), Ex. A); 48 Fed. Reg. 23,270 (May 24, 1983) (RJN, Ex. B).  After carefully studying the question, the FTC proposed defining "natural" to exclude foods that "[h]ave undergone more than minimal processing after harvest . . . . [or c]ontain any artificial flavoring, color, additive, or chemical preservatives or any other artificial or synthetic ingredient."  Charlene C. Price, *Natural Foods*, in U.S. Dep't of Agriculture *National Food Review*, at 10 (Summer 1980) (emphasis added) (referencing the FTC's proposal) (RJN, Ex. C).  A USDA publication issued shortly after the FTC first articulated this standard explained that "[v]arious brands of potato chips . . . fall into this category," and further explained how the FTC's understanding of "natural" foods differed from "organic" foods:

> "Natural" is often confused with "organic."  Organic foods are those which have been grown without synthetic pesticides, fertilizers, or chemicals.  Natural refers to unprocessed or minimally processed goods without additives, preservatives, artificial coloring, or chemicals added after the food is harvested.

*Id.* at 9-10 (emphasis added).

The FTC reinforced its understanding of "natural" through its request for comments on a series of questions regarding what makes a food "natural."  All of those questions involved inquiries into the sorts of artificial flavors, colors, and ingredients that have been added to the food; none referenced how the food is grown or cultivated. *See* 39 Fed. Reg. at

39,849. While the FTC ultimately terminated the rulemaking and decided to evaluate "natural" claims on a case-by-case basis (48 Fed. Reg. at 23,270)—it never questioned its understanding that the term "natural" refers to what is done with food <u>after</u> it is harvested.

      **2.**    ***USDA.*** The USDA was the next agency to study the meaning of "natural" and "organic" in the food-labeling context, and it similarly concluded that whether a food is "natural" depends upon what is done to food after harvesting. The USDA explained that a "product" is "natural" if "(1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 C.F.R. § 101.22 [(RJN, Ex. G)]), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed." *See* USDA Food Standards and Labeling Policy Book (Aug. 2005) (RJN, Ex. D) (reiterating the same definition of "natural" as articulated in USDA's 1982 Policy Memo). In 2006, when the USDA held a public meeting on the meaning of "natural," it sought comments on "processing" and the terms "artificial" and "synthetic" in its definition. 71 Fed. Reg. 70,503 (Dec. 5, 2006) (RJN, Ex. E). The USDA's requests for comments did not ask any questions about the method of growth. *Id.*

      The USDA has also issued formal regulations pertaining to when a food can be labeled "organic" under the National Organic Program, pursuant to the Organic Foods Production Act of 1990, 7 U.S.C. § 6501 *et seq.*, as implemented by 7 C.F.R. Part 205; *see* 7 C.F.R. § 205.102; *id.* §§ 205.300-205.311. These regulations provide rules about how a crop is grown, as well as what is done to the crop after harvesting. To qualify as "organic," the USDA specifically excludes foods made from crops grown using many commonly-used bioengineering techniques. *See* 7 C.F.R. § 205.2 (defining "excluded methods" that are

impermissible for organic foods) (RJN, Ex. F); USDA, Policy Memorandum at 11-13, Genetically Modified Organisms (Apr. 15, 2011) (RJN, Ex. H).

To further clarify the difference between "natural" and "organic" claims in the food-labeling context, the USDA's website directs consumers to a summary of the terms "natural" and "organic," explaining that the summary "[p]rovides answers to questions regarding consumer purchase behavior of organic and natural foods in the marketplace."  USDA, National Agricultural Library (RJN, Ex. I).  This September 2008 summary (which pre-dates the Class Period by two years) was compiled by the Food Marketing Institute, an organization that represents 1,500 food retailers and wholesalers, and explained that "[t]he term 'natural'. . . applies broadly to foods that are minimally processed and free of synthetic preservatives; artificial sweeteners, colors, flavors and other artificial additives; hydrogenated oils; stabilizers; and emulsifiers," and then added that "'[o]rganic' refers not only to the food itself, but also to how it was produced . . . Crops must be grown without using synthetic pesticides, bioengineered genes, petroleum-based fertilizers and sewage sludge-based fertilizers."  FMI Study, at 1 (emphases added) (RJN, Ex. J).[1]

**3.    *FDA.***  The FDA—the agency with the primary responsibility for regulating the food labeling at issue here (*see* FDCA, 21 U.S.C. § 301 *et seq.*; 21 C.F.R. § 1.1 *et seq.*)—has also studied the use of the terms "natural" and "organic."  After careful analysis, which included specifically considering the FTC proposal and the USDA's "natural" definition (58 Fed. Reg. 2302, 2407-08 (Jan. 6, 1993) (RJN, Ex. L)) the FDA found that "natural" in the food context

---

[1]    The USDA website links to the FMI study (http://fnic.nal.usda.gov/food-labeling/organic-foods (RJN, Ex. I)), which was—until last year—located at http://www.fmi.org/media/bg/natural_organic_foods.pdf (accessed on February 2012).  The FMI has since redesigned its website, moving the 2008 study to http://www.fmi.org/docs/media-backgrounder/natural_organic_foods.pdf?sfvrsn=2 (last visited on Apr. 19, 2013).

means that "nothing artificial or synthetic (including all color additives regardless of source) [has been] included in, or has been added to, [the product] that would not normally be expected to be [there]," and issued a widely available policy statement to this effect.  *Id.* at 2407 (emphases added); *accord* 56 Fed. Reg. 60,421, 60,466 (Nov. 27, 1991) (RJN, Ex. K).

The FDA recognized that ambiguities remain concerning what additives are "artificial" or "synthetic"—such that their addition to an already-harvested crop would make use of a "natural" claim impermissible.  56 Fed. Reg. at 60,466.  Thus, in 1991, the FDA posed a series of questions for public comment such as what level of "processing" would make a food non-natural.  *Id*.  Two years later, in 1993, reviewing the comments it received, not a single comment the FDA referenced referred to how the crop was grown.  58 Fed. Reg. at 2407.  Ultimately, the FDA was unable to make a final decision on the ambiguities regarding "artificial" and "synthetic" additives, and thus reiterated its policy statement on the meaning of the term "natural."  *Id*.  As the FDA stated, "the agency will maintain its current policy . . . not to restrict the use of the term 'natural' except for added color, synthetic substances, and flavors as provided in § 101.22."  *Id.* (emphasis added).

Under its "natural" policy, the FDA has sent many warning letters to companies that have claimed their products are "natural" on the ground that they include added artificial or synthetic ingredients to their food.  *See, e.g.*, RJN, Exs. M, N.  Plaintiffs do not allege Frito-Lay has ever received a warning letter concerning Tostitos, SunChips, or Fritos Bean Dip. Indeed, as far as Frito-Lay is aware, in the 20 years the FDA has maintained its natural policy, the FDA has never sent a warning letter challenging a "natural" label on the ground that the product in question contained an ingredient grown with the benefit of bioengineering technology.

As to the term "organic," the FDA acknowledged that the method by which a product is grown is part of the "organic" inquiry, and stated that "[b]ecause responsibility for regulating use of the term "organic" has been assigned by Congress to USDA, FDA will defer issuing any regulations governing the term "organic" until USDA has adopted appropriate regulations (*see* 56 Fed. Reg. at 60,467; 58 Fed. Reg. at 2407), which USDA of course has now done (*see supra* p. 8-9).

**4.    *States.*** To the extent that states have considered the meaning of "natural" and "organic" in the food-labeling context, they also have understood that term in the same way as the FTC, USDA and FDA.  Thus, Massachusetts, for example, has explained that a "[n]atural food" means a "food which in its processing has not been treated with preservatives, antibiotics, synthetic additives, artificial flavoring, artificial coloring, or has been processed in such a manner so that it become significantly less nutritive.  Natural foods may only be processed by extracting, purifying, heating, fermenting, concentrating, dehydrating, cooling, or freezing."  105 Mass. Code Regs. 520.116 (emphases added) (RJN, Ex. O).

California law also distinguishes between "natural" and "organic" labeling.  The California Organic Products Act provides that "organic" products must satisfy the National Organic Program's requirements (Cal. Health & Safety Code § 110820 (RJN, Ex. P)), which exclude the use of genetically modified products (7 C.F.R. §§ 205.2, 205.105(e)).   In contrast, California law expressly provides that "natural" labeling need not meet these standards.  Cal. Health & Safety Code § 110885 ("This article shall not apply to the term 'natural' when used in the labeling or advertising of a product.") (RJN, Ex. P).  California voters chose to maintain this distinction in November 2012 (near the end of the Class Period), when they rejected a ballot initiative, Proposition 37, that would have—among other

changes—prohibited use of the terms "natural," "naturally made," "naturally grown," and "all natural" on foods that contain genetically engineered ingredients.  Proposition 37, Right to Know Genetically Engineered Food Act § 110809.1.  Mandatory Labeling Initiative Statute (Cal. Health & Safety Code §§ 110425-111223) (rejected Gen. Elec. 2012) (RJN, Ex. Q).  The purpose of this initiative was plainly to write into California law the theory underlying the plaintiffs' complaint.  On November 6, 2012, the voters of California rejected Proposition 37, keeping California law consistent with the long established meaning of "natural" claims in the food-labeling context.  *Id.*

     **5.**    ***Industry and Consumer Groups.***  As noted above, the USDA has publicized on its website the Food Marketing Institute's summary on the difference between "natural" and "organic" claims in the food-labeling context.  That summary explains to consumers that "[t]he term 'natural' . . . applies broadly to foods that are minimally processed and free of synthetic preservatives; artificial sweeteners, colors, flavors and other artificial additives; hydrogenated oils; stabilizers; and emulsifiers," and explains that  "'[o]rganic' refers not only to the food itself, but also to how it was produced . . . Crops must be grown without using synthetic pesticides, bioengineered genes, petroleum-based fertilizers and sewage sludge-based fertilizers."  FMI Study at 1.

     Other industry sources have articulated the same understanding of "natural" as "refer[ring] to the end product, that is, one that is minimally processed," while explaining that "'organic' refers to a system of agricultural practices and certification to production and handling standards . . . [which] may not include genetically modified organisms (GMOs) in any aspect of production or handling."  *See* Tom Hutcheson, *"Natural" Foods Are Distinct From Organic Foods*: *Comments of the Organic Trade Association on Docket Number FSIS*

12

*2006-0040*, *Organic Trade Association* (RJN, Ex. P).  Leading pro-consumer groups, such as the Center for Science in the Public Interest ("CPSI"), also advise consumers that "[i]f one wants to avoid GE crops, the best way to do that is to buy 'organic.'  If a product is certified as 'organic' under federal standards, then the ingredients in that product cannot come from GE crops."  CSPI, *Straight Talk on Genetically Engineered Foods:  Answers to Frequently Asked Questions* (RJN, Ex. S).[2]

## B.     LABELING OF FOOD GROWN WITH BIOENGINEERING TECHNOLOGY

The FDA also has addressed the labeling of bioengineered foods, and, as with guidance about the term "natural," Frito-Lay also has followed these to the letter.  In 1992, the FDA issued a policy statement clarifying its interpretation of the FDCA.  The FDA stated that it "has . . . been asked whether food developed using techniques such as recombinant DNA techniques would be required to bear special labeling to reveal that fact to consumers." 57 Fed. Reg. 22984, 22991 (May 29, 1992) (RJN, Ex. T).  The FDA said no, reasoning that "the new techniques are extensions at the molecular level of traditional methods and will be used to achieve the same goals as pursued with traditional plant breeding."  *Id.*  The FDA further stated that "[t]he agency is not aware of any information showing that foods derived by these new methods differ from other foods in any meaningful or uniform way . . .," and that "the agency does not believe that the method of development of a new plant variety (including the use of new techniques including recombinant DNA techniques) is normally material information within the meaning of 21 U.S.C. § 321(n) [(RJN, Ex. U)] and would not normally be required to be disclosed in labeling for the food."  *Id.*  (emphasis added) (The

---

[2]   CSPI's guide goes on to say that some USDA organic claims "are misleading, because they falsely imply that the food made <u>without</u> GE ingredients is somehow safer than or superior to the same product made with GE ingredients."  *Id.* at 4 (emphasis added).

FDA guidance explains when the use of bioengineering would be "material," such as where "a food derived from a new plant variety differs from its traditional counterpart such that the common or usual name no longer applies" or where the use of bioengineering techniques might "cause an allergic reaction in a susceptible population," 57 Fed. Reg. at 22991.  The plaintiffs do not allege that either situation applies here.)

Nine years later, the FDA issued additional guidance for industry.  *See Guidance for Industry:  Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering: Draft Guidance* (Jan. 2001) (RJN, Ex. V).  This guidance followed the review of data and information on labeling that the FDA had received and reviewed since 1993; three public meetings; and the review of 50,000 written comments about the safety and labeling of bioengineered foods.  *Id.* at 2.  Upon review of that body of information, FDA reiterated that "[t]he agency is still not aware of any data or other information that would form a basis for concluding that the fact that a food or its ingredients was produced using bioengineering is a material fact that must be disclosed under sections 403(a) and 201(n) of the act [21 U.S.C. §§ 321(n) & 343(a)].  FDA is therefore reaffirming its decision to not require special labeling of all bioengineered foods."  *Id.* (21 U.S.C. §§ 321 & 343 are reproduced at RJN, Ex. V).  The FDA then went on to address when statements concerning the presence or absence of bioengineered ingredients might or might not be misleading.  The FDA's examination of these statements focused on claims involving "non-GMO," "bioengineering," "genetic engineering," "GMO free," and "not genetically modified."  *See id.* at 3.  Nowhere does the FDA suggest or imply that a "natural" statement makes any implied representation about whether foods are bioengineered.  Indeed, the FDA reaffirmed in its policy statement that the USDA "organic" program includes a requirement that

"products or ingredients identified as <u>organic</u> must not be produced using biotechnology methods." *Id.* at 4 (emphasis added).

<u>The FDA has also made clear that bioengineering relates to how a crop is grown or developed, not whether anything synthetic or artificial has been added after harvesting</u>. *See* 57 Fed. Reg. at 22,986. This is why neither the FDA, USDA, nor any other federal or state agency has provided or ever suggested that foods containing products grown using bioengineering techniques may not be labeled "natural." Indeed, these entities' definitions of "natural" clearly allow such "natural" labeling of products containing crops grown with bioengineering techniques, assuming no unexpected artificial or synthetic ingredients are added to those crops after harvest. *See supra* p. 6-13. On the other hand, because bioengineering techniques impact how a product is grown, the USDA prohibits labeling crops made with certain bioengineering techniques as "organic." *See* 7 C.F.R. § 205.2.

## IV.    LEGAL STANDARD

A court must dismiss a complaint under Rule 12(b)(6) if the allegations in the complaint are not "plausible on [their] face" or do not allege sufficient facts to satisfy the legal standard. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007). "A plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). In making this determination, the Court must "draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As to the plaintiffs' claims grounded in fraud—including the plaintiffs' UCL, FAL, CLRA, FDUTPA and New York, California and Florida fraudulent misrepresentation claims—to survive dismissal under Federal Rule of Civil Procedure 9(b), the plaintiffs must "state with particularity the circumstances constituting fraud."

15

## V.    ARGUMENT

### A.    THE PLAINTIFFS' SUBJECTIVE UNDERSTANDING OF FRITO-LAY'S LABELS CONFLICTS WITH OBJECTIVELY REASONABLE CONSUMER EXPECTATIONS

All of the plaintiffs' claims require either "a showing that a reasonable consumer would have been misled by the defendant's conduct," or some other articulation of being "reasonably" misled or "reasonably" relying upon warranties or fraudulent misrepresentations. *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996).[3] Whether a consumer is "reasonable" is an <u>objective</u>—rather than a subjective—standard, which is not defined by the unique views of the particular consumers before the Court. *See Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007). Courts have regularly dismissed claims where the plaintiff has asserted a subjective, objective unreasonable, interpretation of a food labeling claim either by: (1) examining the objective meaning of food labeling terms (*see, e.g.*, *Cardona v. Target Corp.*, No. 12-1148, 2013 WL 1181963 (N.D. Cal. Mar. 20, 2013)), or (2) looking at the entire label, in context (*see, e.g.*, *Hairston v. S. Beach Beverage Co.*, No. CV 12-1429-JFW (DTBx), 2012 U.S. Dist. LEXIS 74279 (C.D. Cal. May 18, 2012)).[4] In the present case, the plaintiffs' <u>subjective</u>

---

[3]    *See also Maurizio v. Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 230 (S.D.N.Y. 2003); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995); *Hairston v. South Beach Beverage Co., Inc.*, No. CV 12-1429, 2012 WL 1893818, at *4-5 (C.D. Cal. May 18, 2012); *Baltazar v. Apple, Inc.*, No. CV-10-3231, 2011 WL 588209 (N.D. Cal. Feb. 10, 2011); *Zlotnick v. Premier Sales Grp. Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007).

[4]    *See also Werbel ex rel. v. Pepsico, Inc.*, No. 09-04456, 2010 WL 2673860, at *3 (N.D. Cal. July 2, 2010); *Rooney v. Cumberland Packing Corp.*, No. 12-CV-0033, 2012 WL 1512106, at *4 (S.D. Cal. Apr. 16, 2012); *Sugawara v. Pepsico, Inc.*, No. 2:08-cv-1335-MCE-JFM, 2009 WL 1439115, at *3-4 (E.D. Cal. May 21, 2009); *Dvora v. General Mills, Inc.*, No. CV 11-1074-GW(PLAx), 2011 WL 1897349 (C.D. Cal. May 16, 2011); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 401-03 (S.D.N.Y. 2010); *Weaver v. Opera Tower, LLC*, No. 07-23332-CIV, 2008 WL 4145520, at *2 & n.8 (S.D. Fla. Aug. 1, 2008).

view that Frito-Lay's labels include an implicit representation that its products contain only corn grown without bioengineering technology is <u>objectively</u> unreasonable on both levels.

*First*, the term "natural" has a commonly understood meaning in the food-labeling context, which—standing alone—refutes the plaintiffs' theory of this case.  The FDA, USDA, FTC, states, and industry have all articulated to consumers for over thirty years that whether a food is "natural" depends upon whether unexpected "artificial" or "synthetic" additives and ingredients were added to the <u>harvested</u> crop.  58 Fed. Reg. at 2407; USDA Food Standards and Labeling Policy Book; *see supra* p. 6-13.  The FDA has long maintained a widely-available policy that a food is "natural" when "nothing <u>artificial</u> or <u>synthetic</u> (including colors regardless of source) [has been] <u>included in</u>, or has been <u>added to</u>, the product that <u>would not normally be expected to be there</u>." 56 Fed. Reg. at 60,466 (emphases added).  It would be objectively unreasonable for any consumer to view the inclusion of the word "natural" on a product label as an implicit representation that the corn from which the product is made was grown without bioengineering technology.

The contrast between "natural" and "organic" food labels demonstrates clearly that the term "natural" does not pertain to how a crop is grown, but rather what happens to it after harvesting.  As the FMI's summary, cited as authoritative by the USDA on its publicly-available website, explains: "The term <u>'natural'. . . applies broadly to foods that are</u> <u>minimally processed and free of synthetic preservatives; artificial sweeteners, colors, flavors</u> <u>and other artificial additives; hydrogenated oils; stabilizers; and emulsifiers</u>," while "'[o]rganic' refers not only to the food itself, but also to how it was produced. . . .  Crops must be <u>grown without using</u> synthetic pesticides, <u>bioengineered genes</u>, petroleum-based fertilizers and sewage sludge-based fertilizers."  FMI Study, at 1 (emphases added).

California's Organic Products Act draws this same distinction by its provision that the "organic" rules "shall not apply to the term 'natural.'"  Cal. Health & Safety Code § 110885. And the USDA has provided that certain methods of crop growth—including bioengineering—are impermissible for an "organic" label.  *See* 7 C.F.R. § 205.2.  No federal or state agency provides <u>any</u> guidelines for crop growth that are inappropriate for a "natural" label.  *See supra* p. 6-11.  Frito-Lay does not label the products at issue "organic" or make any other affirmative statement about whether ingredients are bioengineered; rather, its labels say the products are "made with all natural ingredients."

The fundamental flaw in the plaintiffs' theory is similar to the defect in the recently dismissed complaint in *Cardona*, 2013 WL 1181963, at *13.  In that case, the plaintiff alleged that Target had deceptively labeled its honey products as "pure" honey, even though it had filtered the pollen out of the products.  The district court concluded—on a motion to dismiss—that the plaintiff "cannot plausibly allege that Defendant's Honey Products are not 'pure'" because "it is the <u>addition of other ingredients</u> that make claims of 'purity' misleading." *Id.* at *13 (emphasis added); *accord* USDA Food Standards and Labeling Policy Book (permitting the use of a "pure" label "when the poultry [or] meat contains no added ingredients").  In other words, a representation about "pure" relates to what happens <u>during processing</u>.  This case is no different, because the meaning of the term "natural" on food labels depends upon what ingredients were added to the food after harvesting.  While "natural" and "pure" may have somewhat divergent meanings in some respects, the terms are similar in that they do not turn on how the food was grown (*e.g.*, non-GMO, or pollen-free). Indeed, if complaints like the plaintiffs' are permitted to survive motions to dismiss, common food labeling terms such as "natural" and "pure" will theoretically become unusable despite

18

the abundant guidance from regulators, because plaintiffs need only allege that these terms confuse their subjective and particular interpretations.[5]

*Second*, Frito-Lay's particular labels make even more plain to any reasonable consumer that Frito-Lay is invoking the term "natural" in the manner articulated by the FDA, USDA, FTC, consumer groups and industry.  Context matters.  As the complaint alleges (Compl. ¶ 37), Frito-Lay surrounds the words "made with ALL NATURAL ingredients" with the explanatory phrase "No MSG – No Preservatives – No Artificial Flavors."  This makes crystal clear that Frito-Lay has used the term "natural" to explain that no artificial or synthetic additives have been added after harvesting.  "No reasonable reader could ignore" this aspect of Frito-Lay's labeling; the context, and those words <u>must</u> be taken into account as part of the reasonable consumer inquiry.  *Freeman*, 68 F.3d at 289; *Hairston v. S. Beach Beverage Co., Inc.*, No. 12-1429, 2012 WL 1893818, at *5 (C.D. Cal. May 18, 2012) ("[N]o reasonable consumer would read the 'all natural' language as modifying the 'with vitamins' language and believe that the added vitamins are suppose[d] to be 'all natural vitamins.'"); *Verzani v. Costco Wholesale Corp.*, No. 09 Civ. 2117, 2010 WL 3911499 at *2 (S.D.N.Y. Sept. 28, 2010) (reasonable consumer would not focus on one aspect of the label, while ignoring other aspects) (citing *Druyan v. Jagger*, 508 F. Supp. 2d 228, 244 (S.D.N.Y. 2007)).

Frito-Lay's marketing materials send the same signal to consumers as do its labels, further bolstering its entitlement to judgment as a matter of law here.  In the press release

---

[5]  The plaintiffs can be expected to rely upon the denial of the motion to dismiss in *In re ConAgra Foods Inc.*, No. 11–05379, 2012 WL 5995454 (C.D. Cal. Nov. 15, 2012), but unlike the defendants in the present case, ConAgra did not argue that the plaintiff's case was premised on a theory of "natural" that conflicted with guidance and views of every regulator to have addressed the issue.  Instead, ConAgra contended that a "natural" label was permissible because the FDA has not affirmatively required that bioengineered foods be so-identified, and explained that "there is no need to resort to the definition of 'natural'" to resolve its motion to dismiss.  *See* ConAgra Mot. to Dismiss, ECF No. 24, at 17 (Aug. 24, 2011).  The district court's denial of ConAgra's motion to dismiss thus does not support the plaintiffs' complaint here.

announcing its "all natural" line—quoted in the plaintiffs' complaint—Frito-Lay explained to consumers that "products made with all natural ingredients do not have any artificial or synthetic ingredients, and they do not contain any artificial flavors or artificial preservatives, or ingredients such as monosodium glutamate (MSG)."  Compl. ¶ 31.  Similarly, Frito-Lay's publicly-available website—also quoted in the plaintiffs' complaint (Compl. ¶ 58)—explains that "made with all natural ingredients . . . means these products don't contain any artificial flavors or artificial preservatives, nor do they use monosodium glutamate (MSG) or partially hydrogenated oil."  http://www.fritolay.com/your-health/naturally-delicious.html (last visited Apr. 5, 2013).  And the USA TODAY article that the plaintiffs' cite in their complaint (Compl. ¶¶ 53-54) likewise explains that Frito-Lay's "all natural" stamp means that its products "will lose all of th[o]se additives."  *See* Bruce Horovitz, *Frito-Lay Turns To Nature's Path*, USA TODAY, Dec. 28, 2010.

In light of the text and context of Frito-Lay's actual labels, as well as the meaning of the term "natural" expressed by federal, state, and industry actors for the last thirty years, the plaintiffs' theory is plainly implausible.  Indeed, it cannot possibly be the case that a food company that uses a food labeling term in exactly the way three federal agencies, states, and consumer groups have uniformly said it may be truthfully used—and then dutifully makes that usage plain on its own packages and related advertisements—must still face a lawsuit because particular consumers say their subjective interpretations about bioengineering were disappointed.  That should not be, and is not, the law.

Finally, the plaintiffs' attempts to evade both the well-accepted understanding of "natural" in the food-labeling context and the explanatory phrase on Frito-Lay's labels and advertising are wholly unavailing.  Their complaint alleges that according to Monsanto,

20

Romer Labs, the WHO, and the EPA, bioengineered crops "have had their genetic makeup altered to exhibit traits that are not naturally theirs" (Compl. ¶ 43), "express novel traits that normally would not appear in nature" (*id.* ¶ 44), have "been altered in a way that does not occur naturally" (*id.* ¶ 45), and "utilize[] several different modern scientific techniques" (*id.* ¶ 46).  But these sources <u>do not purport to discuss the meaning of the term "natural" as that term is used on food package labels</u>, and do not mention how federal agencies have explained when this term may truthfully be used in that context.  Similarly, while the plaintiffs cite to an article to support their view that bioengineering techniques are different from other methods of crop growth (*id.* ¶ 47), this has nothing to do with the truthfulness of Frito-Lay's labeling.  Corn grown to exhibit favorable characteristics may be labeled "natural" regardless of whether that corn was grown through Darwinian random chance/natural selection, Mendelian selective cross-breeding, or modern bioengineering techniques, unless artificial and synthetic additives or ingredients are added to or included in the food after harvesting.  Every regulator agrees with this position.

## B.   THE COMPLAINT SHOULD BE DISMISSED UNDER OBSTACLE PREEMPTION OR THE PRIMARY JURISDICTION DOCTRINE

Federal law preempts state law where that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  If Congress's purposes "cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power."  *Hines v. Davidowitz*, 312 U.S. 52, 67 n.20 (1941) (quotation omitted).  And even if a federal law does not preempt state laws, a court should dismiss a state law claim under the primary jurisdiction doctrine where deciding

the claim "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).

Congress has placed food labeling within the FDA's jurisdiction, authorizing the FDA to "protect the public health by ensuring that [ ] foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2)(A) (emphasis added). In exercising this authority, the FDA issued a policy in the Federal Register on the meaning of the term "natural," reissued that same policy statement in 1993 after a full notice-and-comment period, and enforced the policy through numerous warning letters to manufacturers. *See supra* p. 9-11. The FDA's policy provides that a product is "natural" when "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food." 58 Fed. Reg. at 2407.

The plaintiffs' theory of the case directly contradicts the FDA's natural policy in two respects. First, the plaintiffs would redefine "natural" as excluding not only "synthetic" or "artificial" additives or ingredients, but also some methods of growing crops. *See supra* p. 9-11. Second, the FDA's policy provides that the only sort of artificial and synthetic additives that would make a food non-natural are those that "would not normally be expected to be in the food." 58 Fed. Reg. at 2407. Even if corn itself could somehow be subject to the FDA's "natural" definition, bioengineered corn is the "normally" "expected" corn in the United States. As the FDA has explained, "[m]ost, if not all cultivated food crops have been genetically modified" using modern bioengineering techniques (FDA, Guidance for Industry), and bioengineering seeds are the source of most of the corn in the United States (USDA, Adoption of Genetically Engineered Crops in the U.S. (RJN, Ex. W)).

22

Since the plaintiffs' claims are contrary to the FDA's "natural" policy, they are preempted under obstacle preemption.  An agency's guidance—such as the FDA's "natural" policy—can preempt contrary state laws where those state laws' conflict with the guidance creates an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *English*, 496 U.S. at 79; *see Degelmann v. Advanced Med. Optics Inc.*, 659 F.3d 835, 841-42 (9th Cir. 2011) (giving preemptive effect to a non-binding FDA guidance).  It would be an obstacle to Congress's decision to entrust the FDA with maintaining a safe and uniform labeling regime if each state could adopt meanings of "natural" that <u>directly contradict</u> the FDA's well-established policy.  Indeed, were states allowed to adopt separate, unique definitions of the term "natural"—such as the one that Proposition 37's sponsors unsuccessfully attempted to write into California law—interstate food sellers would then be faced with potentially 50 different regulations on the meaning of the term "natural," making the term unusable on pain of civil litigation.[6]

Alternatively, even if this Court concludes that the plaintiffs' state law claims are not preempted, it should defer to the FDA's primary jurisdiction.  A court deciding whether to defer to an agency's primary jurisdiction must consider four factors: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the

---

[6]   The FDA's "natural" policy does not preempt *all* state law "natural" claims because it does not definitively define the full boundaries of what additives are artificial or synthetic.  For example, the policy was found not to preempt cases involving high fructose corn syrup or other additives, which arguably could be seen as artificial or synthetic ingredients.  *See, e.g.*, *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 335-42 (3d Cir. 2009).

agency has been made." *Nat'l Comm'cns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995). Whether the labeling term "natural" should be significantly revised—in contradiction to the FDA's "natural" guidance—is within the FDA's "technical or policy" competence, and particularly with the FDA's discretion. *Id.* The FDA's interest and expertise regarding this area is demonstrated by its careful study of both the term "natural" (*see* 56 Fed. Reg. at 60,466-67; 58 Fed. Reg. at 2407), and of the labeling of foods grown with the benefit of bioengineering technology (*see* 57 Fed. Reg. at 22,984-86; FDA, Guidance for Industry, RJN, Ex. V).

The court explained in *Astiana v. Hain Celestial Group, Inc.*, No. C-11-6342 PJH, 2012 WL 5873585 (N.D. Cal. Nov. 19, 2012)—when it relied upon the FDA's primary jurisdiction to dismiss a state law "natural" claim—that while "courts do regularly decide whether conduct is false or misleading . . . courts do not decide such issues when such a decision would 'undermine, through private litigation, the FDA's considered judgments.'" *Id.* at *1 (citing *Pom Wonderful LLC v. Coca-Cola Co.*, 679 F.3d 1170, 1178 (9th Cir. 2012)) (emphasis added). That reasoning applies with full force in this case. The issues involved in departing from the FDA's definition of "natural" are "technical questions of fact uniquely within the expertise and experience of [the FDA]" (*Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988)) (internal quotation marks omitted), and thus this Court should follow *Astiana* and dismiss this case under the primary jurisdiction doctrine.

## C.    THE MMWA CLAIM MUST BE DISMISSED

The plaintiffs allege that Frito-Lay violated the MMWA, 15 U.S.C. § 2301(d)(1), because of its "made with all natural ingredients" label. Compl. ¶¶ 89-90. The MMWA prohibits—as relevant—"any written affirmation of fact or written promise" that "affirms or promises that such material or workmanship is defect free or will meet a specified level of

performance over a specified period of time." 15 U.S.C. § 2301(6) (emphases added).

Courts have uniformly held that labels and advertising that use the terms "natural," "all

natural" or "100% natural" cannot be subject to a MMWA suit because such statements are

"product descriptions rather than promises that [the product] is defect-free or guarantees of

specific performance levels," and thus fall outside of the MMWA's written warranty

protections. *Hairston v. South Beach Beverage Co.*, No. CV 12-1429-JFW (DTBx), 2012

U.S. Dist. LEXIS 74279, at *18 (C.D. Cal. May 18, 2012). These decisions are correct and

doom the plaintiffs' MMWA claim. Frito-Lay's labels represent that no unexpected artificial

or synthetic additives or ingredients have been added (and, on the plaintiffs' erroneous

theory, that the food was grown using organic techniques). The use of bioengineering

technology is not a "defect" and does not relate to any "level of performance."[7]

Plaintiffs' MMWA claim also suffers from other fatal defects. The MMWA is

"inapplicable to any written warranty the making or content of which is otherwise governed

by Federal law." 15 U.S.C. § 2311(d); *see Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th

780, 797 (2002). If Frito-Lay's label is a "warranty"—which it clearly is not—that

"warranty" would fall squarely within the FDA's purview under the FDCA (*see supra* p. 21-

23), and would thus be "otherwise governed by Federal Law" (*see Hairston*, 2012 U.S. Dist.

---

[7]    *See also Thomas v. Costco Wholesale Corp.*, No. 5:12-cv-02908-EJD, 2013 WL 1435292, at *6 (N.D.
Cal. Apr. 9, 2013) (dismissing MMWA claim with prejudice and stating that "food labels . . . do not
constitute warranties against a product defect."); *Maxwell v. Unilever U.S. Inc.,* No. 5:12-cv-01736-EJD,
slip op. at 6 (N.D. Cal. Apr. 9, 2013) (same); *Wilson v. Frito-Lay North America, Inc.*, No. 3:12-cv-1586,
2013 WL 1320468, at *15 (N.D. Cal. Apr. 1, 2013) (same); *Jones v. Conagra Foods, Inc.*, No. C-12-
01633-CRB, 2012 WL 6569393, at *13 (N.D. Cal. Dec. 17, 2012) (same); *Littlehale v. The Hain Celestial
Group, Inc.*, No. C 11–6342 PJH, 2012 WL 5458400, at *1 (N.D. Cal. July 2, 2012) (same); *Astiana v.
Dreyer's Grand Ice Cream, Inc.*, No. C-11-2910, 2012 WL 2990766, at *2-4 (N.D. Cal. July 20, 2012)
(same); *Larsen v. Trader Joe's Co.*, No. 11-cv-5188, 2012 WL 5458396, at *3 (N.D. Cal. June 14, 2012)
(same).

LEXIS 74279, at *17).   In addition, only Plaintiff Gengo has provided the statutorily required notice, and only on behalf of California consumers, alleging violations of California law.   *See* 15 U.S.C. § 2310(e) (seller must have a "reasonable opportunity to cure such failure to comply" with warranty).   Finally, the plaintiffs have not alleged that their individual claims exceed "the sum or value of $25."   *See* 15 U.S.C. § 2310(d)(3); *see Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 243-45 (2d Cir. 1986).

**D.     THE FDUTPA AND GBL CLAIMS MUST BE DISMISSED UNDER STATUTORY SAFE HARBOR PROVISIONS, AND THE UCL, FAL, AND CLRA CLAIMS MUST BE DISMISSED UNDER COMMON LAW SAFE HARBOR DOCTRINE**

Under Florida law, a plaintiff may not bring a FDUTPA claim where "[a]n act or practice required or ***specifically permitted by federal*** or state law."  Fla. Stat. § 501.212(1) (emphasis added).  Similarly, New York law provides a "complete" defense to a claim under the GBL where the defendant's conduct "***complies with*** the rules and regulations of" federal agencies.   GBL § 349(d) (emphasis added); *id*. § 350-c.   Courts adjudicating consumer deception claims under Florida and New York have dismissed claims brought under the FDUTPA and GBL where the defendant's relevant conduct was both regulated by a federal agency and complied with that agency's guidance.  *See, e.g.*, *Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1358 (S.D. Fla. 2012) ("An act 'permitted' by federal law necessarily encompasses voluntary standards."); *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 144 (S.D.N.Y. 1987); *Berenguer v. Warner-Lambert Co.*, No. 02-05242, 2003 WL 24299241, at *3 (Fla. Cir. Ct. July 31, 2003).  Notably, when dealing with an analogous "safe harbor" under the Nebraska Consumer Protection Act, the district court in *In re ConAgra*, 2012 WL 5995454—which is expected to be the plaintiffs' primary authority in this case—held that the Nebraska claim must be dismissed under that statutory safe harbor

because "labeling and advertising of food products like the Wesson Oils is extensively regulated by the FDA" and "the FDA has regulated use of the term 'natural.'" *Id.* at *8.

In the present case, the plaintiffs' claims under the FDUTPA and the GBL must similarly be dismissed because Frito-Lay's labeling is "permitted by" (Fla. Stat. § 501.212(1)) and "complies with" (GBL § 349(d)) federal law.  The FDCA empowers the FDA to require that "foods are . . . properly labeled" (21 U.S.C. § 393(b)(2)(A)), and the FDA has exercised that authority by issuing a "natural" policy which constitutes an "advisory opinion" (21 C.F.R. § 10.85), which it has now maintained for 20 years and published in the Federal Register after a full notice-and-comment procedure.  The FDA may enforce this policy through an injunction and seizure of its products (21 U.S.C. § 332), and must follow that policy until it amends or revokes it (21 C.F.R. § 10.85(e)).  The FDA has regularly enforced this policy through warning letters to companies that have added "artificial" or "synthetic" additives to food.  *See supra* p. 10.  Frito-Lay's labeling in this case unquestionably complies with FDA's "natural" policy, which is why the FDA has issued no such warning letters as to any of the innumerable foods that are both labeled "natural" and grown with the benefit of bioengineering technology.  *See supra* p. 10.  Accordingly, just as with the Nebraska safe harbor in *In re ConAgra*, Frito-Lay's "natural" label is exempt under FDUTPA and the GBL because that label is "permitted by" and "complies with" federal law.

California courts have developed a more narrow common law safe harbor provision than the one found under Florida and New York (and Nebraska law) statutory law, which provides that "courts may not use the unfair competition law to condemn actions the legislature permits."  *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011)  (citation omitted).   Here, the California Legislature enacted into its law the provision that the

limitations applicable to "organic" labeling "shall not apply to the term 'natural' when used in the labeling or advertising of a product." Cal. Health & Safety Code § 110885. Because the California Legislature has specifically concluded that the requirements that apply to "organic" labeling, <u>including that the food not be grown using bioengineering techniques</u>, do not apply to "natural" labeling, the plaintiffs' label is specifically permitted by California law, and thus cannot be the basis of a claim under the UCL, FAL, and CLRA. *Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572, 592 (Cal. Ct. App. 2011); *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 829-30 (2003).

## E.    THE STATE WARRANTY CLAIMS MUST BE DISMISSED

The plaintiffs' California, New York, and Florida express warranty claims fail as a matter of law for the same reasons the MMWA claim must be dismissed. "[T]o plead a cause of action for [state law] breach of express warranty, one must allege the exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach of that warranty which proximately causes plaintiff injury." *See Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986); *accord Horowitz v. Stryker Corp.*, No. CV-07-1572 (DGT), 613 F. Supp. 2d 271, 285 (E.D.N.Y. Feb. 20, 2009); *Borchardt v. Mako Marine Int'l, Inc.*, No. 08-61199-CIV, 2009 WL 3856678, at *4 (S.D. Fla. Nov. 17, 2009). Frito-Lay's "all natural" label does not provide any "exact" terms of a "warranty," but is mere labeling on a package. This is insufficient to state an express warranty claim. *See, e.g.*, *Werbel v. Pepsico, Inc.*, No. C 09-04456 SBA, 2010 WL 2673860, at *5 (N.D. Cal. July 2, 2010) (dismissing as "frivolous" claim that a "contains berries" label was an express warranty); *Anderson v. Bungee Int'l Mfg. Corp.*, 44 F. Supp. 2d 534, 540-42 (S.D.N.Y. 1999) (label stating that products are "Premium Quality" and "Made in the USA" do not create an express warranty).

The New York and Florida warranty claims must also be dismissed because plaintiffs Shake and Summerlin did not provide Frito-Lay with pre-litigation notice and opportunity to cure.  *See* N.Y. U.C.C. § 2-607(3)(a) ("the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"); Fla. Stat. § 672.607(3)(a) (same); *see, e.g.*, *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1340 (S.D. Fla. 2011) (dismissing warranty claim for failure to notify); *Moxie Indus., Inc. v. Hayden*, 677 F. Supp. 187, 192 (S.D.N.Y. 1988) (same).

Finally, the plaintiffs' Florida express warranty claims must be dismissed because the plaintiffs did not purchase their products directly from Frito-Lay, but bought those products from third-party supermarkets.  Compl. ¶ 20; *see T.W.M. v. Am. Med. Sys., Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995) ("[T]o recover for the breach of a warranty . . . the plaintiff must be in privity of contract with the defendant . . . .  A plaintiff who purchases a product, but does not buy it directly from the defendant, is not in privity with that defendant."); *accord Weiss v. Johansen*, 898 So. 2d 1009, 1012 (Fla. Dist. Ct. App. 2005); *Hill v. Hoover Co.*, No. 1:06-cv-00096-SPM, 2012 WL 4510855, at *7 (N.D. Fla. Oct. 1, 2012).

**F.   THE INTENTIONAL MISREPRESENTATION, FAL, UCL, CLRA, AND FDUTPA CLAIMS MUST BE DISMISSED BECAUSE THE PLAINTIFFS FAILED TO SATISFY THE RULE 9(B) PLEADING STANDARD**

The plaintiffs' claims for intentional misrepresentation under New York, California, and Florida law, as well as under the FAL, UCL, CLRA, and FDUTPA, are "grounded in fraud" and thus must be pled with particularity under Federal Rule of Civil Procedure 9(b).  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Liberty Mut. Ins. Co. v. WAWA Tours, Inc.*, CV-07-0880 (CPS), 2007 WL 2743500, at *6-7 (E.D.N.Y. Sept. 18, 2007); *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002).  For all of these claims, Rule 9(b) requires that the plaintiffs articulate with particularity the "time,

place, and nature of the misrepresentations" (*Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)), including specifically which labels they saw, when they saw them, and what stores they shopped at (*Kearns*, 567 F.3d at 1126). Here, the plaintiffs' allegations do not suffice. Plaintiff Shake does not even explain what Frito-Lay products he purchased, and plaintiffs Gengo and Zuro provide no details about where they purchased Frito-Lay products. And none of the plaintiffs provide details about when they bought Frito-Lay products, at what price, which print media they saw, or when they first became aware of Frito-Lay's "natural" claims. Indeed, the plaintiffs completely fail to allege that they saw or relied on any particular websites or non-label advertisements before purchasing the challenged products. The plaintiffs' vague and conclusory website and advertising claims must be dismissed under Rule 8 and *Twombly*, let alone Rule 9(b).

In addition, as to the plaintiffs' three intentional misrepresentation claims in particular, Rule 9(b) also requires that the plaintiffs plead facts that "give rise to a strong inference of **fraudulent intent**,"—e.g., "knew or were reckless in not knowing" falsity. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128-29 (2d Cir. 1994) (emphasis added); *see also Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1476 (Cal. App. 1st Dist. 1997) ("The requisite state of mind, or scienter, for [] intentional misrepresentation is disbelief in the truth of the statement, i.e., *knowledge of falsity*").[8] The plaintiffs' only allegation relating to this scienter requirement is the barebones statement that Frito-Lay "knew the products were not 'all natural' because they contained GMOs." Compl.

---

[8]   *See also Roohparvar v. Fairchild Semiconductor of CA*, No. C-05-04222-JW, 2006 WL 294797, at *3 (N.D. Cal. Feb. 7, 2006) ("Every element of a fraud cause of action [including misrepresentation, knowledge of falsity, intent to defraud, justifiable reliance and damages,] must be alleged with . . . specificity") (citing *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal. App. 3d 104, 109 (Cal. App. 1976)).

¶ 170.  But such a "conclusory allegation" is clearly insufficient under Rule 9(b).  *See Liberty Mut. Ins. Co.*, 2007 WL 2743500, at *7 (sole allegation that defendant "submitted the application knowing it to contain false information and with the intent to defraud" was "conclusory" and "fail[ed] to establish a 'strong inference'").  The plaintiffs provide no support for their assertion that Frito-Lay "knew" that its labels contained an implicit representation that its products were grown using organic methods (i.e., without the use of modern genetic engineering), in direct contradiction to the instructions from the FDA, USDA, FTC, states, industry, and the explanatory ring on Frito-Lay's labels.  Their intentional misrepresentation claims must be dismissed.  *Id.*, at *6-7 (dismissing intentional misrepresentation claim where plaintiff's conclusory allegations failed to establish a "strong inference of fraudulent intent").

## G.   THE CLAIMS ASKING FOR EQUITABLE RELIEF—OR REQUESTING NO RELIEF—SHOULD BE DISMISSED BECAUSE THE PLAINTIFFS HAVE AN ADEQUATE REMEDY AT LAW

To assert a claim for equitable relief under New York, California or Florida law, a plaintiff must demonstrate that there is no adequate remedy at law.  *See 1659 Ralph Ave. Laundromat Corp. v. Ben David Enters., L.L.C.*, 762 N.Y.S.2d 288, 288-89 (2d Dep't 2003); *Prudential Home Mortg. Co. v. Super. Ct.*, 66 Cal. App. 4th 1236, 1249-50 (1998); *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260-61 (C.D. Cal. 2003); *Matthews v. American Honda Motor Co., Inc.*, No. 12-60630-CIV, 2012 WL 2520675, at *2 & n.2 (S.D. Fla. June 6, 2012).  While the plaintiffs claim that they will suffer irreparable harm without equitable relief such as declaratory relief, restitution, disgorgement, and/or injunctive relief (*see, e.g.*, Compl. ¶¶ 95, 98), they do not provide any basis for this assertion.  Indeed, the plaintiffs have brought damages claims under the MMWA, state express warranty statutes, and the FDUTPA for the very same labels, and on the same basis, as they seek equitable relief.  If the plaintiffs

prevail on their damages claims, they will be adequately compensated.  Thus, their requests for equitable relief must be dismissed.  *See 1659 Ralph,* 762 N.Y.S.2d at 288-89; *Heighley*, 257 F. Supp. 2d at 1260-61; *Matthews*, 2012 WL 2520675, at *2 & n.2.  And because the plaintiffs seek only equitable relief under their GBL § 349, GBL § 350, FAL, UCL, and CLRA claims—and appear to seek no relief at all for their New York, California, and Florida fraudulent misrepresentation claims—those claims should be dismissed in their entirety.  *See Gaul v. N.Y. State Dep't of Envtl. Conservation*, 884 N.Y.S.2d 314 (N.Y. Sup. Ct. 2009); *McAdam v. State Nat'l Ins. Co.*, No. 12cv1333, 2012 WL 4364655 (S.D. Cal. Sept. 24, 2012).

## H.   THE NEW YORK LAW CLAIMS MUST BE DISMISSED TO THE EXTENT THEY APPLY TO NON-NEW YORK CONSUMERS

The plaintiffs assert their New York law claims—GBL §§ 349, 350, breach of express warranty and intentional misrepresentation—on behalf of themselves, a nationwide class and a three state class of New York, California and Florida consumers.  Compl. ¶¶ 92, 100, 147, 168.  These claims must be dismissed as to any consumers who bought their products outside of New York.  It is well-established that GBL §§ 349, 350 apply only to purchases made in New York state because those statutes—by their very terms—apply only to misconduct "in this state."  N.Y. General Business Law § 349(a) McKinney (1963); *id.* § 350; *see Szymczak v. Nissan N. Am., Inc.*, No. 10 CV 7493, 2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) (dismissing under Rule 12(b)(6)); *accord Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 324-325 (2002).  Plaintiffs Gengo, Zuro and Summerlin's GBL claims must be dismissed.

The New York express warranty and intentional misrepresentation claims share the same fate.  Under choice-of-law principles, these claims are governed by the location where each plaintiff purchased the Frito-Lay products.  *See, e.g.*, *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 288 (2d Cir. 2004) ("Under New

32

York conflict of law principles, fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located."); *accord Mazzuocola v. Thunderbird Prods. Corp.*, No. 90-CV-405 (ARR), 1995 WL 311397, at *6 (E.D.N.Y. May 16, 1995) ("Because New Jersey was the point of purchase, it bears the paramount interest in this transaction."); *see also In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 149 (S.D.N.Y. 2008) (applying the law of the state of purchase "for that is the situs of the parties' contracting, negotiation, and performance on the sales contract."); *Magnus v. Fortune Brands, Inc.*, 41 F. Supp. 2d 217, 221 (E.D.N.Y. 1999) (ruling on choice of law on motion to dismiss); Restatement (Second) of Conflict of Laws § 188.   Thus, only plaintiff Shake may raise New York warranty and misrepresentation claims—the other plaintiffs' New York claims must be dismissed.

## I.   THE PLAINTIFFS HAVE NO STANDING TO BRING CLAIMS FOR PRODUCTS THAT THEY DID NOT PURCHASE

The complaint asserts claims as to twenty different Tostitos, SunChips and Fritos Bean Dip products (Compl. ¶ 3), but fails to allege that any of the named plaintiffs purchased <u>eight</u> of those products.[9]   The Supreme Court has squarely and unanimously held that a "plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).   Thus, the plaintiffs do not have standing to bring claims based upon products that they never purchased; their legal rights were not impaired by sales of those products.   *See id.*; *see also Hairston*, 2012 WL 1893818,

---

[9]   These include: (1) Tostitos Bite Size Rounds Tortilla Chips; (2) Tostitos Restaurant Style with a Hint of Jalapeno Flavored Tortilla Chips; (3) Tostitos Restaurant Style with a Hint of Pepper Jack Flavored Tortilla Chips; (4) Tostitos Artisan Recipes Baked Three Cheese Queso Flavored Tortilla Chips; (5) Tostitos Artisan Recipes Roasted Garlic and Black Bean Flavored Tortilla Chips; (6) Tostitos Artisan Recipes Toasted Southwestern Spices Flavored Tortilla Chips; (7) SunChips Jalapeno Jack Flavored Multigrain Snacks; and (8) Fritos Hot Bean Dip.   Compl. ¶¶ 17-20.

at *16 n.5; *Carrea v. Dreyer's Grand Ice Cream, Inc.*, No. C 10-01044 JSW, 2011 WL 159380 (N.D. Cal. Jan. 10, 2011).[10]

The Supreme Court has expressly repudiated the doctrine of "ancillary standing"—*i.e.*, the notion that merely because a plaintiff has alleged injury by one act of a defendant, the plaintiff can bootstrap that one injury to challenge other acts. *See Cuno*, 547 U.S. at 353. This is because "standing is not dispensed in gross" and "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (citing *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)). The Supreme Court has also rejected the theory that named plaintiffs in a class action are subject to less restrictive standing rules. *See Lewis*, 518 U.S. at 357 ("That a suit [has been styled] as a class action . . . adds nothing to the question of standing . . .") (quotation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 502 (1975) (same). This principle flows from the Rules Enabling Act: as Rule 23 is a *procedural* rule, "the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" *See* 28 U.S.C. § 2072(b); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Under these established precedents, the plaintiffs' claims relating to these eight products must be dismissed.

## J.     THE CLAIMS AGAINST PEPSICO, INC. MUST BE DISMISSED

The plaintiffs' claims against PepsiCo, Inc. must be dismissed under *Twombly* and *Iqbal* because the complaint fails to include any non-conclusory

---

[10]   *See also Larsen v. Trader Joe's Co.*, No. C 11-05188 SI, 2012 WL 5458396, at *4-5 (N.D. Cal. June 14, 2012); *Roach v. T.L. Cannon Corp.*, 889 F. Supp. 2d 364 (N.D.N.Y. 2012).

allegations reflecting PepsiCo participation in the challenged labeling or marketing for the challenged <u>Frito-Lay</u> products.  PepsiCo is not a proper defendant in this case.  Conclusory references to "intertwined" and "coordinate[d]" marketing and advertising functions among Frito-Lay and PepsiCo (*see* Compl. ¶ 27) simply do not raise the right to relief against PepsiCo "above the speculative level." *Twombly*, 550 U.S. at 545; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals . . . do not suffice.").

The plaintiffs' assertions regarding PepsiCo's creation of a "Power of One – America's Counsel" or a "Global Snacks Group," have nothing to do with labeling or advertising for Tostitos, SunChips, or Fritos Bean Dip, and do not support their claims.  Compl. ¶¶ 28-30.  Nor do the facts that PepsiCo held an annual shareholder meeting at Frito-Lay's headquarters in Texas, that Frito-Lay shares business functions with other PepsiCo subsidiaries, or that a Frito-Lay executive also serves as a PepsiCo executive, reflect PepsiCo involvement in labeling or marketing for Tostitos, SunChips or Bean Dip.  Compl. ¶¶ 33-35.  As the Supreme Court has expressly held, a parent-subsidiary relationship is insufficient to make the parent liable for the acts of the subsidiary, absent plausible alter ego allegations entirely absent here.  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  And the plaintiffs' references to a <u>Frito-Lay</u> press release from December 28, 2010 mentioning only <u>Frito-Lay</u> actions, and comments by PepsiCo and Frito-Lay executive John Compton about <u>Frito-Lay's</u> labeling initiatives, do not establish a direct claim against PepsiCo for the labeling of Frito-Lay Products.  Compl. ¶¶ 31, 32; *Wilson*, 2013 WL 1320468, at *3-4.

## VI.     CONCLUSION

For the foregoing reasons, the plaintiffs' claims must be dismissed with prejudice.

Dated:  April 19, 2013

By: _____
Andrew S. Tulumello
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Tel:  (202) 955-8500
Fax: (202) 467-0539

*Attorneys for Defendants Frito-Lay North*
*America, Inc., and PepsiCo, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2013, I served the foregoing document on the following

counsel via UPS overnight delivery at the below-listed addresses:

Henry Kelston, Esq.
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
*Interim Class Counsel*

Michael R. Reese, Esq.
REESE RICHMAN, LLP
875 Avenue of the Americas
18th Floor
New York, NY 10001
*Interim Class Counsel*

Dated:  April 19, 2013

Jason R. Meltzer