**MILBERG LLP**
ARIANA J. TADLER
HENRY J. KELSTON
One Penn Plaza, 50th Floor
New York, New York 10119-0165
Telephone:     (212) 594-5300
Facsimile:     (212) 868-1229
atadler@milberg.com
hkelston@milberg.com

**REESE LLP**
MICHAEL R. REESE
GEORGE V. GRANADE
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone:     (212) 643-0500
Facsimile:     (212) 253-4272
mreese@reesellp.com
ggranade@reesellp.com

*Class Counsel*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | Case No. 12-MD-02413-RRM-RLM |
| ) | |
| ) | |
| ) | |
| *Frito-Lay North America, Inc. "All Natural"* ) | |
| *Litigation* ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**JOINT DECLARATION OF MICHAEL R. REESE AND ARIANA J. TADLER IN
SUPPORT OF (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND (2) PLAINTIFFS' MOTION FOR AWARDS OF ATTORNEYS'
FEES, EXPENSES, AND CASE CONTRIBUTION AWARDS**

We, Michael R. Reese and Ariana J. Tadler, declare as follows:

1.      Michael R. Reese is a partner with Reese LLP, court appointed Co-Lead Class Counsel for Plaintiffs in this litigation. Ariana J. Tadler is a partner with Milberg LLP, court appointed Co-Lead Class Counsel for Plaintiffs in this litigation. We respectfully submit this Joint Declaration in support of: (1) Plaintiffs' Motion for Final Approval of Settlement and (2) Plaintiffs' Motion for Awards of Attorneys' Fees, Expenses, and Case Contribution Awards.[1]

2.      Except as otherwise noted, the matters stated herein are based on our personal knowledge or otherwise on information obtained from associates and staff we supervise, and, if called upon, we would competently testify thereto. We make this declaration pursuant to 28 U.S.C. § 1746.

## I.      INTRODUCTION

3.      We are the court-appointed Class Counsel representing the designated representatives of the provisionally certified class—Plaintiffs Julie Gengo, Valarie Zuro, Chris Shake and Deborah Lawson ("Plaintiffs")—and the provisionally certified class (the "Class") in this matter.[2] Milberg LLP and Reese LLP have been responsible for the prosecution of this Litigation and for the negotiation of the Settlement Agreement. Milberg LLP and Reese LLP have vigorously represented the interests of the Class Members throughout the course of the litigation and settlement negotiations.

4.      Plaintiffs' Counsel achieved a favorable Settlement on behalf of the Class after more than five years of work, including substantial investigation and voluminous discovery,

---

[1] The Capitalized terms shall have the meaning ascribed to them in the Parties' Class Action Settlement Agreement ("Settlement Agreement") (ECF No. 100-2).

[2] Memorandum & Order, ECF No. 107 (the "Preliminary Approval Order") , ¶¶6-8.

vigorously contested litigation, and lengthy arm's-length settlement negotiations under the guidance of an experienced and respected neutral mediator.

5. Plaintiffs alleged that Frito-Lay North America, Inc. ("Defendant" or "Frito-Lay") falsely and deceptively labeled and marketed various Tostitos, SunChips, and Fritos Bean Dip products as "Made with All Natural Ingredients" when, in fact, the Products were made from unnatural, genetically-modified organisms ("GMOs"). From the outset, Plaintiffs' main objective in filing the lawsuit was to remedy the alleged deceptions in Frito-Lay's marketing and labeling of the Products.

6. The Products are purchased by tens of millions of consumers each year in virtually every supermarket and convenience store in the country. Annual sales exceed $1.5 billion. Given the importance of the Products to Frito-Lay, and the prominence of the "Made With All Natural Ingredients" in the marketing and labeling of the Products, Plaintiffs did not expect this litigation to be quick or easy or inexpensive; indeed, it was intense, complex and resource-intensive.

7. Through this hard-fought litigation, and the resulting mediated Settlement Agreement, Plaintiffs have obtained significant relief for the Class: Frito-Lay has removed the "Made with All Natural Ingredients" claim from the Products, and has agreed not to label the Products as "natural" as long as the Products continue to include GMO ingredients, unless the use of "natural" claims on products containing GMOs is expressly authorized by FDA guidance or state or federal legislation. In addition, Frito-Lay has agreed not to label the Products as "natural" under any circumstances for the next five years, unless the ingredients in the Products are approved for use in products identified as "natural" by a federal agency or controlling regulatory body. This provision protects the Class against the potentially misleading use of a

"natural" claim on the Products for *any* reason, not just the presence of GMOs in the Products. Frito-Lay has further agreed not to place an affirmative "non-GMO" claim on the Products at any time unless the claim is certified by an independent third-party certification organization.

8.     The labeling changes made by Frito-Lay and the very broad protections provided by the injunctive provisions represent significant and valuable benefits to the Class. Considering that this broad injunctive relief achieves Plaintiffs' primary objective in the litigation, and considering the risks of establishing liability, damages, and maintaining the class action through a trial, Plaintiffs have determined that the benefits of this Settlement outweigh the risks of continued litigation. The potential benefits of continued litigation would be injunctive relief plus potentially nominal monetary damages for Class members. But, even if Plaintiffs succeed at trial, it is unlikely that the injunctive relief obtained would be broader than that obtained in the Settlement and could, in fact, be narrower.

9.     Notably, Frito-Lay acknowledges that the litigation was an important factor in its decision to modify the challenged labeling policies and practices.

10.     This Settlement was achieved with the assistance of an independent, neutral mediator, former United States District Judge Richard J. Holwell (Ret.) (District Court of the Southern District of New York), after mediation sessions over a period of ten months. The Parties reached the mediated Settlement after conducting significant investigation, research, and extensive discovery and protracted and contentious discovery negotiations and motion practice. The Settlement takes into account the substantial risks the Parties would face if the litigation continued.

11.     After reaching agreement on the substantive terms of the Settlement, the Parties, under the supervision and with the assistance of the mediator, also reached agreement as to

amounts for attorneys' fees and expenses to be sought by Plaintiffs' Counsel and, if awarded by the Court, to be paid by Frito-Lay.

12. In accordance with this mediated agreement, Class Counsel now hereby move for an award of $1,900,000 in attorneys' fees, $200,000 in costs and expenses, and payments to named plaintiffs of $5,000 each to Julie Gengo, Valarie Zuro, and Christopher Shake and $2,500 to Deborah Lawson for their participation in the Litigation as plaintiffs on behalf of the Class and their contributions to the success of the lawsuit in obtaining substantial benefits for the Class. The fees and expenses sought are substantially less than the amounts accrued and incurred by Plaintiffs' Counsel during the course of this 5+-year litigation. Defendant does not oppose or object to these applications.

13. Although the Court-ordered October 17, 2017 deadline for Class Members to file objections to the Settlement has not yet passed, as of the date of this Motion, Class Counsel are unaware of any objections to the Settlement or the fee and expense request. To the extent that any objections are submitted before the October 17, 2017 deadline, Plaintiffs may address those objections in a supplemental filing no later than November 4, 2017, seven calendar days before the November 11, 2017 Fairness Hearing. ECF No. 107, ¶ 16.

14. As the record before this Court demonstrates, the favorable outcome in this case is the result of Plaintiffs' Counsel's long and diligent efforts. The amounts requested in fees and expenses for Plaintiffs' Counsel are fair and reasonable, given the actual amounts accrued and incurred, to compensate them for more than five years of work devoted to this case, as well as their unreimbursed expenses incurred in the prosecution of this Litigation. The requested amounts are in line with prior decisions of courts in the Second Circuit.

## A. The Filing of Complaints and Discovery

15. The attorneys representing Plaintiffs and the Class performed extensive work identifying and investigating potential claims and drafting and filing the initial complaints and Amended Consolidated Class Action Complaint with this Court.

16. Plaintiffs allege that defendant Frito-Lay falsely and deceptively labeled and marketed as "Made with All Natural Ingredients" various Tostitos, SunChips, and Fritos Bean Dip products (collectively, the "Products")[3] when, in fact, the Products were made from GMOs.

17. On December 14, 2011, Plaintiff Julie Gengo filed a class action complaint in the Central District of California, alleging that Frito-Lay violated California Business & Professions Code §§ 17500 *et seq.*, California Business & Professions Code §§ 17200 *et seq.*, California Civil Code §§ 1750 *et seq.*, Magnuson-Moss Act 15 U.S.C. §§ 2301 *et seq.*, and breached the California common law of express warranty.

18. On December 28, 2011, Plaintiff Valarie Zuro filed a similar complaint, also in the Central District of California alleging the same violations against Frito-Lay.

19. On January 27, 2012, Plaintiff Chris Shake filed a complaint in the Eastern District of New York alleging that Frito-Lay and its parent company, PepsiCo, Inc. ("PepsiCo") violated the New York General Business Law § 349 and § 350, and breached the New York common law of express warranty.

20. By Order entered on March 20, 2012, the Gengo, Zuro and Shake actions were consolidated and Milberg LLP and Reese Richman LLP were appointed as interim class counsel.[4]

---

[3] *See* Settlement Agreement, at Paragraph 1.20 for list of the Products.
[4] On March 9, 2015, Reese Richman LLP filed a notice that it had changed its name to Reese LLP (ECF No. 90).

21.     A consolidated complaint was filed on July 3, 2012 in the Eastern District of New York, adding Lisa Summerlin as a plaintiff. The consolidated complaint also added allegations that Frito-Lay and PepsiCo violated the Florida Deceptive and Unfair Trade Practices Act, breached the Florida common law of express warranty and intentional misrepresentation, and violated the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.*).

22.     A number of follow-on suits were filed in various district courts around the country. Defendant Frito-Lay and former defendant PepsiCo moved before the Judicial Panel on Multidistrict Litigation to centralize all of the actions for coordinated proceedings. The JPML centralized the pending actions before this Court in orders dated December 12, 2012, December 21, 2012, and August 8, 2013 (ECF Nos. 1, 2, and 36). This Court consolidated all of the actions in the MDL for pre-trial proceedings in orders dated January 25, 2013 and August 9, 2013 (ECF No. 39). Milberg LLP and Reese Richman LLP were appointed as interim co-lead class counsel by the January 25, 2013 Order.

23.     On April 4, 2013, following letter-briefs to the Court, the Court held a pre-motion conference and set a schedule for the briefing of Defendants' Motion to Dismiss, and denied Defendants' request to stay discovery in the interim (ECF No. 13). Defendants served their opening brief on April 19, 2013, along with a Motion for Judicial Notice, which Plaintiffs opposed on May 31, 2013. Defendants served reply papers on June 26, 2013 (ECF Nos. 29, 30), and at that time the complete bundled motions were filed with the Court.

24.     By Order dated August 29, 2013 (ECF No. 38), the Court dismissed PepsiCo as a defendant and dismissed Plaintiffs' nationwide Magnuson-Moss claim but denied the vast majority of Defendant's motion. In a 56-page opinion, the Court ruled that neither preemption

nor the primary jurisdiction doctrine applied, and that Plaintiffs' complaint more than adequately met the pleading requirements of Rule 9(b).

25.     The Amended Consolidated Complaint, the operative complaint in the litigation, was filed on December 3, 2013 (ECF No. 51). PepsiCo was named by Plaintiffs in the Amended Consolidated Complaint despite having been dismissed as a defendant in order to preserve claims against it for possible appeal.

26.     By Order dated December 2, 2013, the Court granted Plaintiffs' motion for the withdrawal of Ms. Summerlin, addition of Deborah Lawson as Plaintiff, and Leave to File an Amended Consolidated Complaint Reflecting Change of Plaintiff.

27.     Meanwhile, with the Court having denied defendants' request for a stay of discovery in early April 2013, extensive discovery was ongoing. On February 22, 2013, Plaintiffs served their first Request for Production of Documents to Frito-Lay and PepsiCo, and Defendants served their first Request for Production of Documents to Plaintiffs on April 16, 2013.

28.     In total, Plaintiffs served three separate sets of document requests, to which Frito-Lay responded with twelve separate document productions totaling over 324,000 pages, which Plaintiffs reviewed. Plaintiffs served Requests for Admission on both PepsiCo (prior to its dismissal as a defendant) and Frito-Lay. Plaintiffs responded to multiple document requests from Frito-Lay, producing over 1,400 pages, and each named Plaintiff responded to interrogatories from Frito-Lay as well.

29.     Plaintiffs Julie Gengo and Valarie Zuro were deposed in San Francisco, California. Plaintiff Chris Shake was deposed in New York, New York. The deposition of

Plaintiff Deborah Lawson was postponed shortly before it was scheduled to occur in Florida in December 2014, as the Parties agreed to enter mediation.

30.     Between August 2013 and January 2014, the Parties engaged in protracted and highly contentious discovery negotiations concerning the adequacy of Frito-Lay's efforts to search for and produce relevant documents, Frito-Lay's objections to Plaintiffs' notice for a Rule 30(b)(6) deposition, and Frito-Lay's requests concerning Plaintiffs' purchases from various retailers.

31.     In late January 2014, the Parties sought relief from the Court regarding the dispute over the adequacy of Frito-Lay's search and production protocol—Plaintiffs via a motion to compel and Defendant via a motion for protective order. After responsive filings and telephone conferences and a four-hour in-person hearing before Magistrate Judge Mann in March 2014, Plaintiffs' proposed search protocol was adopted by the Court with minimal changes.

32.     This unusual victory for Plaintiffs represented the culmination of hundreds of hours of work (over 500 hours by Milberg LLP and Reese LLP alone) devoted to the electronic discovery and search protocol issue, a dispute that involved more than twenty letters, dozens of emails, and numerous "meet and confer" sessions between counsel for both sides.

33.     Following entry of the Court's Order approving Plaintiffs' proposed search protocol, the Parties engaged in further meet and confer discussions regarding the implementation of the search protocol and then executed the detailed steps for that protocol. Frito-Lay began producing additional documents on August 5, 2014.

34.     At the Court's suggestion in early 2014, certain depositions of Frito-Lay employees were deferred until Frito-Lay's document production was substantially complete. Following Frito-Lay's August 2014 document production, interim co-lead class counsel

scheduled and took five depositions of mid-level and senior Frito-Lay employees in Dallas, Texas.

35.     Plaintiffs also pursued significant third-party discovery. Plaintiffs subpoenaed PepsiCo, resulting in a document production that led to protracted negotiations about the adequacy of PepsiCo's search and production protocol. Plaintiffs also issued subpoenas to trade organizations with relevant information, including the Grocery Manufacturers Association and the International Food Information Council, both of which produced documents in response. Plaintiffs also sought detailed sales and pricing information for the Products through subpoenas to The Nielsen Company (U.S.) LLC, and Information Resources, Inc. Finally, anticipating a possible challenge to the ascertainability of the class, Plaintiffs issued subpoenas to nineteen third-party retailers seeking information about the identities of individuals who purchased the Products during the relevant time period, resulting in the production of over one gigabyte of data identifying hundreds of thousands of potential class members.

36.     The Parties also engaged in extended negotiations regarding Frito-Lay's requests for documents concerning Plaintiffs' purchases of "consumable" items at various retailers. Ultimately, those negotiations failed and Frito-Lay filed a motion to compel, which Plaintiffs opposed. The motion was later terminated as moot.

37.     By the end of October 2014, Frito-Lay had made twelve separate productions of 36,670 documents totaling over 324,000 pages.

**B.      Settlement Negotiations and Mediation**

38.     On December 8, 2014, at the request of the Parties, the Court ordered a stay of all proceedings to enable the Parties to engage in mediation. At the time the stay was entered, deposition notices were outstanding for four senior current or former employees of Frito-Lay and PepsiCo, including John Compton (former CEO of PepsiCo), Albert Carey (former president and

CEO of Frito-Lay), and Ann Mukherjee (former senior vice president and Chief Marketing Officer of Frito-Lay). In addition, the Parties were negotiating search terms and custodians for additional document productions by Frito-Lay.

39.     The Parties agreed to engage former United States District Judge Richard J. Holwell (Ret.) as mediator.

40.     The Parties held an all-day mediation session with Judge Holwell on December 17, 2014, but were unable to reach agreement on settlement terms. The Parties reconvened with Judge Holwell on December 22, 2014.

41.     Over the next ten months, Plaintiffs and Frito-Lay continued their negotiations directly and with the assistance of Judge Holwell. Another in-person mediation session was held on April 14, 2015. On September 9, 2015, after another in-person mediation session with Judge Holwell, the Parties reached agreement on the terms of this Settlement.

42.     The claim challenged in this lawsuit – the "Made with All Natural Ingredients" claim on the packaging of each of the Products – was removed from the Products by Frito-Lay during the litigation and, for the purposes of the Settlement, Frito-Lay acknowledges that this litigation was an important factor in its decision to remove the challenged claim.[5]

**C.     Settlement Agreement and Recognition Of The Difficulties Associated With Litigation**

43.     This Settlement was achieved with the assistance and under the supervision of Judge Holwell, after numerous in-person and telephonic mediation sessions over a period of ten months.

44.     On September 9, 2015, the Parties reached an agreement in principle and then began the process of negotiating and preparing the Settlement Agreement and the corresponding

---

[5] *See* Exhibit 1, Settlement Agreement, at Paragraph 5.1.

papers; selecting a Class Action Administrator for the purposes of distributing notice to the class; and formulating a proposed notice plan.

45.     The Parties formalized the Settlement in a long-form Settlement Agreement that was fully executed on November 10, 2015.

46.     The Parties negotiated the requested attorneys' fees and expenses with the assistance of Judge Holwell after extensive negotiation and after agreement in principle on all other substantive terms.

47.     Based on extensive investigation and discovery, Plaintiffs believe that they could obtain class certification, defeat all dispositive motions filed by Defendant, and proceed to a trial on the merits. Notwithstanding their being convinced as to the merits of the case, Plaintiffs also recognize the substantial risks involved in continuing this litigation, particularly in the face of developing case law and regulations under consideration.

48.     All complex class actions are uncertain in terms of ultimate outcome, difficulties of proof, and duration, and this action is no different. There is always the possibility that we may not prevail if this action continues. Plaintiffs and Class Counsel recognize, however, the expense and length of continued proceedings necessary to prosecute the claims in this over five-year-old litigation through trial and appeal and have taken into account the uncertain outcome and risk of litigation, as well as the difficulties and delays inherent in such litigation. Plaintiffs and Class Counsel also recognize that Defendant has several factual and legal defenses that, if successful, would defeat or substantially impair the value of Plaintiffs' claims. They believe the settlement articulated in the Settlement Agreement provides substantial benefits for Class Members. Based on the above-described evaluation, they have determined that the settlement set forth in the Settlement Agreement is fair, reasonable, and adequate and in the best interest of the Class.

49.     Defendant has denied, and continues to deny that its labeling of the challenged Frito-Lay Products is false, deceptive, or misleading to consumers or violates any legal requirement.

50.     On November 10, 2015, Plaintiffs moved for preliminary approval of the Settlement (ECF No. 100).

51.     In response to the CAFA Notice after the preliminary approval filing, the Parties were contacted by representatives of the state Attorneys General from California, Illinois, New York, Texas, and Washington. By letter dated June 1, 2016, (ECF No. 103), Plaintiffs informed the Court that the Parties intended to implement a minor change to the language of the Proposed Preliminary Approval Order, (ECF No. 100, Ex. 1 & Ex. E): in order to prevent any possible misunderstanding, the Parties agreed to clarify their intention that the proposed settlement would not prohibit class members from participating in or receiving benefits from any action initiated by a governmental or regulatory body.

52.     Accordingly, on June 17, 2016 the Parties filed an amended Proposed Order adding language to Paragraph 20 (Stay of Collateral and Related Litigation) of the Proposed Order: "Provided, however, nothing in this paragraph shall be construed to prohibit Class Members from participating in or receiving benefits from any government or regulatory-initiated enforcement action." (ECF No. 104)

53.     With this added language, the Court granted preliminary approval on August 24, 2017 (Memorandum & Order, ECF No. 107 (the "Preliminary Approval Order")).

**D.      Time and Expense Incurred In the Prosecution Of The Action**

54.     Plaintiffs' Counsel have not received any payment throughout this Litigation, which they have been working on since 2011.

55.     The hours worked, the lodestar fee calculation, and unreimbursed costs and expenses for each of the three firms who did substantial work for the Class are set forth in the attorney declarations, attached as Exhibits A, B, and C. They can be summarized as follows:

| PLAINTIFFS' COUNSEL'S TIME | | | |
|---|---|---|---|
| EXHIBIT | FIRM | HOURS | LODESTAR |
| A | MILBERG LLP | 5,234.40 | $2,815,975.50 |
| B | REESE LLP | 2,035.25 | $1,676,606.25 |
| C | LAW OFFICES OF JULIO J. RAMOS | 440.25 | $316,443.75 |
| | TOTAL | 7,709.90 | $4,809,025.50 |

| PLAINTIFFS' COUNSEL'S EXPENSES | | |
|---|---|---|
| EXHIBIT | FIRM | EXPENSES |
| A | MILBERG LLP | $215,211.06 |
| B | REESE LLP | $36,790.26 |
| C | LAW OFFICES OF JULIO J. RAMOS | $650.91 |
| | TOTAL | $252,652.23 |

56.     As of October 1, 2017, Plaintiffs' Counsel have billed 7,709.90 contingency fee hours on this case for a combined lodestar of $4,809,025.50. This excludes any work that will take place subsequent to the filing of this motion. They have also incurred $252,652.23 in unreimbursed costs and expenses.

57.     Plaintiffs' Counsel also will incur additional time and expenses in connection with the fairness hearing and any post-settlement administration, coordinating with the settlement administrator, monitoring settlement administration, and responding to Class Members' inquiries.

58.     All firms made an effort to prevent duplication of work or inefficiencies that might result from having multiple firms working on the case.

59.     Based on our experiences, the hourly rates charged by our firms are within the range of rates that attorneys of equivalent experience and skill, who practice at firms involved in nationwide class action litigation, charge. In determining the firms' hourly rates from year to year, the partners consider rates that counsel at other national class actions firms seek, and we appropriately and thoughtfully set our hourly rates. The hourly rates for the partners, attorneys, and professional staff are the same as the regular rates charged for these services, and they have been accepted and approved in other recent class action litigation. Such cases include:

- *Huyer v. Wells Fargo & Co.*, Case No. 08-cv-00507-RP-CFB (S.D. Iowa 2016);

- *Frohberg v. Cumberland Packaging Corp.*, Case No. 1:14-cv-0748-RLM (E.D.N.Y.);

- *Ferrera v. Snyder's-Lance, Inc.*, case no. 13-cv-62496 (S.D. Fla.)

- *Wong v. Alacer Corporation*, Case No. CGC-12-519221 (San Francisco Super. Ct. 2014);

- *Denning v. Clearwire Corp.*, Case No. 010-cv-01859 (W.D. Wash. 2013);

- *Finley v. CVS Pharmacies, Inc.*, Case No. 08-L-616 (Madison Co. Super. Ct. 2012);

- *Chin v. RCN Corp.*, Case No. 08-cv-0749 (S.D.N.Y. 2011); and

- *Yoo v. Wendy's Corp.*, Case No. 07-4515 (C.D. Cal. 2009).

60.     Based on the high degree of experience of Milberg LLP and Reese LLP in the area of consumer and class action litigation and the nationwide nature of the resolution in this case, we believe it is appropriate to apply the market rates for the home market for each attorney at the firms.

### E. Dedication To Pursuit Of This Matter and The Risk Involved

61.     In addition to the hours Milberg LLP's and Reese LLP's partners, associates, and staff have expended on this case, we took great financial risk in advancing costs and expenses associated with the prosecution of the action. Our firms took this matter on a contingent basis, agreeing to advance all costs and expenses necessary to prosecute the litigation. This constituted a considerable risk for our firms, as there was no guarantee we would recoup any of the costs or fees. Indeed, our firms have lost hundreds of thousands of dollars in expenses in similar actions that did not result in settlement or a plaintiffs' verdict after trial; and in this case, the requested fees and expenses are substantially less than what our two firms alone accrued and incurred, respectively.

### F. The Terms Of The Settlement

#### 1. Defendant Has Changed Product Labeling and Agrees To Injunctive Relief

62.     During the course of the litigation, Frito-Lay removed the "Made With All Natural Ingredients" claim from the Products. Frito-Lay acknowledges that this litigation was an important factor in its decision to modify the labeling and marketing challenged in this lawsuit.[6]

63.     As part of the Settlement, Frito-Lay has agreed to further modify its labeling policies and practices for the Products. Specifically, the Settlement Agreement provides for the following:

- Frito-Lay will refrain from labeling, marketing, or advertising the Products as "Made With All Natural Ingredients" or "natural" unless the FDA issues express guidance, or federal or state legislation is enacted authorizing use of a "natural" claim on a product containing GMO ingredients. *See* Settlement Agreement, ¶ 4.1.1.

---

[6] *See* Settlement Agreement, ¶ 5.1.

- Frito-Lay will not make a non-GMO claim on the Products unless the claim is certified by an independent third-party certification organization. *See* Settlement Agreement, ¶ 4.1.2.

- Frito-Lay will modify its main FAQ page at http://www.fritolay.com/faq and FAQ Nutrition Page at http://www.fritolay.com/nutrition/nutrition-faq.html to direct consumers looking for non-GMO ingredients to appropriate Frito-Lay products. *See* Settlement Agreement, ¶ 4.1.3.

- In addition, to protect consumers against the potentially misleading use of a "natural" claim on the Products for reasons *other than* the presence of GMOs in the Products, for a period of five years, Frito Lay will not label the Products as "natural" unless the ingredients are approved or determined as acceptable for products identified as "natural" by a federal agency or controlling regulatory body. *See* Settlement Agreement, ¶ 4.1.1.2.

### 2. Defendant Agrees to Class Certification for Settlement Purposes Only

64. For purposes of settlement only, the Parties seek confirmation of certification of the Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). Defendant agreed to certification of the Class for purposes of achieving settlement and does not consent to certification of the Class (or to the propriety of class treatment) for any purpose other than to effectuate the Settlement.

### 3. Defendant Will Pay the Notice and Class Action Administrator

65. The Settlement Agreement specifies that Defendant will pay the actual cost of class notice, up to $215,000. *See* Settlement Agreement, ¶ 6.1. The Court approved the designation of Dahl Administration, LLC to serve as the Court-appointed class action administrator. Preliminary Approval Order (ECF No. 107), ¶ 9.

####          4.    **Defendant Will Pay Court-Ordered Attorneys' Fees and Expenses**

66.      The Settlement Agreement provides that Class Counsel may apply for $1,900,000 for fees and $200,000 in costs and expenses. Frito-Lay will pay up to these amounts, as awarded by the Court. These figures were agreed to by the Parties with the assistance of Judge Holwell as mediator after extensive negotiation and after agreement on all other substantive terms had been reached. The Parties recognize that the Court shall have the final authority to award the amount of fees and expenses. *See* Settlement Agreement, ¶ 10.1.

###       G.    **Defendant Will Pay Court-Ordered Awards to the Class Representatives**

67.      The Settlement Agreement also provides that Defendant will not oppose an application for awards of up to $5,000 each to named plaintiffs Julie Gengo, Valarie Zuro, and Christopher Shake (each of whom sat for depositions) and up to $2,500 for Deborah Lawson (whose deposition was cancelled a few days before it was to take place). The Parties acknowledge the Court shall have the final authority to determine the amount of the awards up to these amounts in recognition of their service as plaintiffs in this action and the time expended by each of them. Defendant will pay up to these amounts, as awarded by the Court. *See* Settlement Agreement, ¶ 10.3.

## II.    **THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE FINALLY APPROVED**

68.      The Settlement is fair, adequate, and reasonable. It provides substantial non-monetary benefits to the Class. The Settlement provides the primary relief sought by the Class—the assurance that the Products will not be labeled, marketed or advertised as "natural" unless the use of "natural" claims on products containing GMOs is expressly authorized by FDA guidance or state or federal legislation. The Settlement accomplishes this while avoiding both the

uncertainty and the delay that would be associated with further litigation. It represents a fair compromise of the Parties' respective positions in the Litigation and enables each Party to put an end to the Litigation, thus avoiding its costs and risks. Finally, the Settlement was reached through arm's-length negotiations as part of a supervised mediation process. Class Counsel, who have significant experience in litigating class actions, support the Settlement as fair, reasonable, and adequate and providing reasonable relief to the Class.

69. Class Counsel worked steadfastly to litigate this matter and reach the Settlement. While Plaintiffs and Class Counsel believe the claims resolved have merit, they also recognize that there is significant expense and risk associated with continuing to prosecute the claims through trial and appeal. Class Counsel has taken those uncertainties into account as well as the delays inherent in such litigation. In the process of investigating and litigating this case, Class Counsel have conducted significant research on the various consumer protection statutes at issue as well as the overall legal landscape to determine the likelihood of success and the reasonable parameters for which like settlements have been approved. They believe the Settlement provides significant relief to the Class. Accordingly, Class Counsel have determined that the Settlement is fair, reasonable, and adequate, and in the best interests of the Class.

A. **The Settlement Is Procedurally Fair: the Settlement is the Result of Good Faith, Arm's-Length Negotiations by Well-Informed, Highly-Experienced Counsel with the Assistance of a Mediator Conducted after Significant Discovery**

70. A proposed settlement is entitled to a "presumption of fairness" where, as here, the process leading to the proposed settlement was fairly conducted by highly qualified counsel who sought to obtain the best possible result for their clients (and, in the case of Class Counsel, the Class). Counsel for the Parties have a substantial amount of experience in litigating class actions as well as negotiating class settlements. As detailed above, before agreeing to a

Settlement, Class Counsel conducted extensive investigation, engaged in discovery, and weighed the risks of continued litigation. It was through this process that Class Counsel was able to obtain a thorough understanding of the strengths and weaknesses of their case and Defendant's case and to evaluate and negotiate the Settlement.

71. The fairness of the settlement here is bolstered by the fact that the Parties engaged in mediation with the assistance of former United States District Judge Richard J. Holwell, serving as mediator. The participation of an experienced mediator in settlement negotiations further establishes a settlement's fairness.

72. Based on the foregoing, the Settlement is procedurally fair.

**B. The Settlement Is Substantively Fair: The *Grinnell* Factors Weigh in Favor of Granting Final Approval**

**1. The complexity, expense and likely duration of litigation (*Grinnell* factor 1)**

**73.** Consumer class action lawsuits, like this action, are complex, expensive, and lengthy. Plaintiffs filed this action more than five years ago. Since then, the action has prompted multiple motions to transfer, a motion for dismissal, private mediation (with multiple sessions over a 10-month period), extensive discovery, and multiple disputes over its scope. Should this Court not approve the Settlement, this lengthy and contentious litigation would resume, with disputes likely occurring over remaining discovery, class certification, summary judgment motions, and expert testimony. Moreover, the benefits of reverting to litigation and the likelihood of success would be uncertain.

**2. The reaction of the class to the settlement (*Grinnell* factor 2)**

74. The deadline for Class Members to file objections to the Settlement is October 17, 2017. Preliminary Approval Order, at ¶¶ 11, 12, 25c-d. Although this deadline has not yet passed, as of the date of this motion, Class Counsel are unaware of any objections to the

Settlement.[7] A relatively small number of objections compared to the overall size of the Class would weigh in favor of the proposed Settlement.

### 3. The stage of the proceedings and the amount of discovery completed (*Grinnell* factor 3)

75.     The Court denied Defendants' request to stay discovery prior to its ruling on their motions to dismiss. Accordingly, discovery commenced early on with initial discovery requests proffered by Plaintiffs on February 22, 2013. After the Court's August 29, 2013 Order on the motion to dismiss, the Parties engaged in significant discovery, including interrogatories, requests for admission, document production and litigation of multiple motions to compel. Defendant has produced over 324,000 pages of documents to date, including more than 18,000 produced consequent to Magistrate Judge Mann's Order granting Plaintiffs' Motion to Compel additional discovery. Plaintiffs also subpoenaed and obtained documents from PepsiCo and several third-party retailers of the Products and deposed five Frito-Lay witnesses in Dallas, Texas, near Frito-Lay headquarters. Three of the four Plaintiffs appeared for depositions (the remaining deposition was postponed). Thus, Plaintiffs had sufficient information to evaluate the terms of the proposed settlement.

### 4. The risks of establishing liability, damages and of maintaining the class action through the trial (*Grinnell* factors 4, 5 and 6)

76.     In the absence of a settlement, this expensive and protracted litigation would continue on, with no guaranteed or inevitable favorable outcome. Although Plaintiffs believe that they could succeed in obtaining the certification of a class here, they also recognize that they face several obstacles to obtaining and maintaining class certification. First, it may be difficult

---

[7] To the extent that any objections are submitted before the October 17, 2017 deadline, Plaintiffs may address those objections in a supplemental filing no later than November 7, 2017, seven calendar days before the November 14, 2017 Fairness Hearing. Preliminary Approval Order, at ¶¶ 16, 25f (ECF No. 107).

(although not impossible) to quantify the precise amount of monetary damages suffered by the class. Plaintiffs recognize the challenge of quantifying the effect of the "Made With All Natural Ingredients" claim across more than twenty separate products, where the time periods during which the challenged claim appeared on the Product packaging vary not only among the Products but also among the various package sizes in which each Product was sold. The variations in the labeling dates also may create difficulties in ascertaining class members, as consumers may have difficulty recalling which variety and which package size they purchased during a particular time period. Class Counsel is also mindful of the inherent problems of proof related to the claims and defenses asserted in the Litigation.

### 5. The ability of Defendants to withstand a greater judgment (*Grinnell* factor 7)

77.　　According to PepsiCo's 2016 Annual Report, Frito-Lay's net revenues exceeded $15.5 billion in 2016. As such, Plaintiffs have no reason to believe that Frito Lay could not withstand a monetary judgment. But the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that a settlement is unreasonable or inadequate.

### 6. The range of reasonableness of the settlement in light of the best possible recovery and in light of all the attendant risks of litigation (*Grinnell* factors 8 and 9)

78.　　The relief provided by the Settlement Agreement is within the range of reasonableness, in light of the best possible recovery and in light of all the attendant risks of litigation. Courts have consistently approved injunction-only settlement agreements that resolve deceptive and false food labeling class actions. *See, e.g., Guttmann v. Ole Mexican Foods, Inc.*, No. 14-cv-04845-HSG, 2016 U.S. Dist. LEXIS 100534 (N.D. Cal. Aug. 1, 2016); *Lilly v. Jamba Juice Co.*, No. 13-cv-02998, 2015 U.S. Dist. LEXIS 58451 (N.D. Cal. May 1, 2015); *In re*

*Quaker Oats Labeling Litig.*, No. 5:10-cv-00502-RS, 2014 U.S. Dist. LEXIS 104817 (N.D. Cal. July 29, 2014).

79.     Should Plaintiffs succeed at trial, the injunctive relief obtained is unlikely to be broader than that obtained in the Settlement and could, in fact, be narrower. The Settlement Agreement provides the primary relief sought by the Class—the labeling and marketing of the Products have been modified and, as long as the Products contain GMOs, they will not be labeled, marketed or advertised as "natural" unless the use of "natural" claims on products containing GMOs is expressly authorized by FDA guidance or state or federal legislation. Further, and providing even broader benefit to the Class, the Products will not be labeled as "natural" under any circumstances for the next five years, unless the ingredients in the Products are approved for use in products identified as "natural" by a federal agency or controlling regulatory body.

80.     Frito-Lay acknowledges, for purposes of settlement, that the litigation was an important factor in its decision to modify the labeling and marketing challenged in this lawsuit. *See* Settlement Agreement, ¶ 5.1. The Settlement Agreement provides the primary relief sought in the Litigation – *i.e.,* injunctive relief that prohibits and restricts the Products from being labeled, marketed or advertised as "natural" unless the use of "natural" claims on products containing GMOs is expressly authorized by FDA guidance or state or federal legislation. The Settlement prohibits the labeling, marketing or advertising of the Products as "natural" for a period of five years unless the ingredients are expressly approved or determined as acceptable for products identified as "natural" by a federal agency or controlling regulatory body. The Settlement also prohibits the placement of an affirmative "non-GMO" claim on the Products unless the claim is certified by an independent third-party certification organization. *See*

Settlement Agreement, §§ 3-4. This relief constitutes a "complete relabeling of . . . challenged products," and amounts to "meaningful injunctive relief . . . within the range of possible recoveries by the Class." *See In re Quaker Oats Labeling Litig.*, 2014 U.S. Dist. LEXIS 104817, *8.

81.     Thus, consideration of the range of reasonableness of the settlement in light of the best possible recovery and in light of all the attendant risks of litigation weighs strongly in favor of approving the Settlement.

## III.     THE COURT SHOULD CONFIRM CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES

82.     The proposed settlement class satisfies all of the prerequisites of Rule 23(a) and (b)(2). In its August 24, 2017 Memorandum & Order, the Court certified the Class under Rule 23(b)(2), for settlement purposes only, while providing Class Members who do not wish to participate in the Settlement the right to submit written requests to be "excluded from" or to "opt-out" of the Settlement. Plaintiffs respectfully ask the Court to confirm certification of the Class for settlement purposes.

### A.     The Class Meets All Rule 23(a) Prerequisites

#### 1.     Numerosity Under Rule 23(a)(1)

83.     The Class is "obviously numerous." *Marisol A.*, 126 F.3d at 376. The Products are purchased by consumers each year in virtually every supermarket and convenience store in the country. Annual sales exceed $1.5 billion. Accordingly, the Class here clearly meets the numerosity prerequisite of Rule 23(a).

### 2. Commonality Under Rule 23(a)(2)

84.     Class Members bring claims that centrally depend on the resolution of a common contention—whether the Products' labeling would mislead a reasonable consumer. Thus, the commonality prerequisite of Rule 23(a) is satisfied here.

### 3. Typicality Under Rule 23(a)(3)

85.     The claims of the representative Plaintiffs are typical of the Class' claims. The Plaintiffs and the rest of the Class purchased the Products and challenge the use of "natural" labeling on the Products, which Plaintiffs contend were made from corn containing GMOs and which Plaintiffs contend is misleading and violates the Magnuson-Moss Warranty Act,[8] California, Florida, and New York deceptive trade practices statutes and the common law. Again, as with the numerosity and commonality prerequisites, the typicality prerequisite is met.

### 4. Adequacy of Representation Under Rule 23(a)(4)

86.     Here, the adequate representation prerequisite is satisfied. The Plaintiffs have no fundamental conflicts with other Class Members' interests, as they seek the same type of relief (injunctive relief) and assert the same legal claims as other Class Members. They have diligently served as class representatives throughout this litigation, providing discovery responses and all but one appeared for depositions (the remaining deposition was postponed). Class Counsel are qualified, experienced and able to conduct the litigation and have extensive experience in class action litigation and consumer advocacy. Thus, the adequate representation prerequisite is met.

### B.      The Class Meets the Requirements of Rule 23(b)(2)

87.     The Class, as a class seeking injunctive relief, meets all Rule 23(b)(2) requirements, and the Court should certify it for purposes of this Settlement.

---

[8] Plaintiffs' Magnuson-Moss claims have been dismissed but remain subject to possible appeal.

88.     Plaintiffs here seek only class-wide injunctive relief. Like the class members in *Sykes*, this relief would, in remedying the Products' labeling, benefit each Class Member at once. Equitable relief in the form of an injunction would be an appropriate remedy. Accordingly, the Class should be found to meet Rule 23(b)(2) and, as the Class also satisfies the Rule 23(a) prerequisites, the Class should be certified for injunctive relief.

## IV.     PLAINTIFFS' COUNSEL AND PLAINTIFFS HAVE INVESTED SIGNIFICANT TIME IN THE PROSECUTION OF THIS ACTION AND ARE ADEQUATE REPRESENTATIVES OF THE CLASS

89.     Throughout the course of investigation, pleadings, motion practice, discovery, mediation and filing of the Settlement and accompanying motion with the Court, Plaintiffs' Counsel have devoted significant time to the investigation, development, and resolution of this action.

90.     Each Plaintiff performed an important and valuable service for the benefit of the Class. Each met, conferred, and corresponded with Plaintiffs' Counsel as needed for the efficient prosecution of this litigation.

91.     Each Plaintiff has participated in numerous interviews by Plaintiffs' Counsel, provided personal information concerning this litigation, and remained intimately involved in the mediation and litigation processes. Each Plaintiff has produced responsive documents to Frito-Lay in response to document requests, and each invested additional time assisting counsel in obtaining Plaintiffs' purchase records from various retailers.

92.     Each Plaintiff made herself or himself available for deposition. Plaintiffs Julie Gengo, Chris Shake, and Valarie Zuro were deposed by Frito-Lay, and Deborah Lawson prepared for her deposition with Plaintiffs' Counsel before it was ultimately postponed as the Parties pursued mediation.

93.     Each Plaintiff actively participated in discussions with Plaintiffs' Counsel related to the Settlement.

94.     Class Counsel has substantial experience with consumer class actions in general and with consumer fraud and false advertising, specifically.

95.     Milberg LLP has been involved in the prosecution of class action and consumer matters including, but not limited to:

- *In re General Mills, Inc. Kix Cereal Litigation*, No. 2:12-cv-00249-KM-JBC (D.N.J.);

- *In re ConAgra Foods, Inc.*, No. 2:11-cv-05379 MMM (AGRx) (C.D. Cal.);

- *In re Target Corporation Customer Data Security Breach Litig.*, MDL No. 14-2522 (PAM/JJK);

- *Novak v. Pacific Bioscience Labs., Inc., et al*, No. BC582188 (Super. Ct. Cal., Los Angeles Cnty. Ct.);

- *Michael v. Shop-Vac Corp.*, No. 2:12-cv-00726-ES-CLW (D.N.J);

- *Sturdivant v. Pella*, No. 5:16-cv-00615-MMH-PRL (M.D. Fla.)

- *In re Intuit Data Litig.*, No. 5:15-cv-01778-EJD (N.D. Cal.)

- *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal.); and

- *Torres, et. al. v. Wendy's International, LLC.*, No. 6:16-cv-210-Orl-40DCI (M.D. Fla.).

Milberg LLP's Firm Resume is attached hereto as Exhibit 3 to Exhibit A.

96.     Reese LLP has been appointed as class counsel for the prosecution of food-related class actions including, but not limited to:

- *In re General Mills, Inc. Kix Cereal Litigation*, No. 2:12-cv-00249-KM-JBC (D.N.J.);

- *In re Vitaminwater Sales and Marketing Practices Litig.*, No. 1:11-md-02215-DLI-RML (E.D.N.Y.);

- *Wong v. Alacer Corp.*, No. CGC-12-519221 (San Francisco Superior Court);

- *Howerton v. Cargill, Inc.*, No. 13-cv-00336- LEK-BMK (D. Hawaii);

- *Red v. Unilever United States, Inc.*, No. 5:10-cv-00387 (N.D. Cal.); and

- *Yoo v. Wendy's Int'l Inc.*, No. 07-CV-04515-FMC (C.D. Cal.).

Reese LLP's Firm Resume is attached hereto as Exhibit 3 to Exhibit B.

### A. The Notice To The Class Satisfies The Requirements Of Rule 23 and Due Process

97. Rule 23(e) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by" a proposed settlement. Fed. R. Civ. P. 23(e)(1).

98. For a Rule 23(b)(2) class such as the one in this Settlement, Rule 23(c)(2)(A) states that "the court may direct appropriate notice to the class." Here, the Parties developed a notice program with the assistance of Dahl Administration, LLC, a company that specializes in the development and implementation of notice and settlement administration, which in Dahl's expert opinion, provides the best notice practicable under the circumstances to the members of the Class and complies with Rule 23(c)(2)(B).[9] *See, e.g., In re Quaker Oats Labeling Litig.*, 2014 U.S. Dist. LEXIS 104817, *6.

---

[9] The Notice Plan was described in the Affidavit of Jeffrey D. Dahl with Respect to Settlement Notice Plan, attached to the Settlement Agreement as Exhibit C (ECF No. 100-2). It and its supporting exhibits provide more details on the sufficiency and proposed implementation of the Notice Plan.

## B. The Method of Notice is Appropriate

99.     As discussed in the Dahl affidavit filed in connection with preliminary approval, the notice to the Class includes: (a) comprehensive web-based notice using paid banner ads on targeted websites; (b) additional web-based notice using "keyword" searches displaying banner ads; (c) social media ads targeting relevant interest areas; (d) publication of the Summary Notice in *People* magazine and *USA Today*; (e) a dedicated, informational website through which Class Members can obtain more detailed information about the Settlement and access case documents, including the Long Form Notice; and (f) a toll-free telephone helpline by which Class Members can obtain additional information about the Settlement and request the Long Form Notice. *See* Dahl Aff. The Notice Plan has been designed to obtain over 124.7 million individual print and digital impressions targeted to achieve sufficient scale and impression frequency to reach more than 75% of the estimated approximately 70 million Class Members. (*Id.*) Coverage and exposure will be further increased by the website, and the toll-free helpline. (*Id.*)

100.    The method used to provide notice to the Class has been reasonable and practicable under the circumstances.

## C. The Notice Plan is Adequate and Appropriate

101.    As discussed in the Dahl affidavit filed in connection with preliminary approval, in Dahl's expert opinion, the Notice Plan meets the notice guidelines established by the Federal Judicial Center's Manual for Complex Litigation, 4th Edition (2004), as well the Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010), and is consistent with notice programs approved previously by both State and Federal Courts. Dahl Aff. ¶ 34.

102.    Notice to the Class commenced shortly after entry of the Preliminary Approval Order. The Notice is being provided to Class Members so they have sufficient time to decide whether to participate in the settlement, object, or opt-out.

103.    The Notice provides sufficient detail. It defines the Class, explains Class Members' rights, releases, and applicable deadlines, and describes in detail the injunctive terms of the Settlement. It plainly indicates the time and place of the hearing to consider approval of the Settlement, and the method for objecting to or opting out of the Settlement. It details the provisions for payment of attorneys' fees and expenses and case contribution awards to the class representatives, and provides contact information for Class Counsel.

104.    As such, the Notice is adequate and meets the requirements of Rule 23 and due process.

### D.    The Mediated Attorneys' Fee Request Amount Provided Under the Settlement Agreement is Fair and Reasonable and Should be Approved

105.    Plaintiffs' Counsel have spent more than five years litigating this matter. They now seek to be compensated for their work – to date Plaintiffs' Counsel have not received attorneys' fees and meanwhile have advanced the costs of the litigation. As Plaintiffs demonstrate below, the mediated amount of $1,900,000 in fees that Class Counsel seeks here is less than Plaintiffs' Counsel's combined lodestar and, if paid from a common fund, would be supported by the traditional factors for analyzing the reasonableness of a common fund fee request in this Circuit as promulgated by *Goldberger v. Integrated Res., Inc.*. For the reasons stated below, Class Counsel respectfully request that the Court issue an order granting their request for payment of $1,900,000 in fees. The mediated $1,900,000 fee request here is fair and reasonable and worthy of the Court's approval.

**E. Negotiated Fee Agreements are Favored and the Mediated Attorneys' Fee Request Amount Was Mediated Only After Agreement on Substantive Terms**

106. The fees and expenses Class Counsel are applying for were agreed to by the Parties after extensive negotiation and with the assistance of Judge Holwell (Ret.) as mediator after agreement on the substantive terms of the Settlement.[10] Such negotiated fees are favored and courts at all levels of the judicial system have endorsed such negotiated fee and expense awards.

**F. The Mediated Attorneys' Fee Will Not Reduce the Value of the Settlement.**

107. In addition to the significant benefits provided to the Class in the form of injunctive relief, the Parties have agreed that Class Counsel may seek an award of attorneys' fees in the amount of $1,900,000 plus up to $200,000 in costs and expenses to be paid by Defendant. The fee awarded here will not affect the benefits available for the Class. The settlement provides injunctive relief only, payment of attorneys' fees and costs cannot reduce the value of the settlement. Reduction of the negotiated fee would benefit only the defendant in these circumstances.

---

[10] The Settlement Agreement states that "Class Counsel shall make an application to the Court for an award of attorneys' fees in the amount of $1,900,000 plus up to $200,000 in costs and expenses, to be paid by Frito-Lay. Defendant shall not oppose or object to the application by class counsel for attorneys' fees in the amount of $1,900,000 plus up to $200,000 in costs and expenses, as these figures have been agreed to by the Parties after extensive negotiation and with the assistance of Judge Holwell (Ret.) as mediator. The Parties recognize that the Court shall have the final authority to award the amount of fees and expenses. The Parties represent that the agreed upon fees and expenses were mediated after agreement on substantive terms with Judge Holwell (Ret.)." Settlement Agreement, Paragraph 10.1.

**G. The Mediated Attorneys' Fee Request Amount is Fair and Reasonable Under the Lodestar Method and is Actually Less Than the Lodestar Value of Plaintiffs' Counsel's Services on an Hourly Basis**

    **1. The Mediated Fee Request is Fair and Reasonable Under the Lodestar Method**

        **a. Plaintiffs' Counsel's Hours are Reasonable**

108. Given the magnitude and duration of the litigation, the time Plaintiffs' Counsel spent prosecuting this Litigation on behalf of the Class is reasonable.

        **b. Plaintiffs' Counsel's Hourly Rates are Reasonable**

109. The current hourly rates of Plaintiffs' Counsel are reflected in the declarations submitted by Plaintiffs' Counsel. Applying Plaintiffs' Counsel's current hourly rates to the hours expended in this Litigation yields a lodestar value of well over $4 million. *See* Exhibit 1 to Exhibits A-C. Plaintiffs' Counsel's hourly rates are competitive market hourly rates in their respective legal communities for cases of this sort and are the same regular current rates charged for their services in non-contingent matters and/or which have been used in the lodestar cross-check accepted by courts in other class litigation. For example, the hourly rates for partners in Plaintiffs' Counsel's submission ranges from $625 to $875 per hour. A recent decision in this Circuit approved partners' hourly billing rates up to $995 per hour. *Woburn Ret. Sys. v. Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2017 U.S. Dist. LEXIS 132515, at *15 (S.D.N.Y. Aug. 18, 2017) ("The lodestar value of counsel's work … reflects the various hourly billing rates for partners, which ranged from $700 to $995 at Bernstein Litowitz, $715 to $980 at Robbins Geller, and $550 to $695 at Hach Rose[.]"). *See also In re Telik, Inc. Secs. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) (approving hourly rates to $750 in 2008). Plaintiffs' Counsel's hourly rates here appropriately reflect the reputation, experience, care, and success records of Plaintiffs'

Counsel. No time spent by Plaintiffs' Counsel in the preparation of this fee petition is included as part of their lodestar herein. *See* ¶ 5 of Exhibits A-C.

110. Based on our experiences, the hourly rates charged by our firms are within the range of rates that attorneys of equivalent experience and skill, who practice at firms involved in nationwide class action litigation, charge. In determining the firms' hourly rates from year to year, the partners consider rates that counsel at other national class actions firms seek, and we appropriately and thoughtfully set our hourly rates. The hourly rates for the partners, attorneys, and professional staff are the same as the regular rates charged for these services, and they have been accepted and approved in other recent class action litigation. Such cases include:

- *Huyer v. Wells Fargo & Co.*, Case No. 08-cv-00507-RP-CFB (S.D. Iowa 2016);

- *Frohberg v. Cumberland Packaging Corp.*, Case No. 1:14-cv-0748-RLM (E.D.N.Y.);

- *Ferrera v. Snyder's-Lance, Inc.*, case no. 13-cv-62496 (S.D. Fla.)

- *Wong v. Alacer Corporation*, Case No. CGC-12-519221 (San Francisco Super. Ct. 2014);

- *Denning v. Clearwire Corp.*, Case No. 010-cv-01859 (W.D. Wash. 2013);

- *Finley v. CVS Pharmacies, Inc.*, Case No. 08-L-616 (Madison Co. Super. Ct. 2012);

- *Chin v. RCN Corp.*, Case No. 08-cv-0749 (S.D.N.Y. 2011); and

- *Yoo v. Wendy's Corp.*, Case No. 07-4515 (C.D. Cal. 2009).

111. Based on the high degree of experience of Milberg LLP and Reese LLP in the area of consumer and class action litigation and the nationwide nature of the resolution in this case, we believe it is appropriate to apply the market rates for the home market for each attorney at the firm.

112. Again, the negotiated fees requested by Plaintiffs' Counsel here are less than a straight lodestar calculation would call for and includes no multiplier, meaning that Plaintiffs'

Counsel's fee request amounts to substantially *less* than their straight time, without any enhancement.

113.    Based on the foregoing, the negotiated $1,900,000 in fees requested by Class Counsel here is fair and reasonable.

### H.    The Mediated Attorneys' Fee Request Amount is Fair and Reasonable Under a *Goldberger* Analysis

114.    Even though in this case the negotiated fee request will not be awarded from a "common fund" created for the Class, the traditional criteria in this Circuit for determining a reasonable common fund fee support the negotiated fee requested here.

### 1.    Plaintiffs' Counsel Expended Significant Time and Labor in This Litigation [*Goldberger* Factor 1: The Time and Labor Expended by Counsel]

115.    Plaintiffs' Counsel have expended significant time and labor pursuing this Litigation on behalf of the Class over the course of more than five years, as shown in the declarations submitted by Plaintiffs' Counsel.

116.    Plaintiffs' Counsel's efforts included, for example: (1) extensive work identifying and investigating potential claims and drafting and filing the initial complaints and Amended Consolidated Class Action Complaint with this Court; (2) briefing and arguing a motion for coordination and transfer before the Judicial Panel on Multi-District Litigation; (3) opposing Defendants' comprehensive motion to dismiss; (4) extensive discovery, including the review of over 324,000 pages of documents and numerous depositions; (5) protracted and highly contentious discovery negotiations concerning the adequacy of Frito-Lay's efforts to search for and produce relevant documents in response to three separate sets of document requests, to which Frito-Lay responded with twelve separate document productions (6) producing over 1,400 pages of documents in response to requests from Frito-Lay (each named Plaintiff responded to

interrogatories from Frito-Lay as well); (7) engaging in multiple mediation sessions with Judge Holwell; and (8) drafting the Settlement Agreement and related documents.

117. Over the course of more than five years, Plaintiffs' Counsel have dedicated over 7,700 hours to the investigation, prosecution, and settlement of this complex action. (*See* Exhibit 1 to Exhibits A-C).

118. In light of these significant expenditures of time and resources, and as discussed more fully below, Class Counsel's requested $1,900,000 fee award represents less than their lodestar (hours multiplied by the usual billing rates for the personnel who worked on this case). There is no multiplier, meaning that the mediated fee request is *less* than their straight time, without any enhancement. This factor weighs in favor of approving Class Counsel's attorneys' fee request.

### 2. The Underlying Litigation was Large and Involved Complex Factual and Legal Issues [*Goldberger* Factor 2: The Magnitude and Complexities of the Litigation]

119. Consumer class action lawsuits, like this action, are complex, expensive, and lengthy. Plaintiffs filed their first action over five years ago. Since then, the Litigation has prompted multiple motions to transfer, a motion for dismissal, private mediation, extensive discovery and multiple disputes over its scope. Should this Court not approve the Settlement, this lengthy and contentious litigation would resume, with disputes likely occurring over remaining discovery, class certification, summary judgment motions, and expert testimony. Moreover, the benefits of reverting to litigation and the likelihood of success would be uncertain.

### 3. Plaintiffs' Counsel Faced Significant Risks at Every Stage of the Litigation [*Goldberger* Factor 3: The Risk of the Litigation]

120.     Plaintiffs' Counsel undertook this litigation purely on a contingency basis notwithstanding the considerable risk confronting them, including nonpayment after prosecuting the case for over five years.

121.     In the absence of this Settlement, this expensive and protracted litigation would continue on, with no guaranteed or inevitable favorable outcome for the Class. In particular, Plaintiffs faced risks of establishing liability, establishing damages, and maintaining a class action through trial. While Plaintiffs' Counsel believe that the Class satisfied all the necessary prerequisites of Rule 23 and would have been certified, class motions in cases of this magnitude are heavily contested and would have likely involved expert testimony from both sides. Plaintiffs bear the risk of class certification and, even if successful, withstanding interlocutory appeal under Rule 23(f). Although Plaintiffs believe that they could succeed in obtaining the certification of a class here, they also recognize that they face several obstacles to obtaining and maintaining class certification. First, it may be difficult (although not impossible) to quantify the precise amount of damages suffered by the class. Plaintiffs recognize the challenge of quantifying the effect of the challenged "natural" claim across more than twenty separate products, where the time periods in which that claim appeared on the Product packaging vary not only among the Products but also among the various package sizes in which each Product was sold. So it may be difficult (although not impossible) to quantify the precise amount of damages suffered by the class. The variations in the labeling dates also may create difficulties in identifying certain class members, as consumers may have difficulty recalling which variety and which package size they purchased during a particular time period. Plaintiffs' Counsel is also mindful of the inherent problems of proof related to their claims and to rebutting defenses to the

claims asserted in the Litigation. While Plaintiffs remain confident in their ability to prove their claims and to effectively rebut Defendants' defenses, they recognize that their ability to prove liability is far from certain. One cannot predict how a jury will weigh competing experts' testimony, especially after listening to multiple complex models for determining damages. In other words, the crucial element of damages would likely be reduced at trial to a "battle of the experts." In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by Defendant's experts, who would seek to minimize or eliminate the amount of damages.

### 4. There was a High Quality of Representation [*Goldberger* Factor 4: The Quality of Representation]

122.    Plaintiffs' Counsel and their firms possess decades of experience in class action litigation, particularly in consumer class actions. Plaintiffs' Counsel include attorneys and firms with national prominence and with reputations as attorneys who zealously pursue meritorious cases through trial and appeals. Plaintiffs' Counsel's experience and qualifications enabled them to successfully litigate this case for more than five years while grappling with the numerous complicated factual and legal issues that this case presented, and ultimately, achieve a significant result for the Class. Consistent with this litigations history, the mediation involved hard-fought negotiations over approximately 10 months.

123.    Here, the proposed Settlement provides substantial non-monetary benefits to the Class. The Settlement provides the primary relief sought by the Class—the assurance that the Products will not be labeled, marketed or advertised as "natural" unless the use of "natural" claims on products containing GMOs is expressly authorized by FDA guidance or state or federal legislation. The substantial experience of Plaintiffs' Counsel in prosecuting consumer protection class action cases was an important factor in achieving this. Furthermore, Class

Counsel have a proven track record in the prosecution of class actions, and they have successfully litigated many major class action cases.

124.    Another consideration for assessing the quality of the services rendered is the quality of the opposing counsel in the case. *See In re Warner Commc'n Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002). Defendants are represented by highly experienced counsel at Gibson, Dunn & Crutcher LLP. The ability of Plaintiffs' Counsel to obtain this settlement for the Class in the face of such formidable legal opposition further reflects favorably on the quality of their work.

### 5. The Mediated Fee Request is Fair and Reasonable in Relation to the Settlement [*Goldberger* Factor 5: The Requested Fee in Relation to the Settlement]

125.    The mediated fee request is fair and reasonable in relation to the Settlement. The Parties had already mediated and agreed on the substantive terms of the Settlement before mediating and agreeing on amounts for Class Counsel's fee and expense requests; thus, the mediator and the Parties knew when negotiating the fees and expenses that the proposed Settlement would provide non-monetary benefits to the Class, not a common fund, and took this into consideration when mediating an appropriate fee and expense request to be paid by Defendant separate and apart from the relief provided to the Class. The fee does not affect the benefits available for the Class. While it is difficult to place a monetary value on an injunction-only settlement resolving deceptive and false food labeling class actions and expert opinions would undoubtedly vary, given the sales volume of the Products, the labeling changes made by Frito-Lay and the very broad protections of the injunctive provisions represent significant and valuable benefits to an extremely large class. The Parties and the mediator were all aware of these facts when the fees and expenses were negotiated and, in their opinions, a $1,900,000 fee is fair and reasonable in relation to the Settlement.

### 6. Public Policy Favors Approving Class Counsel's Mediated Fee Request [*Goldberger* Factor 6: Public Policy Considerations]

126. The proposed Settlement provides substantial non-monetary benefits to the public. The Settlement provides the public with the assurance that the Products will not be labeled, marketed or advertised as "natural" unless the use of "natural" claims on products containing GMOs is expressly authorized by FDA guidance or state or federal legislation.

## V. THE COURT SHOULD APPROVE THE MEDIATED REIMBURSEMENT OF PLAINTIFFS' COUNSEL'S COSTS AND EXPENSES

127. Plaintiffs' Counsel incurred $252,652.23 in costs and expenses while prosecuting this Litigation. *See* ¶ 55 above; Exhibit 2 to Exhibits A-C.

128. Plaintiffs' Counsel's expenses are detailed in their submitted declarations. *See* Exhibits A-C. A majority of Plaintiffs' Counsel's expenses are for discovery-related expenses. *Id*. Over the more than five years of litigation, Plaintiffs' Counsel have, for example: filed hundreds of pages of pleadings; extensively litigated, taken, and responded to discovery; took and defended depositions; conducted extensive factual and legal research; incurred travel costs and significant expert and mediation costs. *Id.* The remaining requested expenses were also reasonably incurred in the prosecution of this Litigation and are categorized in the declarations submitted by Plaintiffs' Counsel. *Id.* These costs have been adequately documented by Plaintiffs' Counsel and were incurred for the benefit of the Class.

129. These costs were integral to the prosecution of this case, including costs associated with mediation as part of the process of reaching a resolution of the Litigation.

130. From the beginning of this Litigation, Plaintiffs' Counsel were aware that they might not recover any expenses and, at the very least, would not recover anything until the Litigation was successfully resolved. Thus, Plaintiffs' Counsel were motivated to, and did, take

significant steps to minimize expenses wherever practical without jeopardizing the vigorous and efficient prosecution of these cases.

131.     Similar to the fee request, the "up to $200,000" in costs and expenses that Class Counsel seek here was negotiated by the Parties at arm's-length with the assistance of a mediator after they had agreed on the substantive terms of the Settlement. The amount is fair and reasonable—in fact, it is less than Plaintiffs' Counsel's actual unreimbursed costs and expenses—and should be approved.

## VI.     THE COURT SHOULD APPROVE THE MEDIATED PROPOSED AWARDS TO THE CLASS REPRESENTATIVE PLAINTIFFS

132.     Class Counsel also request that the Court award $5,000 each to Plaintiffs Julie Gengo, Valarie Zuro, and Christopher Shake and $2,500 to Plaintiff Deborah Lawson as compensation for their time and effort spent in the litigation. These awards are not opposed by Defendant and will not affect the benefits available for the Class.

133.     The efforts of each representative Plaintiff on behalf of the Class confirm the appropriateness of the requested case contribution awards. Each performed important and valuable service for the benefit of the Class, participating in numerous interviews by Class Counsel, providing personal information concerning the Litigation, and remaining involved in the litigation, mediation, and settlement processes.[11] Plaintiffs Julie Gengo, Valarie Zuro, and Christopher Shake each had their depositions taken by Defendant's Counsel, and Plaintiff Deborah Lawson prepared for a deposition that was noticed, but cancelled a few days before it was scheduled. Plaintiffs' actions have benefitted the Class to a significant degree, culminating in the Settlement.

134.     We respectfully request that the Court approve the case contribution awards.

---

[11] See declarations of Plaintiffs Julie Gengo, Valarie Zuro, Christopher Shake, and Deborah Lawson, attached as Exhibits D, E, F, and G to this Joint Declaration.

## VII. CONCLUSION

135. In view of the substantial benefits conferred on the Class, the contingent nature of the fee (which was reached based upon a mediator's proposal only after the benefit to the Class was agreed upon, does not diminish the relief made available to the Class, and represents a significant discount from Plaintiffs' Counsel's lodestar expended throughout this long litigation), the complexity of the case, the risks of the litigation, the enormous effort of Plaintiffs' Counsel, and the quality of the work performed, we respectfully request that this Court:

1.  grant final approval of the Settlement as fair, reasonable, and adequate;

2.  confirm certification of the Class for the purpose of the Settlement;

3.  approve the mediated amounts for attorneys' fees and the reimbursement of costs and expenses sought by Class Counsel and approve the awards to Plaintiffs, which Defendant has agreed not to oppose, subject to the Court's approval; and

4.  enter the Final Judgment and Order in the forms substantially similar to the previously-filed Exhibits F and G to the Settlement Agreement (ECF No. 100-2).

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of October 2017, in New York, New York.

_____
ARIANA J. TADLER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of October 2017, in New York, New York.

_____
MICHAEL R. REESE

## __EXHIBITS__

A.     Declaration of Ariana J. Tadler in Support of Motion for Attorneys' Fees and Reimbursement of Expenses Filed on behalf of Milberg LLP

B.     Declaration of Michael R. Reese in Support of Motion for Attorneys' Fees and Reimbursement of Expenses Filed on behalf of Reese LLP

C.     Declaration of Julio J. Ramos in Support of Motion for Attorneys' Fees and Reimbursement of Expenses Filed on behalf of Law Offices of Julio J. Ramos

D.     Declaration of Plaintiff Julie Gengo in Support of Application for Case Contribution Award

E.     Declaration of Plaintiff Valarie Zuro in Support of Application for Case Contribution Award

F.     Declaration of  Plaintiff Christopher Shake in Support of Application for Service Award

G.     Declaration of Plaintiff Deborah Lawson in Support of Application for Case Contribution Award

EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| | ) |
| | ) |
| *Frito-Lay North America, Inc. "All Natural"* | ) Case No. 12-MD-02413-RRM-RLM |
| *Litigation* | ) |
| | ) |
| | ) |
| | ) |

### DECLARATION OF ARIANA J. TADLER IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES FILED ON BEHALF OF MILBERG LLP

I, **Ariana J. Tadler**, declare as follows:

1. I am a member of the law firm of Milberg LLP. I submit this declaration in support of my firm's application for an award of attorneys' fees in connection with services rendered in this case, as well as the reimbursement of expenses incurred by my firm in connection with this consumer class action litigation.

2. I have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the litigation. My professional accomplishments are described in Exhibit 3 at 15-16.

3. My firm acted as Co-Lead Counsel in this litigation. As detailed in Exhibit 3, my firm has extensive class action experience. The firm represents individuals, small businesses, institutional investors and employees in class action cases litigated in the United States. My firm has served as sole lead-counsel, co-lead counsel or on an executive committee in numerous class actions, including cases brought on behalf of consumers.

4. My firm has been involved in all aspects of this litigation, including the following (as further detailed in the Joint Declaration submitted contemporaneously herewith): initial

investigation and research of possible claims, participation in proceedings before the Judicial Panel on Multi-District Litigation; drafting and filing the Amended Consolidated Class Action Complaint; successful opposition to Defendants' request to stay discovery; opposition to Defendants' Motion to Dismiss; drafting discovery requests; extensive negotiations and meet-and-confer process regarding discovery requests and Defendants' responses and objections thereto; submissions to the Court and multiple hearings before Magistrate Mann concerning discovery disputes;  review of hundreds of thousands of pages of documents produced by Frito-Lay; collection, review and production of documents from Plaintiffs; preparing for and defending depositions of Plaintiffs; preparing for and taking depositions of Frito-Lay personnel; third party discovery on Frito-Lay parent PepsiCo, Inc., food industry trade groups, aggregators of nationwide retail sales and pricing information, and retail sellers of the Products; preparation and conduct of the mediation resulting in this settlement; and drafting and filing Plaintiffs' Motions for Preliminary Approval and Final Approval of Settlement.

5.     The schedule attached hereto as Exhibit 1 is a detailed summary indicating the amount of time, by category, spent by the partners, other attorneys, and professional support staff of my firm who were involved in this litigation, and the lodestar calculation based on my firm's current billing rates.[1] For persons who are no longer employed by my firm, the lodestar calculation is based upon the billing rate for that person in his or her final year of employment by my firm. The schedule was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm, which are available at the request of the Court for review *in*

---

[1] This application does not include time for anyone who spent fewer than 5 hours on this litigation.

*camera*.[2] Time expended in preparing this application for fees and reimbursement of expenses has not been included in this request.

6. The hourly rates for the partners, other attorneys, and professional support staff in my firm included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been used in the lodestar cross check accepted by courts in other class litigation.

7. The total number of hours expended on this litigation by my firm is 5,234.4 hours. The total lodestar for my firm is $2,815,975.50, consisting of $2,675,710.00 for attorneys' time and $140,265.50 for professional support staff time.

8. My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

9. As detailed in Exhibit 2, my firm has incurred a total of $215,211.06 in unreimbursed expenses in connection with the prosecution of this litigation.[3]

10. The expenses incurred in this action are reflected on the books and records of my firm, which are available at the request of the Court. These books and records are prepared from

---

[2] These records may include information concerning privileged and/or confidential attorney-client communications or work product.

[3] Prior to November 2, 2015, document and data management services were provided by Milberg's Litigation Support and Data Hosting services division (a sub-division of Milberg's E-Discovery Practice Group). On November 2, 2015, that division was spun off to a separate, independently owned business, Meta-e Discovery, LLC ("Meta-e"), which provides litigation support and data hosting services to its clients, including, but not limited to Milberg. Milberg's former Chief Discovery Officer, Paul McVoy, is the Managing Director of Meta-e. I am a Principal in Meta-e. Pursuant to agreement, Milberg is entitled to a portion of Meta-e's revenues from customers referred by Milberg. Beginning on November 2, 2015, document and data management services for this litigation were provided by Meta-e.

expense vouchers, check records and other source materials and are an accurate record of the expenses as charged by the vendors. Third-party expenses are not marked up.

11.     By agreement between Plaintiffs' Counsel, my firm is not charging separately for the following costs and expenses: secretarial and clerical overtime, including their meals and local transportation; word processing; secretarial/clerical time for document preparation; time charges for routine copying, faxing or scanning; incoming/outgoing fax charges; office supplies (such as paper, binders, etc.); special publications; continuing legal education seminars; working meals for attorneys (with the exception of meals with clients, expert or other witnesses, meals while traveling for the case, or meal expenses for meetings between Plaintiffs' Counsel); and local overtime meals and transportation for attorneys.

12.     With respect to the standing of counsel in this case, attached hereto as Exhibit 3 is my firm's résumé and brief biographies for the attorneys in my firm who were principally involved in this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of October, 2017, at New York, New York.

Ariana J. Tadler

**EXHIBIT 1**

***Frito-Lay North America, Inc. "All Natural" Litigation***,
**No. 12-MD-2413-RRM-RLM (E.D.N.Y.)**

**MILBERG LLP**

**TIME REPORT — Inception through October 1, 2017**

| Name/Position | A | B | C | D | E | F | G | Total Hours | Hourly Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|
| Kelston, Henry (P) | 0 | 694.00 | 516.50 | 23.20 | 72.50 | 23.20 | 146.90 | 1,476.30 | $675 | $996,502.50 |
| Kupillas, Matthew A. (P) | 0 | 3.20 | 29.50 | 0 | 0 | 0 | 0 | 32.70 | $700 | $22,890.00 |
| Rado, Andrei (P) | 14.30 | 6.30 | 0 | 0 | 0 | 0 | 0 | 20.60 | $625 | $12,875.00 |
| Tadler, Ariana J. (P) | 0 | 109.00 | 380.30 | 7.20 | 102.70 | 12.30 | 201.10 | 812.60 | $825 | $670,395.00 |
| Westerman, Jeff S. (P) | 2.40 | 12.10 | 2.20 | 0 | 8.10 | 0 | 26.30 | 51.10 | $825 | $42,157.50 |
| Alexander, Carey (A) | 0 | 109.80 | 153.60 | 8.50 | 62.10 | 0 | 125.30 | 459.30 | $350 | $160,755.00 |
| Bongiorno, Angela (A) | 0 | 27.00 | 246.00 | 0 | 0 | 7.50 | 0 | 280.50 | $350 | $98,175.00 |
| Keenan, Meagan (A) | 0 | 164.20 | 547.50 | 8.60 | 91.40 | 11.10 | 81.20 | 904.00 | $350 | $316,400.00 |
| Pepper, David (A) | 0 | 139.70 | 7.30 | 0 | 0 | 0 | 0 | 147.00 | $350 | $51,450.00 |
| Schuyler, Christopher (A) | 0 | 41.50 | 95.00 | 0 | 0 | 0 | 0 | 136.50 | $350 | $47,775.00 |
| Sleater, Jessica (A) | 23.70 | 10.00 | 0 | 0 | 0 | 0 | 0 | 33.70 | $425 | $14,322.50 |
| Stamatopoulos, Gregory (A) | 0 | 0 | 129.60 | 0 | 0 | 0 | 0 | 129.60 | $350 | $45,360.00 |
| Tarnor, Nathan (A) | 0 | 107.90 | 52.10 | 0 | 6.10 | 0 | 0 | 166.10 | $500 | $83,050.00 |
| Andrejkovics, Paul J. (OC) | 0 | 0 | 0 | 0 | 0 | 0 | 168.30 | 168.30 | $675 | $113,602.50 |
| Barrett, Meredith (PL) | 0 | 16.50 | 23.00 | 0 | 0 | 40.00 | 3.50 | 83.00 | $325 | $26,975.00 |
| Goraj, Suzanne (PL) | 0 | 113.60 | 11.40 | 0 | 0 | 0 | 0 | 125.00 | $275 | $34,375.00 |
| Joseph, Jason A. (PL) | 0 | 2.40 | 11.00 | 0 | 0 | 0 | 0 | 13.40 | $325 | $4,355.00 |
| Leifer, David (PL) | 0 | 35.80 | 0 | 0 | 11.40 | 0 | 0 | 47.20 | $325 | $15,340.00 |
| Sclafani, David (PL) | 5.20 | 31.00 | 0 | 0 | 0 | 0 | 0 | 36.20 | $325 | $11,765.00 |
| Bursey, W. S. (I) | 0 | 0 | 18.00 | 0 | 0 | 0 | 0 | 18.00 | $550 | $9,900 |
| Petrick, Michelle (I) | 0 | 0 | 18.00 | 0 | 0 | 0 | 0 | 18.00 | $475 | $8,550.00 |
| Sass, Caroline (I) | 0 | 0 | 16.50 | 0 | 0 | 0 | 0 | 16.50 | $475 | $7,837.50 |

| Name/Position | A | B | C | D | E | F | G | Total Hours | Hourly Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|
| McVoy, Paul (LS) | 0 | 0 | 47.30 | 0 | 0 | 11.50 | 0 | 58.80 | $360 | $21,168.00 |
| **TOTAL LODESTAR** | 45.60 | 1,624.00 | 2,304.80 | 47.50 | 354.30 | 105.60 | 752.60 | 5,234.40 | | $2,815,975.50 |

**CATEGORIES**

A. Pre-Filing Investigation and Initial Complaint

B. Legal Research, Pleadings, Briefs, and Motions After Initial Complaint

C. Discovery and Post-Filing Investigation

D. Experts and Consultants

E. Litigation Strategy, Analysis, and Case Management

F. Court Appearances & Preparation

G. Settlement

**POSITION**

P = Partner

A = Associate/Staff Attorney

C = Senior Counsel/Of Counsel

PL = Paralegal

I = Investigator

LS = Litigation Support

**EXHIBIT 2**

***Frito-Lay North America, Inc. "All Natural" Litigation***,
**No. 12-MD-2413-RRM-RLM (E.D.N.Y.)**

**MILBERG LLP**

**EXPENSE REPORT — Inception through October 1, 2017**

| <u>Categories</u>: | <u>Amount</u> |
|---|---:|
| Photocopies/Reproduction | $3,916.44 |
| Postage/Notice Costs | $20.33 |
| Telephone | $520.11 |
| Messengers/Express Services | $1,179.07 |
| Filing/Witness Fees | $1,823.84 |
| Court Reporters/Transcript/Video | $17,220.71 |
| Computer Research (Lexis, Pacer, etc.) | $63,733.64 |
| Experts/Consultants/Professional Services | $19,364.63 |
| Document and Data Management Expenses | $84,053.01 |
| Mediation | $9,313.44 |
| Out-of-Town Meals/Hotel/Transportation | $14,065.84 |
| **TOTAL EXPENSES:** | $215,211.06 |

# EXHIBIT 3

## THE FIRM'S PRACTICE AND ACHIEVEMENTS

Milberg LLP, founded in 1965, was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. The Firm pioneered this type of litigation and is widely recognized as a leader in defending the rights of victims of corporate and other large-scale wrongdoing. The Firm's practice focuses on the prosecution of class and complex actions in many fields, including securities, corporate fiduciary, ERISA, consumer, False Claims Act, antitrust, bankruptcy, mass tort, and human rights litigation. The Firm has offices in New York City and Los Angeles.

In its early years, the Firm built a new area of legal practice in representing shareholder interests under the then recently amended Rule 23 of the Federal Rules of Civil Procedure, which allowed securities fraud cases, among others, to proceed as class actions. In the following decades, the Firm obtained decisions establishing important legal precedents in many of its areas of practice and prosecuted cases that set benchmarks in terms of case theories, organization, discovery, trial results, methods of settlement, and amounts recovered and distributed to clients and class members.

Important milestones in the Firm's early years include the Firm's involvement in the *U.S. Financial* litigation in the early 1970s, one of the earliest large class actions, which resulted in a $50 million recovery for purchasers of the securities of a failed real estate development company; the Ninth Circuit decision in *Blackie v. Barrack* in 1975, which established the fraud-on-the-market doctrine for securities fraud actions; the Firm's co-lead counsel position in the *In re Washington Public Power Supply System Securities Litigation*, a seminal securities fraud action in the 1980s in terms of complexity and amounts recovered; the representation of the Federal Deposit Insurance Corporation in a year-long trial to recover banking losses from a major accounting firm, leading to a precedent-setting global settlement; attacking the Drexel-Milken "daisy chain" of illicit junk-bond financing arrangements with numerous cases that resulted in substantial recoveries for investors; representing life insurance policyholders defrauded by "vanishing premium" and other improper sales tactics and obtaining large recoveries from industry participants; and ground-breaking roles in the multi-front attack on deception and other improper activities in the tobacco industry.

Milberg remains at the forefront in its areas of practice. Significant litigation results include: *In re Vivendi Universal, S.A. Securities Litigation* (jury verdict for plaintiff class in January 2010; final judgments now on appeal); *In re Tyco International, Ltd. Securities Litigation* ($3.2 billion settlement); *In re Nortel Networks Corp. Securities Litigation* (settlement for cash and stock valued at $1.142 billion); *In re Merck & Co., Inc. Securities Litigation*, Nos. 05-1151 and 05-2367 (D.N.J.) (a $1.062 billion recovery); *In re Lucent Technologies, Inc. Securities Litigation* ($600 million recovery); *In re Raytheon Co. Securities Litigation* ($460 million recovery); *In re Managed Care Litigation* (recoveries over $1 billion and major changes in HMO practices); the *In re Washington Public Power Supply System Securities Litigation* (settlements totaling $775 million), and the *In re NASDAQ Market-Makers Antitrust Litigation* ($1 billion in recoveries). Milberg has been responsible for recoveries valued at approximately $56 billion during the life of the Firm.

Milberg serves as co-lead counsel in three class actions challenging the use of "natural" labeling on food products made with crops grown from seeds that have been genetically engineered using sophisticated laboratory techniques (GMOs). *In Re Conagra Foods, Inc,*, No.11-05379 (M.D. Cal.); *Frito-Lay North America, Inc. "All Natural" Litigation,* No. 12-MD-02413 (E.D.N.Y); *In re General Mills, Inc. Kix Cereal Litigation,* No. 12-cv-03567 (D.N.J.).

Most recently, U.S. District Judge Lucy H. Koh appointed Milberg partner Ariana Tadler along with four other attorneys to serve on an executive committee overseeing class litigation alleging massive data breaches affecting more than a billion users, *In Re: Yahoo Inc. Customer Data Security Breach Litigation*, case number 5:16-md-02752, in the U.S. District Court for the Northern District of California.

The Firm's ability to pursue claims against defendants is augmented by its investigators, headed by a 27-year veteran of the Federal Bureau of Investigation.  The Firm and its lawyers are regularly recognized as one of the nation's leading plaintiffs' law firms by the *National Law Journal*, *Legal 500*, *Chambers USA*, and *Super Lawyers,* among others.

For more information, please visit www.milberg.com.

## JUDICIAL COMMENDATIONS

Milberg has been commended by countless judges throughout the country for the quality of its representation.

Milberg partners played leading roles in representing class plaintiffs in a nearly four-month jury trial in *In re Vivendi Universal, S.A. Securities Litigation*, No. 02-5571 (S.D.N.Y.), which in January 2010 resulted in a jury verdict for an international class of defrauded investors (aggregate value of over $9 billion, but class was vastly reduced when subsequent caselaw excluded foreign claimants from coverage of securities statutes.  At the close of the trial, Judge Richard Holwell commented:

> I can only say that this is by far the best tried case that I have had in my time on the bench.  I don't think either side could have tried the case better than these counsel have.

In approving a $3.2 billion securities fraud settlement, one of the largest in history, in *In re Tyco International, Ltd. Securities Litigation*, 535 F. Supp. 2d 249, 270 (D.N.H. 2007), Judge Barbadoro lauded Milberg's efforts as co-lead counsel:

> This was an extraordinarily complex and hard-fought case.  Co-Lead Counsel put massive resources and effort into the case for five long years, accumulating [millions of dollars in expenses] and expending [hundreds of thousands of hours] on a wholly contingent basis.  But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. . . .  Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery. . . .

In *Simon v. KPMG LLP*, No. 05-3189, 2006 U.S. Dist. LEXIS 35943, at *18, 30-31 (D.N.J. June 2, 2006), a case in which Milberg served as class counsel, Judge Cavanaugh, in approving the $153 million settlement, found that "Plaintiffs . . . retained highly competent and qualified attorneys" and that "[t]he Initial Complaint . . . demonstrates that [Milberg] expended considerable time and effort with the underlying factual and legal issues in this case before even filing this lawsuit. . . .  Settlement discussions were conducted over a period of some fourteen months with the supervision and guidance of Judges Politan and Weinstein, and are evidence of [Milberg's] appreciation of the merits and complexity of this litigation."

In *In re Lucent Technologies, Inc. Securities Litigation*, 307 F. Supp. 2d 633, 641-47 (D.N.J. 2004), Judge Pisano issued an opinion approving the $600 million settlement and complimenting Milberg's work as co-lead counsel for the class as follows:

> [T]he attorneys representing the Plaintiffs are highly experienced in securities class action litigation and have successfully prosecuted numerous class actions throughout the United States.  They are more than competent to conduct this action.  Co-Lead Counsel diligently and aggressively represented the Plaintiffs before this Court and in the negotiations that resulted in the Settlement. . . .  [T]he efforts and ingenuity of Lead Plaintiffs and Lead Counsel resulted in an extremely valuable Settlement for the Benefit of the Class.

In *In re Rite Aid Corp. Securities Litigation*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003), Judge Dalzell commented on the skill and efficiency of the Milberg attorneys litigating this complex case:

At the risk of belaboring the obvious, we pause to say a specific word about . . . the skill and efficiency of the attorneys involved. [Milberg was] extraordinarily deft and efficient in handling this most complex matter. [T]hey were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. . . . In short, it would be hard to equal the skill class counsel demonstrated here.

In *In re IKON Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 195 (E.D. Pa. 2000), Judge Katz commented on Milberg's skill and professionalism as one of plaintiffs' co-lead counsel:

First, class counsel is of high caliber and has extensive experience in similar class action litigation. . . . Each of the co-lead counsel firms has a national reputation for advocacy in securities class actions, and there is no doubt that this standing enhanced their ability both to prosecute the case effectively and to negotiate credibly. . . .

Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate. . . . This cooperation enabled the parties to focus their disputes on the issues that mattered most and to avoid pointless bickering over more minor matters.

In *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998), in an opinion approving settlements totaling over $1.027 billion, Judge Sweet commented:

Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

Judicial recognition of Milberg's excellence is not limited to courts within the United States. In *In re Flag Telecom Holdings, Ltd. Securities Litigation*, No. 02-3400 (S.D.N.Y. 2009), Milberg litigated a discovery dispute before the English Royal High Court of Justice, Queens Bench Division, which recognized the Milberg attorney handling the matter as a "Grade A" lawyer and a "vital cog in the machine." Likewise, in *Sharma v. Timminco Ltd.*, 09-378701 (Can. Ont. Sup. Ct. 2009), Canada's Ontario Superior Court of Justice recognized Milberg's "fine reputation and excellent credentials" in connection with Milberg's representation in a securities case pending in Canada.

Milberg has also been recognized for its commitment to public service. In lauding Milberg's work representing victims of the September 11th attack on the World Trade Center in connection with the September 11 Victims Compensation Fund, Special Master Kenneth R. Feinberg stated the following:

Once again, as I have learned over the years here in New York, the [Milberg] firm steps up to the plate in the public interest time and time again. The social conscience of the [Milberg] firm, acting through its excellent associates and partners, help deal with crises that confront the American people and others, and I am personally in the debt of Milberg . . . for the work that it is doing . . . . [T]hey are second among none in terms of the public interest, and I'm very, very grateful, not only to you guys for doing this, but . . . for the firm's willingness to help out. I wanted to let everybody know that.

*In re September 11 Victim Compensation Fund*, Preliminary Hearing, Claim No. 212-003658 (Dec. 9, 2003).

# NOTEWORTHY RESULTS

The quality of Milberg's representation is further evidenced by the Firm's numerous significant recoveries, some of which are described below.

- ***In re Merck & Co., Inc. Securities Litigation***, Nos. 05-1151 and 05-2367 (D.N.J.). Milberg served as co-lead counsel in this federal securities fraud class action, and following over 12 years of hard-fought litigation, ultimately obtained a combined settlement totaling $1.062 billion, the largest securities class action settlement ever against a pharmaceutical company, which received final approval on June 28, 2016. This lawsuit involved claims under the Securities Exchange Act of 1934 against Merck and certain of its executives arising out of allegations that defendants made materially false and misleading statements concerning the safety profile and commercial viability of Merck's purported "blockbuster" drug VIOXX. During this litigation, Milberg and co-lead counsel engaged in exhaustive discovery, including the review and analysis of over 35 million pages of documents involving complex scientific and medical issues, as well as the examination of over 59 fact and expert witnesses. Plaintiffs successfully appealed the dismissal of this action on state of limitations grounds to the Third Circuit Court of Appeals, and prevailed in defendants' further appeal to the Supreme Court, resulting in a unanimous decision by the Supreme Court in Plaintiffs' favor which clarified the law regarding the application of the statute of limitations to federal securities fraud claims. Plaintiffs' claims also survived additional motions to dismiss and motions for summary judgment, and the parties reached settlement less than three months before trial was scheduled to commence

- ***In re Vivendi Universal, S.A. Securities Litigation***, No. 02-5571 (S.D.N.Y.). Milberg lawyers were instrumental in obtaining a jury verdict for a class of defrauded investors after a trial lasting nearly four months. The jury found Vivendi liable for 57 false or misleading class period statements.

- ***In re Target Corporation Customer Data Security Breach Litigation***, No. 14-md-02522-PAM (D. Minn.). Milberg serves on the Steering Committee guiding the landmark data breach case. In addition to participating in overall case strategy, the drafting of pleadings and motions and settlement negotiation, the Milberg team was responsible for leading discovery, which included targeted discovery requests, the establishment of a series of discovery protocols, the selection of a data-hosting provider, and discovery motion practice that involved unique topics warranting special attention. The case, which involved an estimated 110 million consumers whose personal information was compromised, settled for $10 million, entitling individual consumers to recover losses up to $10,000. (An appeal remains pending before the Eighth Circuit.)

- ***In re Conagra Foods, Inc,***, **No.11-05379 (M.D. Cal.).** Milberg is co-lead counsel in a class action against ConAgra Foods, Inc., the maker of Wesson Oils, concerning the company's use of the phrase "100% Natural" to market food products made with crops grown from seeds that have been genetically engineered using sophisticated laboratory techniques. The District Court certified eleven separate statewide classes of Wesson purchasers. ConAgra appealed the class certification order to the Ninth Circuit Court of Appeals, which affirmed the decision in a decision considered extremely favorable to consumer class actions. Conagra has petitioned the U.S. Supreme Court for review of the Ninth Circuit's decision. Plaintiffs have opposed the petition, which remains pending.

- ***In re Chase Bank USA, N.A. "Check Loan" Contract Litig.***, No. 09-2032 (N.D. Cal.). Milberg served on the Executive Committee representing the class in this action against JP Morgan Chase & Co. The complaint alleged that Chase improperly increased by 150% the minimum monthly payment requirement for customers who entered into balance transfer

loans with "fixed" interest rates that were guaranteed to remain so for the "life of the loan." Milberg and its co-counsel, achieved a $100 million settlement for the class.

- **Mason v. Medline**, No. 07-05615 (N.D. Ill.). Milberg successfully represented a healthcare worker in a False Claims Act case against his former employer, Medline Industries, Inc., one of the nation's largest suppliers of medical and surgical products, along with its charitable arm, The Medline Foundation. The suit alleged that Medline engaged in a widespread illegal kickback scheme targeting hospitals and other healthcare providers that purchase medical products paid for by federal healthcare programs. Although a party to the settlement agreement, the U.S. Department of Justice chose not to intervene in the lawsuit. Milberg pursued the case on a non-intervened basis and recovered $85 million on behalf of the federal government -- one of the largest settlements of a False Claims Act case in which the government declined to intervene. The whistleblower was awarded 27.5% of the proceeds.

- **Blessing v. Sirius XM Radio, Inc.**, No. 09-10035 (S.D.N.Y.). This antitrust case stemmed from the 2008 merger of Sirius Satellite Radio, Inc. and XM Satellite Holdings, Inc. that created Sirius XM, the nation's only satellite radio company. The plaintiffs alleged that the merger of the only two U.S. satellite radio providers was an illegal move to eliminate competition and monopolize the satellite radio market. Before the merger, Sirius CEO Mel Karmazin convinced regulators not to block the deal by promising that "the combined company will not raise prices" and that the merger would actually result in "lower prices and more choice for the consumer." After the merger, Sirius quickly reversed course, raised prices by 15-40%, and eliminated multiple radio stations. Milberg achieved a settlement for the class valued at $180 million.

- **In re Initial Public Offering Securities Litigation**, No. 21-92 (S.D.N.Y.). Milberg represented investors in 310 consolidated securities actions arising from an alleged market manipulation scheme. Plaintiffs alleged, among other things, that approximately 55 defendant investment banks, in dealing with certain of their clients, conditioned certain allocations of shares in initial public offerings on the subsequent purchase of more shares in the aftermarket, thus artificially boosting the prices of the subject securities. This fraudulent scheme, plaintiffs alleged, was a major contributing factor in the now infamous technology "bubble" of the late 1990s and early 2000s. As a member of the court-appointed Plaintiffs' Executive Committee, and with certain partners appointed by the court as liaison counsel, Milberg oversaw the efforts of approximately 60 plaintiffs' firms in combating some of the most well-respected defense firms in the nation. In granting final approval to a $586 million settlement on October 5, 2009, the court described the law firms comprising the Plaintiffs' Executive Committee as the "cream of the crop."

- **Carlson v. Xerox**, No. 00-1621 (D. Conn). Milberg served as co-lead counsel in this lawsuit, which consolidated 21 related cases alleging violations of the federal securities laws. Plaintiffs alleged that Xerox and several of its top officers reported false financial results during the class period and failed to adhere to the standard accounting practices the company claimed to have followed. In the course of litigating plaintiffs' claims, Milberg engaged in arduous and exhaustive factual discovery, including review and analysis of more than four million pages of complex accounting and auditing documents and thousands of pages of SEC deposition transcripts. Plaintiffs' claims survived three motions to dismiss and a motion for summary judgment, ultimately resulting in a $750 million settlement, which received final approval on January 14, 2009.

- **In re Tyco International Ltd., Securities Litigation**, MDL 1335 (D.N.H.). Milberg served as co-lead counsel in this litigation, which involved claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 against Tyco and its former CEO, CFO, general counsel, and certain former directors arising out of allegations of Tyco's $5.8 billion overstatement of income and $900 million in insider trading, plus hundreds of millions of dollars looted by insiders motivated to commit

the fraud. Plaintiffs also asserted claims under the 1933 and 1934 Acts against PricewaterhouseCoopers LLP for allegedly publishing false audit opinions on Tyco's financial statements during the class period and failing to audit Tyco properly, despite knowledge of the fraud. On December 19, 2007, the court approved a $3.2 billion settlement of the plaintiffs' claims and praised the work of co-lead counsel.

- *In re Sears, Roebuck & Co. Securities Litigation*, No. 02-7527 (N.D. Ill.). This case involved allegations that Sears concealed material adverse information concerning the financial condition, performance, and prospects of Sears' credit card operations, resulting in an artificially inflated stock price. The approved settlement provided $215 million to compensate class members.

- *In re General Electric Co. ERISA Litigation*, No. 04-1398 (N.D.N.Y.). This ERISA class action was brought on behalf of current and former participants and beneficiaries of the General Electric ("G.E.") 401(k) Plan. Milberg, serving as co-lead counsel, achieved a $40 million settlement on behalf of current and former G.E. employees who claimed that the company's 401(k) Plan fiduciaries imprudently invested more than two-thirds of the Plan's assets in company stock. The settlement included important structural changes to G.E.'s 401(k) plan valued at more than $100 million.

- *In re Biovail Corp. Securities Litigation*, No. 03-8917 (S.D.N.Y.). Milberg, representing Local 282 Welfare Trust Fund and serving as co-lead counsel, litigated this complex securities class action brought on behalf of a class of defrauded investors, alleging that defendants made a series of materially false and misleading statements concerning Canadian company Biovail's publicly reported financial results and the company's then new hypertension/blood pressure drug, Cardizem LA. This was a highly complex case in which counsel took numerous depositions across the U.S. and Canada and obtained documents from defendants and several third-parties, including, among others, UBS, McKinsey & Co., and Merrill Lynch. Milberg obtained a $138 million settlement for the class, and Biovail agreed to institute significant corporate governance changes.

- *In re Nortel Networks Corp. Securities Litigation*, No. 01-1855 (S.D.N.Y.). In this federal securities fraud class action, Milberg served as lead counsel for the class and the court-appointed lead plaintiff, the Trustees of the Ontario Public Service Employees' Union Pension Plan Trust Fund. In certifying the class, the court specifically rejected the defendants' argument that those who traded in Nortel securities on the Toronto Stock Exchange (and not the New York Stock Exchange) should be excluded from the class. The Second Circuit denied the defendants' attempted appeal. On January 29, 2007, the court approved a settlement valued at $1.142 billion.

- *In re American Express Financial Advisors Securities Litigation*, No. 04-1773 (S.D.N.Y.). This case involved allegations that American Express Financial Advisors violated securities laws by representing to class members that the company would provide tailored financial advice, when the company actually provided "canned" financial plans and advice designed to steer clients into American Express and certain nonproprietary mutual funds. The case settled for $100 million, with the settlement agreement requiring that the company institute remedial measures.

- *In re Lucent Technologies, Inc. Securities Litigation*, No. 00-621 (D.N.J.). In this federal securities fraud action, in which Milberg served as co-lead counsel, plaintiffs alleged, *inter alia*, that Lucent and its senior officers misrepresented the demand for Lucent's optical networking products and improperly recognized hundreds of millions of dollars in revenues. The settlement provided compensation of $600 million to aggrieved shareholders who purchased Lucent stock between October 1999 and December 2000.

- *In re Raytheon Co. Securities Litigation*, No. 99-12142 (D. Mass.). This case, in which Milberg served as lead counsel, concerned claims that a major defense contractor failed to write down assets adequately on long term construction contracts. In May 2004, Raytheon

and its auditor, PricewaterhouseCoopers LLP, settled for a total of $460 million.

- In *In re Rite Aid Corp. Securities Litigation*, No. 99-1349 (E.D. Pa.), in which Milberg served as co-lead counsel, the plaintiffs asserted federal securities fraud claims arising out of allegations that Rite Aid failed to disclose material problems with its store expansion and modernization program, resulting in artificially inflated earnings. Judge Dalzell approved class action settlements totaling $334 million against Rite Aid ($207 million), KPMG ($125 million), and certain former executives of Rite Aid ($1.6 million).

- In *In re CMS Energy Corp. Securities Litigation*, No. 02-72004 (E.D. Mich.), a federal securities fraud case arising out of alleged round-trip trading practices by CMS Energy Corporation, Judge Steeh approved a cash settlement of more than $200 million. Milberg served as co-lead counsel in this litigation.

- *In re Deutsche Telekom AG Securities Litigation*, No. 00-9475 (S.D.N.Y.). Milberg served as co-lead counsel in this securities class action alleging that Deutsche Telekom issued a false and misleading registration statement, which improperly failed to disclose its plans to acquire VoiceStream Wireless Corporation and materially overstated the value of the company's real estate assets. On June 14, 2005, Judge Buchwald approved a $120 million cash settlement.

- *In re CVS Corp. Securities Litigation*, No. 01-11464 (D. Mass.). Milberg served as co-lead counsel in this class action alleging that defendants engaged in a series of accounting improprieties and issued false and misleading statements which artificially inflated the price of CVS stock. On September 7, 2005, Judge Tauro approved a $110 million cash settlement for shareholders who acquired CVS stock between February 6, 2001, and October 30, 2001.

- *Scheiner v. i2 Technologies, Inc.*, No. 01-418 (N.D. Tex.). Milberg served as lead counsel in this securities fraud case, filed on behalf of certain purchasers of i2 common stock. The plaintiffs alleged that certain of the company's senior executives made materially false and misleading statements and omissions in i2's public statements and other public documents regarding i2's software, thereby artificially inflating the price of i2's common stock. In May 2004, Milberg recovered a settlement of $84.85 million.

- *In re Royal Dutch/Shell Transport ERISA Litigation*, No. 04-1398 (D.N.J.). This was an ERISA breach of fiduciary duty class action against the Royal Dutch/Shell Oil Group of Companies on behalf of certain of the companies' U.S. employee investment plan participants. Notably, the $90 million settlement included important provisions regarding the monitoring and training of individuals appointed to be ERISA fiduciaries.

- Milberg served as co-lead counsel in *Irvine v. ImClone Systems, Inc.*, No. 02-0109 (S.D.N.Y.), in which a $75 million cash settlement was approved by the court in July 2005. Plaintiffs alleged that ImClone issued a number of misrepresentations and fraudulent statements to the market regarding the likelihood of approval of the drug Erbitux, thereby artificially inflating the price of ImClone stock.

- In *In re W.R. Grace & Co. (Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. and Official Committee of Asbestos Personal Injury Claimants v. Fresenius Medical Care Holdings, Inc.)*, Nos. 02-2210 and 02-2211 (D. Del.), Milberg acted as lead counsel for the asbestos personal injury and property damage committees in two separate fraudulent conveyance actions within the W.R. Grace bankruptcy. The actions sought to return the assets of Sealed Air Corporation and Fresenius Medical Care Holdings (each of which had been Grace subsidiaries pre-bankruptcy) to the W.R. Grace bankruptcy estate. Complaints in both cases were filed in mid-March 2002, and agreements in principle in both cases were reached on November 27, 2002, the last business day before trial was set to begin in the Sealed Air matter. The two settlements, which consisted of both cash and stock, were valued at approximately $1 billion.

- *Nelson v. Pacific Life Insurance Co.*, No. 03-131 (S.D. Ga.). Milberg served as lead counsel

in this securities fraud class action arising from allegations of deceptive sales of deferred annuity tax shelters to investors for placement in retirement plans that are already tax-qualified. The court approved a $60 million settlement of claims arising from such deception.

- The Firm was lead counsel in *In re Prudential Insurance Co. Sales Practice Litigation*, No. 95-4704 (D.N.J.), a landmark case challenging Prudential's sales practices that resulted in a recovery exceeding $4 billion for certain policyholders. The settlement was approved in a comprehensive Third Circuit decision.

- In *In re NASDAQ Market-Makers Antitrust Litigation*, MDL 1023 (S.D.N.Y.), Milberg served as co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy in one of the largest and most important antitrust cases in history. After more than three years of intense litigation, the case settled for a total of $1.027 billion, one of the largest antitrust settlements at that time.

- *In re Washington Public Power Supply System Securities Litigation*, MDL 551 (D. Ariz.) was a massive securities fraud litigation in which Milberg served as co-lead counsel for a class that obtained settlements totaling $775 million, the largest-ever securities fraud settlement at that time, after several months of trial.

- *In re Exxon Valdez*, No. 89-095 (D. Alaska) and *In re Exxon Valdez Oil Spill Litigation*, 3 AN-89-2533 (Alaska Sup. Ct. 3d Jud. Dist.). Milberg was a member of the Plaintiffs' Coordinating Committee and co-chair of the Plaintiffs' Law Committee in the massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. Plaintiffs obtained a jury verdict of $5 billion, which, after years of appeals by Exxon, was reduced to approximately $500 million by the United States Supreme Court.

- In *In re Managed Care Litigation*, MDL 1334 (S.D. Fla.). Final approval of a settlement between a nationwide class of physicians and defendant CIGNA Healthcare, valued in excess of $500 million, was granted on April 22, 2004.

A similar settlement valued in excess of $400 million involving a nationwide class of physicians and Aetna was approved by the court on November 6, 2003. The settlements stem from a series of lawsuits filed in both state and federal courts by physicians and medical associations against many of the nation's largest health insurers arising from allegations that the insurers engaged in a fraudulent scheme to systematically obstruct, reduce, delay, and deny payments and reimbursements to health care providers. These settlements brought sweeping changes to the health care industry and significant improvements to physician-related business practices.

- *In re Sunbeam Securities Litigation*, No. 98-8258 (S.D. Fla). Milberg acted as co-lead counsel for the class. Plaintiffs alleged that Sunbeam, its auditor, and its management engaged in a massive accounting fraud which led to a restatement of over three years of previously reported financial results. The court approved a combined settlement of more than $140 million, including a $110 million settlement with Arthur Andersen LLP, Sunbeam's auditor. At that time, the Andersen settlement was one of the largest amounts ever paid by a public accounting firm to settle federal securities claims. The settlement with the individuals was achieved on the eve of trial, and ended almost four years of litigation against Andersen and Sunbeam's insiders, including Albert Dunlap, Sunbeam's former Chairman and CEO. The settlement included a personal contribution from Dunlap of $15 million.

- *In re Triton Energy Limited Securities Litigation*, No. 98-256 (E.D. Tex.). Plaintiffs alleged that defendants misrepresented, among other things, the nature, quality, classification, and quantity of Triton's Southeast Asia oil and gas reserves during the period March 30, 1998 through July 17, 1998. The case settled for $42 million.

- In *In re Thomas & Betts Securities Litigation*, No. 00-2127 (W.D. Tenn.), the plaintiffs, represented by Milberg as co-lead counsel, alleged that Thomas & Betts engaged in a series of accounting improprieties while publicly representing that its financial statements were in compliance with GAAP, and failed to disclose

known trends and uncertainties regarding its internal control system and computer and information systems. The case settled for $46.5 million dollars in cash from the company and $4.65 in cash from its outside auditor, KPMG.

- *In re MTC Electronic Technologies Shareholder Litigation*, No. 93-0876 (E.D.N.Y.). Plaintiffs alleged that defendants issued false and misleading statements concerning, among other things, purported joint venture agreements to establish telecommunications systems and manufacture telecommunications equipment in China. The court approved a settlement of $70 million, including $65 million in cash and $5 million worth of MTC Class A shares with "put" rights.

- In *In re PaineWebber Limited Partnerships Litigation*, No. 94-8547 (S.D.N.Y.). Milberg represented investors alleging that PaineWebber developed, marketed, and operated numerous investment partnerships as part of an ongoing conspiracy to defraud investors and enrich itself through excessive fees and commissions over a twelve-year period. On March 20, 1997, Judge Sidney Stein approved a $200 million settlement, consisting of $125 million in cash and $75 million worth of guarantees and fee waivers.

- In *Andrews v. AT&T*, No. 91-175 (S.D. Ga.) the Firm represented a class of persons who paid for premium-billed "900-number" calls that involved allegedly deceptive games of chance, starting in 1993. Defendants included major long-distance companies, which approved the call programs and billed for the calls. Defendant MCI settled for $60 million in benefits. The class against AT&T was decertified on appeal and the Firm prosecuted the individual plaintiffs' claims, obtaining a jury verdict in 2003 for compensatory and punitive damages.

In the context of shareholder derivative actions,

Milberg has protected shareholder investments by effectuating important changes in corporate governance as part of the global settlement of such cases. Cases in which such changes were made include:

- *In re Comverse Technology, Inc. Derivative Litigation*, No. 601272/2006 (N.Y. Sup. Ct. N.Y. Cnty.). On December 28, 2009, Milberg announced a $62 million settlement for the derivative plaintiffs, which was approved by the Court on June 23, 2010. The settlement also resulted in significant corporate governance reforms, including the replacement of the offending directors and officers with new independent directors and officers; the amendment of the company's bylaws to permit certain long-term substantial shareholders to propose, in the Company's own proxy materials, nominees for election as directors (proxy access); and the requirement that all equity grants be approved by both the Compensation Committee and a majority of the non-employee members of the Board.

- *In re Topps Co., Inc. Shareholder Litig.*, No. 600715/2007 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 17, 2007). Milberg served as co-lead counsel in this transactional case, which led to a 2007 decision vindicating the rights of shareholders under the rules of comity and the doctrine of *forum non conveniens* to pursue claims in the most relevant forum, notwithstanding the fact that jurisdiction might also exist in the state of incorporation. This case was settled in late 2007 in exchange for a number of valuable disclosures for the class.

- *In re Marketspan Corporate Shareholder Litigation*, No. 15884/98 (N.Y. Sup. Ct. Nassau Cnty.). The settlement agreement in this derivative case required modifications of corporate governance structure, changes to the audit committee, and changes in compensation awards and to the nominating committee.

# PRECEDENT-SETTING DECISIONS

Milberg has consistently been a leader in developing the federal securities, antitrust, and consumer protection laws for the benefit of investors and consumers. The Firm has represented individual and institutional plaintiffs in hundreds of class action litigations in federal and state courts throughout the country. In most of those cases, Milberg has served as lead or co-lead counsel. The Firm has also been responsible for establishing many important precedents, including the following:

- ***Platinum Partners v. Chicago Board Options Exchange, Inc.***, No. 1-11-2903 (Ill. App. Ct. 2012). Milberg represented an investment management group in a case against the Chicago Board Options Exchange, Inc. ("CBOE") and Options Clearing Corp. ("OCC"). The plaintiff investment management group alleged that it was injured when the CBOE and OCC privately disclosed strike price information to certain insiders prior to the information being made public. In the interim between the private disclosure and the public announcements, the plaintiff purchased tens of thousands of affected options. The lower court dismissed the complaint on the grounds that the CBOE and OCC, as self-regulatory organizations, were immune from suit. However, the Appellate Court reversed, holding that a private disclosure to insiders served no regulatory purpose and should not be protected from suit. The Illinois Supreme Court declined the defendants' petition for leave to appeal.

- ***In re Lord Abbett Mutual Funds Fee Litigation***, 553 F.3d 248 (3d Cir. 2009). This important decision set significant precedent regarding the scope of preemption under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). In reversing the District Court's dismissal of the plaintiffs' claims, the Third Circuit held that "SLUSA does not mandate dismissal of an action in its entirety where the action includes only some pre-empted claims." In so holding, the court explained that "nothing in the language, legislative history, or relevant case law mandates the dismissal of an entire action that includes both claims that do not offend SLUSA's prohibition on state law securities class actions and claims that do . . . ."

- ***Abdullahi v. Pfizer, Inc.***, 562 F.3d 163, 170 (2d Cir. 2009). In this matter, the plaintiffs, Nigerian children and their families, asserted claims under the Alien Tort Statute ("ATS") in connection with Pfizer's clinical trial of the drug, Trovan, without their knowledge. In January 2009, the Second Circuit reversed the District Court's dismissal for lack of jurisdiction. The court held that the plaintiffs pled facts sufficient to state a cause of action under the ATS for a violation of international law prohibiting medical experimentation on human subjects without their consent.

- ***In re Comverse Technology, Inc. Derivative Litigation***, 866 N.Y.S.2d 10 (App. Div. 1st Dep't 2008). In this derivative case in which Milberg serves as co-lead counsel, plaintiff shareholders sued certain of the company's officers and directors based on allegations of illegal options backdating. The lower court dismissed the plaintiffs' claims, holding that the plaintiffs failed to make a pre-suit demand on the company's board, and that in any event, the board had already formed a special committee to investigate the misconduct. In this significant opinion reversing the lower court's dismissal, the Appellate Division clarified the standards of demand futility and held that a board of directors loses the protection of the business judgment rule where there is evidence of the directors' self-dealing and poor judgment. The court noted that the mere creation of a special committee did not justify a stay of the action and did not demonstrate that the board took appropriate steps. Rather, "the picture presented in the complaint is that of a special committee taking a tepid rather than a vigorous approach to the misconduct and the resultant harm. Under such circumstances, the board should not be provided with any special protection."

- ***South Ferry LP #2 v. Killinger***, 542 F.3d 776 (9th Cir. 2008). The important opinion issued by the Ninth Circuit in this securities fraud class action clarified, in the post-*Tellabs*

environment, whether a theory of scienter based on the "core operations" inference satisfies the PSLRA's heightened pleading standard. In siding with the plaintiffs, represented by Milberg, the Ninth Circuit held that "[a]llegations that rely on the core operations inference are among the allegations that may be considered in the complete PSLRA analysis." The court explained that under the "holistic" approach required by *Tellabs*, all allegations must be "read as a whole" in considering whether plaintiffs adequately plead scienter. After remand, the District Court found that the plaintiffs sufficiently alleged scienter under the Ninth Circuit's analysis.

- In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), in which Milberg was lead counsel for the class, the United States Supreme Court announced a uniform standard for evaluating the sufficiency of a complaint under the PSLRA. The court held that on a motion to dismiss, a court "must consider the complaint in its entirety," accepting "all factual allegations in the complaint as true," as well as "tak[ing] into account plausible opposing inferences." On remand, the Seventh Circuit concluded that "the plaintiffs have succeeded, with regard to the statements identified in our previous opinion as having been adequately alleged to be false and material, in pleading scienter in conformity with the requirements of the PSLRA. We therefore adhere to our decision to reverse the judgment of the district court dismissing the suit." The unanimous decision was written by Judge Richard A. Posner.

- *Asher v. Baxter International, Inc.*, 377 F.3d 727 (7th Cir. 2004). In reversing and remanding the District Court's dismissal, the Seventh Circuit resolved in plaintiffs' favor an important issue involving the PSLRA's "safe harbor" for forward-looking statements. The court held that whether a cautionary statement is meaningful is an issue of fact, because whether a statement is meaningful or not depends in part on what the defendant knew when the statement was made as well as other issues of fact. Thus, this issue is not appropriately resolved on a motion to dismiss.

- *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003). This important decision strongly reaffirmed the principle that whether an undisclosed fact would have been material to investors cannot ordinarily be decided on a motion to dismiss. The Eighth Circuit, stressing that "[t]he question of materiality hinges on the particular circumstances of the company in question," observed that even relatively small errors in financial statements might be material if they concern areas of particular importance to investors and raise questions about management integrity.

- *In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002). In this opinion, the First Circuit joined the Second Circuit in allowing a complaint to be based on confidential sources. The court also accepted the argument made by plaintiffs, represented by Milberg, that courts should consider the amount of discovery prior to deciding a motion to dismiss, with a lack of discovery resulting in a correspondingly less stringent standard for pleading securities fraud claims with particularity.

- In *Puckett v. Sony Music Entertainment*, No. 108802/98 (N.Y. Sup. Ct. N.Y. Cnty. 2002), a class action was certified against Sony Music Entertainment on behalf of a class of recording artists who were parties to standard Sony recording or production agreements entered into during the class period. The complaint alleged that Sony had a policy of treating the value added tax on foreign sales of recordings improperly thereby impermissibly reducing the royalties paid or credited to the class members. Justice DeGrasse of the New York State Supreme Court determined that class certification was appropriate and that Gary Puckett (of Gary Puckett & the Union Gap) and jazz musician and composer Robert Watson were appropriate class representatives to represent the class of artists and producers to whom Sony accounts for foreign record royalties.

- In *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), the Second Circuit reversed the District Court's ruling, which denied plaintiffs leave to amend to assert a cause of action against defendants for failing to disclose that the defendant Trust was unable to utilize proper "hedging" techniques to insure against risk of

loss. In the court's view, taken together and in context, the Trust's representations would have misled a reasonable investor.

- In ***Shaw v. Digital Equipment Corp.***, 82 F.3d 1194 (1st Cir. 1996), the First Circuit remanded plaintiffs' action after affirming, in part, Milbergs' position that in association with the filing of a prospectus related to the issuance of securities, a corporate-issuer must disclose intra-quarter, materially adverse changes in its business, if such adverse changes constitute "material changes" the disclosure of which is required pursuant to the Securities Act of 1933.

- ***In re Salomon, Inc. Shareholders Derivative Litigation***, 68 F.3d 554 (2d Cir. 1995). The Second Circuit affirmed the District Court's holding that derivative federal securities claims against defendants would not be referred to arbitration pursuant to the arbitration provisions of the Rules of the New York Stock Exchange, but would be tried in District Court. Shortly thereafter, the case settled for $40 million.

- ***Kamen v. Kemper Financial Services, Inc.***, 500 U.S. 90 (1991). The Supreme Court upheld the right of a stockholder of a mutual fund to bring a derivative suit without first making a pre-suit demand. Specifically, the Court held that "where a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate state law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute. . . . Because a futility exception to demand does not impede the regulatory objectives of the [Investment Company Act], a court that is entertaining a derivative action under that statute must apply the demand futility exception as it is defined by the law of the State of incorporation."

- ***Hasan v. CleveTrust Realty Investors***, 729 F.2d 372 (6th Cir. 1984). The Sixth Circuit very strictly construed, and thus narrowed, the ability of a "special litigation committee" of the board of a public company to terminate a derivative action brought by a shareholder.

- ***Rifkin v. Crow***, 574 F.2d 256 (5th Cir. 1978). The Fifth Circuit reversed an order granting summary judgment for defendants in a Section 10(b) case, paving the way for future acceptance of the "fraud-on-the-market" rationale in the Fifth Circuit.

- ***Blackie v. Barrack***, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976). This is the seminal appellate decision on the use of the "fraud-on-the-market" theory of reliance, allowing investors who purchase stock at artificially inflated prices to recover even if they were personally unaware of the false and misleading statements reflected in the stock's price. In so holding, the court noted that class actions are necessary to protect the rights of defrauded purchasers of securities.

- ***Bershad v. McDonough***, 300 F. Supp. 1051 (N.D. Ill. 1969), *aff'd*, 428 F.2d 693 (7th Cir. 1970). In this case, the plaintiff, represented by Milberg, obtained summary judgment on a claim for violation of Section 16(b) of the Securities Exchange Act, where the transaction at issue was structured by the defendants to look like a lawful option. The decision was cited frequently in discussions as to the scope and purpose of Section 16(b).

PARTNERS

**HENRY J. KELSTON** litigates class actions and other complex cases and has extensive experience in state and federal court litigation, administrative proceedings, and arbitrations. Mr. Kelston is a primary litigator in several cases alleging that major food companies misled consumers by labeling products containing GMOs as "natural."

Mr. Kelston is also a member of the Firm's E-Discovery Practice Group and handles a wide range of complex e-discovery issues. He is a member of The Sedona Conference® Working Group 1 on Electronic Document Retention and Production. He is a regular observer at meetings of the Judicial Conference Advisory Committee on Civil Rules and a frequent writer and speaker on discovery-related amendments to the Federal Rules and other e-discovery issues. He recently testified before the Committee regarding the current proposed amendments to the Federal Rules. He was included in the 2014 Chambers USA, America's Leading Lawyers for Business as a nationally "recognized practitioner" in the e-Discovery practice area.

Mr. Kelston is admitted in the United States District Courts for the Southern and Eastern Districts of New York, District of Connecticut, and Northern District of Illinois. He received a B.S. degree, cum laude, from Tufts University in 1975, and a J.D. degree from New York University School of Law in 1978, where he was a member of the Annual Survey of American Law.

**MATTHEW A. KUPILLAS** graduated from the State University of New York at Albany in 1990 with a B.A. degree in philosophy. In 1994, Mr. Kupillas received his J.D. degree from New York University School of Law. Mr. Kupillas focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation. He is a member of the bar of the State of New York and is admitted to practice before the United States District Court for the Southern and Eastern Districts of New York, the District of Colorado, the Eastern District of Wisconsin, and the United States Court of Appeals for the Tenth Circuit.

**ANDREI RADO** focuses his practice on securities litigation, consumer class actions, and SEC whistleblower matters.

Since the passage of the Dodd-Frank Act in 2010, Mr. Rado has represented numerous whistleblowers before the commission under a program that rewards and protects whistleblowers that report violations of securities laws to the Securities and Exchange Commission. These involved a variety of complaints, including allegations of bribing foreign officials to gain business, accounting fraud, and consumer fraud,

against a variety of companies diverse in size and business.

Mr. Rado's securities practice has included numerous complex litigations nationwide, including *In re Initial Public Offering Securities Litigation*, which alleged, in hundreds of consolidated cases then pending in the Southern District of New York, that investment banks manipulated the initial public offerings of hundreds of companies, and mutual fund timing cases alleging that mutual fund managers allowed select investors to profit by improperly timing their trading in fund shares.

Mr. Rado also investigates, launches, and litigates consumer class actions. These cases are as diverse as consumer fraud itself. Early in his career, Mr. Rado litigated a case against jewelry company Zales for improperly denying credit-insurance claims made by unemployed and retired consumers, and a class action against computer maker Gateway for improperly understating in advertising the costs of internet access to consumers, some of whom incurred internet-access fees of hundreds of dollars. More recently, among other cases, Mr. Rado has launched and litigated consumer cases against companies that misled consumers by inflating the technical specifications of their products, and "all natural" food cases, including the first case alleging that products made from genetically modified organisms (GMOs) should not be advertised as natural.

Mr. Rado is editor of Milberg's consumer blog classactioncentral.com

Prior to joining Milberg, Mr. Rado worked as an attorney at a New York City-based investment bank focusing on compliance, with rules and regulations relating to re-sales of control and restricted securities under the Securities Act of 1933. Mr. Rado also worked at another prominent New York City law firm specializing in plaintiffs' securities class action litigation.

Mr. Rado received his Juris Doctor degree from St. John's University School of Law, *cum laude*, in 1999. While in law school, Mr. Rado served as a senior member of the *New York International Law Review*. He is admitted to practice in the courts of the State of New York, as well as the United States District Court for the Southern District of New York. Mr. Rado was born in Bucharest Romania, and lived in Israel for several years before immigrating to New York in the early 80s.

**ARIANA J. TADLER** is a partner at Milberg LLP. She has extensive experience litigating and managing complex securities and consumer class actions, including high profile, fast-paced cases. Ms. Tadler is widely recognized as one of the nation's leading authorities on electronic discovery and chairs Milberg's E-Discovery Practice Group. Ms. Tadler is regularly invited to speak on a variety of litigation and discovery-related topics and has authored numerous publications on E-Discovery. Ms. Tadler is also a Principal in Meta-e Discovery LLC, which is the result of the spin-off of Milberg's prior Litigation Support and Data Hosting services division that Ms. Tadler helped to build.

Ms. Tadler is currently serving as lead counsel in a number of consumer cases involving the mislabeling as "natural" products that contained GMOs, including *In re ConAgra Foods, Inc.*, and is a member of the Steering Committee in *In re Target Corporation Customer Data Security Breach Litigation,* representing consumers in a class action accusing Target Corp. of failing to protect customers from a massive data breach during the holiday shopping season. She also successfully represented an alternative energy company in its claims of negligence against one of the Big 4 accounting firms. Ms. Tadler's accomplishments also include litigation of three cases in the Eastern District of Virginia (a/k/a the "Rocket Docket") in less than four years, including *In re MicroStrategy Securities Litigation* in

which plaintiffs' counsel negotiated settlements valued at more than $150 million. Ms. Tadler served as one of the court-appointed plaintiffs' liaison counsel in the *Initial Public Offering Securities Litigation* in which the court approved a $586 million cash settlement. Among the thousands of defendants in this coordinated action were 55 prominent investment banks and more than 300 corporate issuers.

Ms. Tadler's extensive experience acting as Special Discovery Counsel in complex litigation and class actions includes representing the government of Colombia as Special Discovery Counsel in its pursuit of claims alleging smuggling and illegal sales of alcohol by several international companies for violation of United States RICO statutes and other common law claims. The engagement encompassed identifying relevant information responsive to defendants' requests, confirming and guiding preservation practices, and interviewing and collecting data from more than 100 custodians in 23 Colombian Departments (Colombia's equivalent to our States in the U.S.). The team also reviewed and produced data in the litigation, and was tasked with ensuring compliance with the various privacy laws of Colombia and the United States with regard to personal data, controlled data and the transfer of sensitive information — all hot topics in the area of E-Discovery today.

Ms. Tadler was recently appointed by United States Supreme Court Justice Roberts to serve on the Federal Civil Rules Advisory Committee.

Ms. Tadler recently completed her service on The Sedona Conference®'s Board of Directors and, after having served for five years as Chair, is Chair Emeritus of the Steering Committee for Working Group 1 on Electronic Document Retention and Production, the preeminent "think tank" on E-Discovery. In addition, she is on the Advisory Board of Georgetown University Law Center's Advanced E-Discovery Institute where she has helped educate federal judges and lawyers on E-Discovery issues and also serves on the Bloomberg Law Litigation Innovation Board. In addition to serving on the Advisory Committee of the Judicial Improvements Committee of the Southern District of New York, Ms. Tadler is on the committee of the Seventh Circuit Electronic Discovery Pilot Program and also actively involved in the reformulation of applicable E-

Discovery rules and best practices. Ms. Tadler serves as the Executive Director for the Board of Advisors of the Benjamin N. Cardozo School of Law's Data Law Initiative, a comprehensive program of courses focused on various aspects of data law including information governance, E-Discovery and cybersecurity.

Ms. Tadler continues to be recognized for her litigation prowess by prominent legal industry rating organizations. Ms. Tadler's most recent accolades include Band 1 (highest) recognition by Chambers and Partners' for E-Discovery; selection by Super Lawyers 2017 "Top 100 Lawyers in New York Metro Area"; Super Lawyers 2017 "Top 50 Women Lawyers in New York Metro Area"; Who's Who Legal Litigation: Leading Practitioner-E-Discovery (2017); and AV® Preeminent rating from Martindale Hubbell. The Legal 500 2016 rankings stated: "'Consummate professional' Ariana Tadler, who leads the E-Discovery unit, is 'exceptional, clear and forceful, a giant in her field' … 'able to navigate technical discovery issues at a very high level.'"

Ms. Tadler is a member of several legal industry associations, including: American Bar Association; American Bar Foundation (Fellow); American Association for Justice; Federal Bar Council; New York State Bar Association; National Association of Women Lawyers; New York County Lawyers Association; New York Women's Bar Association; and The New York Inn of Court (Vice President). Ms. Tadler is a fellow of the Litigation Counsel of America, an invitation-only trial lawyer honorary society that recognizes the country's top attorneys. She is also involved in various community and not-for-profit organizations and currently serves on the board of Mobilization for Justice.

Ms. Tadler graduated from Hamilton College in 1989. In 1992, she received her J.D. from Fordham University School of Law, where she was the Articles and Commentary Editor of the Fordham Urban Law Journal, a member of the Moot Court Board, and the 1990 recipient of the American Jurisprudence Award in Criminal Law.

**JEFF S. WESTERMAN** (Former Partner) received his B.A. degree from Northwestern University in 1977, where he was selected to be a member of two senior honorary societies. He received his J.D. degree from the University of Pittsburgh in 1980, where he was a member of the Law Review.

Mr. Westerman's practice was primarily in the areas of securities fraud class actions, shareholder derivative actions, and corporate mergers and acquisition litigation. He served as lead or co-lead counsel in cases resulting in significant corporate governance changes, and resulting in plaintiff recoveries and recognized increased value to plaintiffs totaling more than $800 million. In 2005, *The Daily Journal* recognized him as one of the top 30 securities litigators in California.

Mr. Westerman has also been the moderator or speaker for programs on complex litigation, developments in class action practice, settlements, the Sarbanes-Oxley Corporate Responsibility Act, shareholder derivative actions and trends in business litigation.

Mr. Westerman was a member (2001-2003) and Co-Chair (2002-2003) of the Central District of California Attorney Delegation to the United States Ninth Circuit Judicial Conference. He served on the Central District of California, U.S. Magistrate Judge Merit Selection Panel and the standing committee on Attorney Discipline. He was also a member of the Central District of California Attorney Settlement Officer Panel (1998-present).

Mr. Westerman was the president of the Association of Business Trial Lawyers (2004-2005); a member of the Board of Governors (1997-2005), Treasurer (2001-2002), Secretary (2002-2003) and Vice President (2003-2004). He was also on the Board of Governors of the Consumer Attorneys Association of Los Angeles.

Committee, and a member of the Bench-Bar Civil Courts Committee; and served as Judge Pro Tem in the Los Angeles Small Claims Court in 1987-1988, 1990, 1992-1993 and 1996-1997. He is a member of the Los Angeles County and Federal Bar Associations. He was on the California State Bar Task Force on Complex Litigation, and Chair of the Judicial Education Subcommittee (1997). In 2007, he

## OF COUNSEL

**PAUL J. ANDREJKOVICS** graduated from Union College, Schenectady, NY, in 1992, *Phi Beta Kappa*, *magna cum laude*, with a B.A. degree in political science. In 1995, Mr. Andrejkovics received his J.D. degree from Albany Law School.

Mr. Andrejkovics's practice concentrates on class action settlements and settlement administration. He was admitted as a member of the New York bar in 1996 and is admitted to practice before the United States District Court for the Northern, Southern, and Eastern Districts of New York.

## ASSOCIATES

**CAREY ALEXANDER** (Former Associate) focused his practice on complex consumer litigation and class actions.

Mr. Alexander received his B.A. from Skidmore College in 2004, and graduated *magna cum laude* from the St. John's University School of Law in 2012. During law school, Mr. Alexander served as Associate Managing Editor of the *St. John's Law Review*. His student note, *Abusive: Dodd–Frank Section 1031 and the Continuing Struggle to Protect Consumers*, 85 ST. JOHN'S L. REV. 1105 (2012), has been cited in several legal journals, including the *Harvard Law Review*.

Prior to law school, Mr. Alexander served as an editor of the consumer-advocacy blog, *Consumerist.com*. He also served as an advisor to the Bronx Borough President and worked as part of the National Campaign to Restore Civil Rights.

Mr. Alexander admitted to practice in the State of New York.

**ANGELA G. BONGIORNO** received her J.D. from Catholic University of Milan Law School in 2004 and her L.L.M. from Fordham University School of Law in 2008.

Ms. Bongiorno focuses her practice on mass torts, antitrust litigation, and institutional investor and client outreach. Prior to joining Milberg, she worked for an Italian law firm specializing in consumer law. Ms. Bongiorno also has conducted various research projects concerning the implementation of European Union regulations in Member States for the Italian Embassy of Malta and for Fondazione Rosselli, a think tank for Italian and European governmental bodies.

While in law school, Ms. Bongiorno interned with the Italian Embassy of Malta during Malta's accession to the European Union. She is fluent in Italian and conversant in Spanish.

Ms. Bongiorno is admitted to practice in the courts of the State of New York.

**CHRISTOPHER SCHUYLER** focuses his practice on False Claims Act litigation, consumer class actions, and e-discovery.

Before joining Milberg, Mr. Schuyler clerked with the Fortune Society, a New York City non-profit organization focused on providing an alternative to incarceration for non-violent offenders. While in law school, he co-chaired a student organization promoting pro bono legal assistance to indigent members of the community, a role for which he was awarded a university scholarship for public service.

Mr. Schuyler graduated from Temple University, *cum laude,* with a B.A. degree in 2007. In 2011 he earned his J.D. degree from the University of Dayton School of Law. Mr. Schuyler is a member of the bar of the State of New York and is admitted to practice before the United States District Court for the Southern and Eastern Districts of New York.

**GREGORY STAMATOPOULOS** (Former Associate) focused his practice on antitrust litigation, consumer protection, and e-discovery.

Mr. Stamatopoulos graduated from Michigan State University with a B.A., *with honors,* in 2006. In 2010, he earned his J.D. degree from Wayne State University School of Law.

During law school, Mr. Stamatopoulos served as Chairperson of The Free Legal Aid Clinic in Detroit, managing a facility that specializes in providing family and elder law services to city residents. As an undergraduate, Mr. Stamatopoulos double-majored in International Relations and Russian.

Mr. Stamatopoulos is admitted to practice in the state courts of Michigan and New York.

**NATHANIEL TARNOR** (Former Associate) graduated from the University of Illinois with a B.A. degree in 2000. In 2004, he earned his J.D. degree from Chicago-Kent College of Law.

Mr. Tarnor concentrated his practice on complex litigation and corporate accountability. He has represented clients before the U.S. Supreme Court, various federal courts of appeals, and numerous trial courts on a wide variety of issues. Mr. Tarnor's practice areas have included antitrust, civil rights, consumer protection, securities, and shareholder derivative litigation, among others. Additionally, Mr. Tarnor has extensive experience in international litigation and international human rights law. In this regard, he has devoted substantial amounts of pro bono time to assisting human rights victims and their families, and his prior legal work has included representing human rights victims pursuant to the Torture Victim Protection Act, Alien Tort Statute, and Foreign Sovereign Immunities Act.

While in law school, Mr. Tarnor was captain of his law school's international law moot court team, inducted into the International Law Moot Court Honor Society, and focused his academic studies and was awarded a certificate in international and comparative law.

Mr. Tarnor was admitted to practice before the U.S. Supreme Court, U.S. Courts of Appeals for the Second, Seventh, and D.C. Circuits, the U.S. District Courts for the Southern and Eastern Districts of New York, the Northern and Central Districts of Illinois, the District of Columbia, and the District of Colorado. Mr. Tarnor was also admitted to practice in New York, Illinois, and Washington, D.C.

**MEAGAN M. KEENAN** (Former Associate) focused her practice on complex consumer litigation and class actions.

Prior to joining Milberg, Ms. Keenan was a fellow at a private legal services office, where she defended low-income consumers in various credit disputes, tax disputes and debt collection litigation, as well as represented clients in affirmative actions under the Fair Debt Collection Practices Act, Truth in Lending Act, Fair Credit Reporting Act, and other federal and state consumer protection statutes.

Ms. Keenan graduated magna cum laude from Union College in Schenectady, NY, with a B.A. in Political Science in 2009. In 2012, she earned her J.D. from Fordham University School of Law, where she was an Equal Justice Works Fellow for the Legal Aid Society of New York, a member of the Fordham Journal of Corporate & Financial Law, and co-chair of the Regional Board of Directors for the Unemployment Action Center. Ms. Keenan is admitted to practice in the State of New York.

**JESSICA SLEATER** (Former Associate) received a B.A. from Truman State University in 2002, and a J.D. from Saint Louis University School of Law in 2007. Ms. Sleater's practice focused on class action litigation involving defrauded investors and consumers in federal and state courts. Ms. Sleater also has experience in shareholder litigation and has represented the rights of public shareholders of companies whose management had agreed to a corporate buyout, merger, or other corporate transaction.

Prior to joining the Firm, Ms. Sleater practiced at a boutique firm in New York specializing in securities litigation. She also previously worked for the Metropolitan Transportation Authority-New York City Transit and was an Assistant Attorney General for the State of Missouri. During law school, Ms. Sleater served as a law clerk for the Equal Employment Opportunity Commission, the U.S. Department of Agriculture, and the Missouri Attorney General's Office. Also while in law school, Ms. Sleater was selected as the Editor-in-Chief of the *Saint Louis University Public Law Review*.

Ms. Sleater was admitted to practice in the courts of the States of New York and Missouri, as well as the United States District Courts for the Southern and Eastern Districts of New York.

**DAVID PEPPER** (Former Associate) received a B.A. from Northwestern University in 1998, and a J.D. *magna cum laude* from New York Law School in 2011. Mr. Pepper's practice concentrated in investor

and consumer rights litigation, with a particular focus on class action securities litigation.

Prior to becoming an associate, Mr. Pepper worked at Milberg as a financial analyst. In that role, he analyzed complex capital markets issues, such as asset-backed securitizations, currency and interest rate swaps, auction rate securities, and securities lending. His analysis involved deciphering manipulative trading practices and patterns in a wide array of financial markets and assessing corporate transactions through fundamental and market-based valuation methods.

Before joining Milberg, Mr. Pepper enjoyed a seven-year career on Wall Street as an equities trader and market-maker.

While in law school, Mr. Pepper was a staff editor for the *New York Law School Law Review*, in which he had two articles published. Mr. Pepper won the 2010 Best Case Comment Award for his student Comment published in the 2010-11 edition of the *New York Law School Law Review*.

EXHIBIT B

|  | ) |  |
|---|---|---|
|  | ) |  |
| *Frito-Lay North America, Inc. "All Natural"* | ) | Case No. 12-MD-02413-RRM-RLM |
| *Litigation* | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**DECLARATION OF MICHAEL R. REESE IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES FILED ON BEHALF OF REESE LLP**

I, Michael R. Reese, declare as follows:

1.      I am the founding partner of Reese LLP, a law firm established in 2008 that specializes in class action litigation on behalf of consumers and small businesses in both federal and state courts throughout the United States.  I am a member in good standing of the state bars of New York and California as well as numerous federal courts, including but not limited to the U.S. District Courts for the Southern, Eastern and Northern Districts of New York; the Northern, Central, Eastern and Southern Districts of California; the Southern District of Texas; the Northern and Southern Districts of Illinois; the Eastern District of Wisconsin, and the District of Colorado.  I am also a member of the federal bars of the U.S. Courts of Appeals for the Second, Seventh, Eighth and Ninth Circuits, before which I have argued numerous appeals.  I am a frequent lecturer on class actions and food litigation, and I am speaking on food law and policy at both the Perrin Conference in Chicago, Illinois and the Union International des Advocats ("UIA") in Toronto, Canada in October, 2017.  I also am the co-host of an annual food law conference that brings together major stakeholders in food law and policy, including members from academia, non-governmental organizations, the federal government, major food

corporations, and both the plaintiffs and defense bars, with next year's conference scheduled for Denver, Colorado in April, 2018. I also served for five years on the executive committee member of the Plaintiffs' Class Action Forum, where I presented on class actions topics each year. I currently serve as an adjunct law professor at the Brooklyn Law School, where I currently am teaching a class entitled *The Law of Class Actions and Other Aggregate Litigation* and will teach a *Food Law* class in the Spring, 2018 semester. I also am on the advisory board for Wellness in the Schools (WITS), a non-profit dedicated to providing nutritional education to children. My firm and I also frequently work with non-profits such as Center for Science in the Public Interest to address deception involving food labeling. Prior to litigating class actions, I was a prosecutor at the Manhattan District Attorney's Office in New York, New York, where I served as trial counsel in prosecuting white-collar and violent felony crimes.

2. I submit this declaration in support of my firm's application for an award of attorneys' fees in connection with services rendered in this case, as well as the reimbursement of expenses incurred by my firm in connection with this consumer class action litigation. I have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the litigation.

3. My firm are court appointed co-lead counsel in this litigation. My firm has extensive class action experience, especially as it related to food related class actions. My firm has been appointed as class counsel in numerous cases involving food related causes of action, including, but not limited to *Ackerman v. Coca-Cola Co.*, Case No. 09-cv-00395-DLI-RLM (E.D.N.Y.); *Frohberg v. Cumberland Packaging Corp.*, Case No. 1:14-cv-0748-RLM (E.D.N.Y.); *Ferrera v. Snyder's-Lance, Inc.*, case no. 13-cv-62496 (S.D. Fla.); *In re General Mills, Inc. Kix Cereal Litig.*, Case No. 2:12-cv-00249-KM-MCA (D.N.J.); *Howerton v. Cargill,*

*Inc.*, Case No. 13-cv-0336 (D. Hawaii); *Rosen v. Unilever United States Inc.*, Case No. 09-02563 JW (N.D. Cal.)*;* and, *Yoo v. Wendy's Corp.*, Case No. 07-4515 (C.D. Cal.) (stating that Reese LLP "has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy").

4.      As described below in detail, I have been personally involved in all aspects of my firm's work in this litigation, including the following: prosecution of this action from its inception and for conducting initial investigation and drafting of the complaint that was filed on January 27, 2012; appearance before and argument in front of the Judicial Panel on Multi-District Litigation ("JPML"); motion practice (including, but not limited to, opposing a motion to dismiss); extensive discovery, including numerous depositions both in New York, New York and Dallas, Texas; and, numerous mediations before a retired federal judge  – the Hon. Richard J. Holwell (Ret.), formerly of the Southern District of New York - that resulted in the Settlement. Reese LLP has vigorously represented the interests of the Settlement Class Members throughout the course of the litigation and settlement process.

5.      The schedule attached hereto as Exhibit 1 is a detailed summary indicating the amount of time, by category, spent by the partners, other attorneys, and professional support staff of my firm who were involved in this litigation, and the lodestar calculation based on my firm's current billing rates.[1] The schedule was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm, which are available at the request of the Court for review *in camera*.[2] Time expended in preparing this application for fees and reimbursement of expenses has not been included in this request.

---

[1] This application does not include time for anyone who spent fewer than 5 hours on this litigation.

[2] These records may include information concerning privileged and/or confidential attorney-client communications or work product.

6.	The hourly rates for the partners, other attorneys, and professional support staff in my firm included in Exhibit 1 are the same as the regular current rates which have been used in the lodestar cross check accepted by courts in other class litigation.

7.	The total number of hours expended on this litigation by my firm is 2,035.25 hours. The total lodestar for my firm is $1,676,606.25.

8.	My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

9.	As detailed in Exhibit 2, my firm has incurred a total of $36,790.26 in un-reimbursed expenses in connection with the prosecution of this litigation.

10.	The expenses incurred in this action are reflected on the books and records of my firm, which are available at the request of the Court. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses as charged by the vendors. Third-party expenses are not marked up.

11.	By agreement between Plaintiffs' Counsel, my firm is not charging separately for the following costs and expenses: secretarial and clerical overtime, including their meals and local transportation; word processing; secretarial/clerical time for document preparation; time charges for routine copying, faxing or scanning; incoming/outgoing fax charges; office supplies (such as paper, binders, etc.); special publications; continuing legal education seminars; working meals for attorneys (with the exception of meals with clients, expert or other witnesses, meals while traveling for the case, or meal expenses for meetings between Plaintiffs' Counsel); and local overtime meals and transportation for attorneys.

12.     With respect to the standing of counsel in this case, attached hereto as Exhibit 3 is my firm's résumé and brief biographies for the attorneys currently in my firm.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of October, 2017, at New York, New York.

_____
Michael R. Reese

EXHIBIT 1

*Frito-Lay North America, Inc. "All Natural" Litigation*,
No. 12-MD-2413-RRM-RLM (E.D.N.Y.)

**REESE LLP**

**TIME REPORT — Inception through October 1, 2017**

| Name/Position | A | B | C | D | E | F | G | Total Hours | Hourly Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|
| Michael R. Reese/P | 168.50 | 195. 75 | 1038.50 | 56.00 | 85.75 | 55.25 | 125.75 | 1,725.50 | $875 | $1,509,812.50 |
| George V. Granade / P | 0.00 | 49.25 | 105.75 | 0.00 | 8.50 | 0.00 | 3.50 | 167.00 | $700 | $116,900.00 |
| Maurice Hudson/C | 8.25 | 2.50 | 1.75 | 0.00 | 2.25 | 0.00 | 0.00 | 14.75 | $625 | $9,218.75 |
| Jason Hardy/A | 13.5 | 15.00 | 17.0 | 0.0 | 0.0 | 0.0 | 0.0 | 45.5 | $350 | $15,925.00 |
| Ernest Stanley/A | 0.00 | 0.00 | 82.5 | 0.00 | 0.00 | 0.00 | 0.00 | 82.5 | $300 | $24,750.00 |
| | | | | | | | | 0.00 | | $0.00 |
| **TOTAL LODESTAR** | 190.25 | 262.50 | 1,245.50 | 56.00 | 96.5 | 55.25 | 129.25 | 2,035.25 | | $1,676,606.25 |

CATEGORIES

A. Pre-Filing Investigation and Initial Complaint

B. Legal Research, Pleadings, Briefs, and Motions After Initial Complaint

C. Discovery and Post-Filing Investigation

D. Experts and Consultants

E. Litigation Strategy, Analysis, and Case Management

F. Court Appearances & Preparation

G. Settlement

POSITION

P = Partner

A = Associate/Staff Attorney

C = Senior Counsel/Of Counsel

PL = Paralegal

O = Other

**EXHIBIT 2**

***Frito-Lay North America, Inc. "All Natural" Litigation***,
**No. 12-MD-2413-RRM-RLM (E.D.N.Y.)**

**REESE LLP**

**EXPENSE REPORT — Inception through October 1, 2017**

| <u>**Categories**</u>: | <u>**Amount**</u> |
|---|---:|
| Filing/Witness Fees | $350.00 |
| Court Reporters/Transcript/Video | $2,001.25 |
| Experts/Consultants/Professional Services | $21,245.50 |
| Mediation | $9,313.43 |
| Out-of-Town Meals/Hotel/Transportation | $3,880.08 |
| **TOTAL EXPENSES:** | $36,790.26 |

**<u>EXHIBIT 3</u>**

# REESE LLP

Reese LLP represents consumers in a wide array of class action litigation throughout the nation. The attorneys of Reese LLP are skilled litigators with years of experience in federal and state courts. Reese LLP is based in New York, New York.

Recent and current cases litigated by the attorneys of Reese LLP on behalf of consumers include the following:

*Ackerman v. The Coca-Cola Co.*, 09-CV-0395 (JG) (RML) (E.D.N.Y.); class action for violation of California and New York's consumer protection laws; *Rapoport-Hecht v. Seventh Generation, Inc.*, 14-cv-9087-KMK (S.D.N.Y.); *Berkson v. GoGo, LLC,* 14-cv-1199-JWB-LW (E.D.N.Y.); *Chin v. RCN Corporation*, 08-cv-7349 RJS (S.D.N.Y.): class action for violation of Virginia's consumer protection law; *Bodoin v. Impeccable L.L.C.*, Index. No. 601801/08 (N.Y. Sup. Ct.): individual action for conspiracy and fraud; *Young v. Wells Fargo & Co.*, 08-CV-507 (S.D. Iowa): class action for violation of the RICO Act; *Murphy v. DirecTV, Inc.*, 07-CV-06545 FMC (C.D. Cal.): class action for violation of California's consumer protection laws; *Bain v. Silver Point Capital Partnership LLP,* Index No. 114284/06 (N.Y. Sup. Ct.): individual action for breach of contract and fraud; *Siemers v. Wells Fargo & Co.*, C-05-4518 WHA (N.D. Cal.): class action for violation of § 10(b) of the Securities Exchange Act of 1934; *Kastin v. AMR Corporation*, 06-CV-5726 (S.D.N.Y.): class action for violation of the Sherman Antitrust Act; *In re Korean Air Antitrust Litigation*, 07-CV-01891 SJO (C.D. Cal.): class action for violation of the Sherman Antitrust Act; *Dover Capital Ltd. v. Galvex Estonia OU*, Index No. 113485/06 (N.Y. Sup. Ct.): individual action for breach of contract involving an Eastern European steel company; *All-Star Carts and Vehicles Inc. v. BFI Canada Income Fund*, 08-CV-1816 LDW (E.D.N.Y.): class action for violation of the Sherman Antitrust Act; *Petlack v. S.C. Johnson & Son, Inc.*, 08-CV-00820 CNC (E.D. Wisconsin): class action for violation of Wisconsin consumer protection law; *Hill v. Roll International Corporation*, CGC-09-487547 (San Francisco County Superior Court): class action for violation of California's consumer protection laws; *L'Ottavo Ristorante v. Ingomar Packing Co.*, 09-CV-01427 (E.D. Cal.): class action for violation of the Sherman Antirust Act; and *Wong v. Alacer Corp.*, (San Francisco Superior Court): class action for violation of California's consumer protection laws; and, *Howerton v. Cargill, Inc.* (D. Hawaii); class action for violation of various consumer protection laws; *Yoo v. Wendy's International, Inc.*, 07-CV-04515 FMC (C.D. Cal.): class action for violation of California's consumer protection laws.

## The Attorneys of Reese LLP

### Michael R. Reese

Mr. Reese litigates consumer, and antitrust cases as class actions and on behalf of individual clients. Prior to entering private practice in 2000, Mr. Reese served as an assistant district attorney at the Manhattan District Attorney's Office where he served as a trial attorney prosecuting both violent and white-collar crime.

Achievements by Mr. Reese on behalf of consumers span a wide array of actions. For example, in *Yoo v. Wendy's International Inc.*, Mr. Reese was appointed class counsel by the court and commended on achieving a settlement that eliminated *trans* fat from a popular food source. *See Yoo v. Wendy's Int'l Inc.*, No. 07-CV-04515-FMC (JCx) (C.D. Cal. 2007) (stating that counsel "*has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy*"). In *Chin v. RCN Corporation*, Mr. Reese was appointed class counsel and commended by the court for stopping RCN's practice of throttling its Internet customers through adverse network management practices. *See Chin v. RCN Corp.*, No. 08-CV-7349(RJS)(KNF), 2010 WL 3958794, 2010 U.S. Dist. LEXIS 96302 (S.D.N.Y. Sept. 8, 2010) (stating that "*class counsel is qualified, experienced, and able to conduct the litigation*").

Recent victories by Mr. Reese and his firm include a $6.1 million class action settlement in the District of Hawaii in the matter of *Howerton v. Cargill, Inc.* for consumers of Truvia branded sweetener and a $6.4 million class action settlement in San Francisco Superior Court in the matter of *Wong v. Alacer Corp.*, for consumers of Emergen-C branded dietary supplement.

Mr. Reese and his firm are currently court appointed class counsel in a number of pending class actions, including, but not limited to, *In re Frito-Lay N.A. "All-Natural" Litigation* pending in the Eastern District of New York and *In re General Mills "Kix" All-Natural Litigation*, also pending in the District of New Jersey.

Mr. Reese is a frequent lecturer on issues of class actions and has recently moderated a panel on food class actions for the California State Bar; presented at the Food and Drug Law Institute annual conference in Washington, D.C.; presented at the American Bar Association in Washington, D.C.; and, presented at the Perrin Annual Conference in Washington, D.C.

Mr. Reese was also an executive committee member of the Plaintiffs' Class Action Forum for five years, where he lectured on an annual basis and presented previously on the topics of ascertainability, (c)(4) issue classes; and, the level of proof required for class certification.

Mr. Reese is also an adjunct professor at Brooklyn Law School where he teaches on class actions as well as food law.

Mr. Reese is a member of the state bars of New York and California as well as numerous federal courts. Mr. Reese received his juris doctorate from the University of Virginia in 1996 and his bachelor's degree from New College in 1993.

## George V. Granade II

Mr. Granade is partner at Reese LLP who focuses on consumer class actions. Cases Mr. Granade has worked on include:

- *Barron v. Snyder's-Lance, Inc.*, No. 0:13-cv-62496-JAL (S.D. Fla.) (involving "Snyder's," "Cape Cod," "EatSmart," and "Padrinos" brand food products labeled as "natural" and allegedly containing genetically-modified organisms and other synthetic ingredients);

- *In re: Frito-Lay North America, Inc. "All Natural" Litigation*, No. 1:12-md-02413-RRM-RLM (E.D.N.Y.) (involving "SunChips," "Tostitos," and "Bean Dip" products labeled as "natural" and allegedly containing genetically-modified organisms); and

- *Martin v. Cargill, Inc.*, No. 0:13-cv-02563-RHK-JJG (D. Minn.) (involving "Truvia" sweetener product labeled as "natural" and allegedly containing highly processed ingredients).

Mr. Granade received his juris doctorate from New York University School of Law in 2011. He received a master's degree from the University of Georgia at Athens in 2005 with distinction and a bachelor's degree from the University of Georgia at Athens in 2003, *magna cum laude* and with High Honors.

Mr. Granade is a member of the state bar of Georgia and the state bar of New York, as well as the bars of the United States District Court for the Eastern District of New York and the United States District Court for the Southern District of New York.

## Sue J. Nam

Ms. Nam is of counsel at Reese LLP where she focuses on consumer class actions.

Prior to joining the firm, Ms. Nam was the General Counsel for NexCen Brands, Inc., a publicly traded company that owned a portfolio of consumer brands in food, fashion and homeware.

Previously, Ms. Nam was Intellectual Property Counsel and Assistant Corporate Secretary at Prudential Financial, Inc., and she was an associate specializing in intellectual property and litigation at the law firms of Brobeck Phleger & Harrison LLP in San Francisco, California and Gibson Dunn & Crutcher LLP in New York, New York.

Ms. Nam clerked for the Second Circuit prior to joining private practice.

Ms. Nam received her juris doctorate from Yale Law School in 1994. She received a bachelor's degree with distinction from Northwestern University in 1991.

## Belinda L. Williams

Ms. Williams is based in New York, and she focuses her practice on class actions on behalf of defrauded consumers and investors. Ms. Williams has extensive experience in litigating complex commercial cases.

Ms. Williams is admitted to the bars of several federal courts as well as the state bars of New York and Maryland. Ms. Williams received her juris doctorate from the University of Virginia School of Law in 1986 and her undergraduate degree from Harvard University in 1982.


## Kate J. Stoia

Ms. Stoia is based in San Francisco from where she litigates securities and consumer class actions. Ms. Stoia previously worked at the law firms of Brobeck Phleger & Harrison LLP and Gibson Dunn & Crutcher LLP. Prior to her work as a civil litigator, Ms. Stoia clerked for the Hon. Charles A. Legge of the Northern District of California.

Ms, Stoia is a member of the state bar of California and several federal courts. Ms. Stoia received her juris doctorate from Boalt Hall School of Law, University of California at Berkeley and her bachelor's degree from Columbia University.

## Lance N. Stott

Mr. Stott is based in Austin, Texas from where he litigates consumer class actions. Previous and current consumer fraud class actions litigated by Mr. Stott include *Davis v. Toshiba America Consumer Products* for allegedly defective DVD players; *Bennight v. Pioneer Electronics (USA) Inc. et al.* for allegedly defective television sets; *Spencer v. Pioneer Electronics (USA) Inc. et al.* for allegedly defective DVD players; and, *Okland v. Travelocity.com, Inc.*, for deceptive pricing for online hotel reservations.

Mr. Stott is a member of the state bar of Texas. Mr. Stott received his juris doctorate from the University of Texas in 1996 and his bachelor's degree from New College in 1993.

EXHIBIT C

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| *Frito-Lay North America, Inc. "All Natural" Litigation* | )<br>)<br>)   Case No. 12-MD-02413-RRM-RLM<br>)<br>)<br>)<br>) |

## DECLARATION OF JULIO J. RAMOS IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES FILED ON BEHALF OF LAW OFFICES OF JULIO J. RAMOS

I, Julio J. Ramos declare as follows:

1.      I am a principal of the Law Offices of Julio J. Ramos. I submit this declaration in support of my firm's application for an award of attorneys' fees in connection with services rendered in this case, as well as the reimbursement of expenses incurred by my firm in connection with this consumer class action litigation. I have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the litigation.

2.      My firm acted as counsel in this litigation for lead Plaintiff Valarie Zuro in this litigation and as Plaintiffs' Counsel. My firm was actively involved in this litigation from start to finish including preparations and defending Lead Plaintiff depositions, legal research, discovery, and brief writing.  I have been personally involved in all aspects of my firm's work in this litigation.  Throughout the case my office has worked at the request direction of lead counsel with respect to the investigation of claims and prosecution of the action. My firm's lodestar to date includes, among other tasks, time billed for: (a) investigating the claims and drafting pleadings; (b) preparing and reviewing discovery responses and voluminous documents

produced; (c) preparing for and participating in meetings and discussing strategy among the parties and counsel; (d) preparing for and defending the deposition of Ms. Zuro; (e) preparing motion papers, including research and writing of portions of Plaintiffs' successful opposition to defendants' motion to dismiss and (f) attending court conferences.

3.     My firm has extensive class action experience. The firm represents individuals, small businesses, investors and consumers in class action cases litigated in the United States. My firm has served as sole lead-counsel or co-lead counsel in numerous class actions, including cases brought on behalf of consumers. For example, in the matter of *Amezcua v. East West Bank*, BC 412981, Los Angeles Superior Court my firm obtained a $10,000,000.00 class action settlement after more than five years of litigation against a bank that allegedly abetted a Ponzi scheme and we continue to pursue multi-million dollar complex cases of that nature *see Giron v. HSBC USA Inc.,* CASE NO.: 2:15-cv-08869-ODW-JCx (C.D. Cal.)

4.     I personally have over 20 years of experience litigating class actions and has played active roles in the following recent consumer class actions: *In re Conagra Foods Inc., MDL 2291, In re Groupon MDL 2238, In re Enfamil Sales and Marketing Practices Litigation MDL 2222 and In re Mattel Toxic Toys MDL 1897.*

5.     The schedule attached hereto as Exhibit 1 is a detailed summary indicating the amount of time, by category, spent by myself, other attorneys, and professional support staff of my firm who were involved in this litigation, and the lodestar calculation based on my firm's current billing rates.[1]  The schedule was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm, which are available at the request of the Court for

---

[1] This application does not include time for anyone who spent fewer than 5 hours on this litigation.

review *in camera*.[2] Time expended in preparing this application for fees and reimbursement of expenses has not been included in this request.

6.      The hourly rates for the partners, other attorneys, and professional support staff in my firm included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters.

7.      The total number of hours spent on this litigation by my firm and associated local counsel the Law Offices of Paul Dans is 440.15 hours. The total lodestar amount for attorney/professional time is $316,443.75.

8.      My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

9.      As detailed in Exhibit 2, my firm has incurred a total of $650.91 in unreimbursed expenses in connection with the prosecution of this litigation.

10.      The expenses incurred in this action are reflected on the books and records of my firm, which are available at the request of the Court. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses as charged by the vendors. Third-party expenses are not marked up.

11.      By agreement between Plaintiffs' Counsel, my firm is not charging separately for the following costs and expenses: secretarial and clerical overtime, including their meals and

---

[2] These records may include information concerning privileged and/or confidential attorney-client communications or work product.

local transportation; word processing; secretarial/clerical time for document preparation; time charges for routine copying, faxing or scanning; incoming/outgoing fax charges; office supplies (such as paper, binders, etc.); special publications; continuing legal education seminars; working meals for attorneys (with the exception of meals with clients, expert or other witnesses, meals while traveling for the case, or meal expenses for meetings between Plaintiffs' Counsel); and local overtime meals and transportation for attorneys.

12.     With respect to the standing of counsel in this case, attached hereto as Exhibit 3 is my résumé and brief biographies for the associated attorney who was also involved in this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of September, 2017, at San Francisco CA.

**Julio J. Ramos**

**EXHIBIT 1**

*Frito-Lay North America, Inc. "All Natural" Litigation*,
No. 12-MD-2413-RRM-RLM (E.D.N.Y.)

**LAW OFFICES OF JULIO J. RAMOS**

**TIME REPORT — Inception through October 1, 2017**

| Name/Position | A | B | C | D | E | G | Total Hours | Hourly Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|
| Julio J. Ramos Attorney P | 31.15 | 65.30 | 33.15 | 34.45 | | 28.00 | 192.45 | $775 | $149,381.25 |
| Paul Dans Attorney 0 | | 87.45 | 139.30 | 14.45 | 4.30 | 1.15 | 247.30 | $675 | $167.062.50 |
| **TOTAL LODESTAR** | 31.15 | 153.15 | 172.45 | 49.15 | 4.30 | 29.15 | 440.15 | | $316,443.75 |

**CATEGORIES**

A. Pre-Filing Investigation and Initial Complaint

B. Legal Research, Pleadings, Briefs, and Motions After Initial Complaint

C. Discovery and Post-Filing Investigation

D. Experts and Consultants

E. Litigation Strategy, Analysis, and Case Management

F. Court Appearances & Preparation

G. Settlement

**POSITION**

P = Partner

A = Associate/Staff Attorney

C = Senior Counsel/Of Counsel

PL = Paralegal

O = Other

**EXHIBIT 2**

*Frito-Lay North America, Inc. "All Natural" Litigation*,
**No. 12-MD-2413-RRM-RLM (E.D.N.Y.)**

**LAW OFFICES OF JULIO J. RAMOS**

**EXPENSE REPORT — Inception through October 1, 2017**

| <u>Categories</u>: | <u>Amount</u> |
|---|---:|
| Telephone | $22.47 |
| Messengers/Express Services | $143.33 |
| Filing/Witness Fees | $350.00 |
| Computer Research (Lexis, Pacer, etc.) | $135.11 |
| **TOTAL EXPENSES:** | $650.91 |

**EXHIBIT 3**

[FIRM RESUME AND BIOGRAPHIES]

# Paul E. Dans

43 West 43rd Street Suite 29 New York, N.Y. 10036  (212) 203-7600 pdans@pdanslaw.com

EXPERIENCE
New York litigator with 20 years large firm experience.

NOTABLE CASES

*CHEVRON ECUADOR LITIGATION*  Conceived strategy to subpoena discovery that produced smoking-gun evidence of fraud leading to dismissal of criminal charges and unraveling of $27 billion fraud against Chevron.  Profiled in *American Lawyer* (August 2014) and book on case for work turning case around.  Appeared in 13 federal courts across country to obtain related discovery.  Landmark reported decisions include *Chevron v. Berlinger*, 629 F.3d 297 (2d Cir. 2011), *Lago Agrio Plaintiffs v. Chevron*, 409 Fed. Appx. 393 (2d Cir. 2012), *In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010).

*STEEL*  Successful appellate defense of order compelling steel company to arbitrate patent dispute.  *Skyline Steel, LLC v. PilePro Steel LLC*, 139 A.D.3d 646 (NY App. Div. 1st Dep't, 2016).

*PHARMA*  Helped secure $19 million attorneys fee award following defense of drug patent challenge.  *Takeda Chemical Industries, Ltd. v. Mylan*, 2007 WL 840368 (S.D.N.Y. 2007).

*REAL ESTATE*  Enforced developer's buyout provision in dissolution of LLC controlling Pacific Design Center property in W. Hollywood, CA.  *Cohen PDC v. CBO Fund* (NY Sup. Doc. 601024/2003).

*UNITED JEWISH APPEAL-FJOP OF NY*  Co-authored *pro bono* amicus brief in support of UJA on behalf of the United Way of NYC  to shield tort liability for philanthropic donations. *Kobre v. United Jewish Appeal*, 32 A.D.3d 218 (NY App. Div. 2d Dep't, 2009).

BAR ASSOCIATIONS

| | |
|---|---|
| New York City Bar Association | *Member* |
| Federal Bar Council | *Member* |
| Hispanic National Bar Association | *Member* |

FIRM EXPERIENCE

| | | |
|---|---|---|
| Law Office of Paul E. Dans | Principal | 2012 to present |
| Rivero Mestre LLP | Counsel | 2009-2011 |
| Edwards Angell Palmer & Dodge LLP | Sr. Associate | 2004-2009 |
| Debevoise & Plimpton LLP | Associate | 2000-2003 |
| LeBoeuf, Lamb, Greene and MacRae LLP | Associate | 1997-2000 |

EDUCATION

| | | |
|---|---|---|
| University of Virginia School of Law | Juris Doctorate | 1997 |
| University of Paris II Pantheon-Assas | Certificate of French Law | 1996 |
| Massachusetts Institute of Technology | Master in City Planning | 1992 |
| Massachusetts Institute of Technology | B.S. Economics | 1992 |

# JULIO J. RAMOS
## LAW OFFICES OF JULIO J. RAMOS
35 Grove Street, Ste. 107
San Francisco CA, 94102
ramoslawgroup@yahoo.com
Ph (415) 948-3015
Fax (415) 469-9787

**EXPERIENCE**

| | | |
|---|---|---|
| 1/2009 - Present | **Principal, Law Offices of Julio J. Ramos** | **San Francisco, CA** |

- Consumer Complex Litigation
- Federal and State Class Action Practitioner
- Legal Brief Writing

| | | |
|---|---|---|
| 1/2000 - 1/2009 | **Elected Official, Trustee San Francisco Community College District** | **San Francisco, CA** |

- Lobbied and Testified California Legislature on Community College Issues
- Elected 2000 and Re-elected 2004
- Vice-President 2007
- Chairman Legislative Committee

| | | |
|---|---|---|
| 2/2001 - 8/2007 | **Associate, The Furth Firm LLP** | **San Francisco, CA** |

- Represented Governmental Entities in Complex Litigation
- Researched Legal Issues and Drafted Legal Briefs
- Conducted All Phases of Discovery
- Managed All Aspects of Federal Anti-trust Class Action Litigation

| | | |
|---|---|---|
| 9/1999 - 2/2001 | **Staff Attorney, California Public Utilities Commission** | **San Francisco, CA** |

- Directly Lobbied PUC Commissioners
- Represented California Consumers in Administrative Trials
- Counseled Energy and Telecommunication Staff of the Office of Ratepayer Advocate
- Researched and Drafted Legal Memorandum for President of PUC

| | | |
|---|---|---|
| 10/1995 - 9/1999 | **Associate, LeBoeuf, Lamb, Greene and MacRae LLP** | **New York, NY** |

- Researched Insurance Regulatory Issues
- Drafted Legal Briefs and Motions of Law
- Argued Motions in Federal Court
- Participated in Six Month Externship South Brooklyn Legal Services

| | | |
|---|---|---|
| 8/1991 - 8/1992 | **Assistant English Teacher, Japan Exchange Teaching Program** | **Hanyu, Japan** |

- Drafted English Lesson Plans For Two High Schools
- Instructed High School English Classes
- Assisted and Counseled Student Clubs and Associations

| | | |
|---|---|---|
| Summer 1994 | **Summer Associate, Rogers and Wells LLP** | **Los Angeles, CA** |

- Drafted Legal Briefs and Memorandum of Law
- Performed Legal Research
- Assisted in trial preparation

**EDUCATION**

| | | |
|---|---|---|
| 8/1992 - 5/1995 | **Columbia University Law School** | **New York, NY** |

**Juris Doctorate**
Coursework on legislative drafting and administrative agency procedure
Student Editor Journal of International Commercial Arbitration
Harlan Fiske Moot Court

| | | |
|---|---|---|
| 8/1990 - 6/1991 | **Coro Foundation Fellowship** | **Los Angeles, CA** |

Public Affairs Fellowship in Southern California, series of internships with political, labor and private sector entities including government relations department Pacific Mutual Life Insurance Company

| | | |
|---|---|---|
| 8/1986 - 5/1990 | **Claremont Colleges, Pitzer College** | **Claremont, CA** |

**Bachelor of Arts, Political Studies**
Extensive coursework in California State Government and International Relations

**MILITARY**

| | | |
|---|---|---|
| 6/1984 - 6/1992 | **California Army National Guard** | **Ontario, CA** |

Specialist 4, 1-18th Cavalry Division, Awarded California Commendation Medal

**INTERNSHIPS**

| | | |
|---|---|---|
| Summer 1991 | Congressional Intern, Congressman George Brown | **Washington, DC** |
| Summer 1990 | City of Pomona Public Works Department, Recycling Coordinator | **Pomona, CA** |

**BAR ADMISSIONS**

California, New York, Southern and Eastern Districts of New York, Northern and Central Districts of California, Second and Ninth Circuit Court of Appeals

**SPECIAL SKILLS**

Fluent in Written and Spoken Spanish

EXHIBIT D

)
*Frito-Lay North America, Inc. "All Natural"* )   Case No. 1:12-MD-02413-RRM-RLM
*Litigation* )
)

## DECLARATION OF PLAINTIFF JULIE GENGO IN SUPPORT OF APPLICATION FOR CASE CONTRIBUTION AWARD

I, **JULIE GENGO**, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am one of the named plaintiffs in the above-captioned multidistrict litigation. I submit this declaration in support of Plaintiffs' motion for an order granting: (1) final approval of the proposed settlement of this Action; (2) an award of attorneys' fees and reimbursement of counsels' expenses incurred in connection with the prosecution and settlement of the Action; and (3) a case contribution award to compensate me for the time and effort expended in assisting the prosecution of the litigation. I have personal knowledge of the matters set forth in this declaration, and, if called upon to do so, I could and would competently so testify.

2.      I have been involved in this action since its inception almost six years ago. I spent considerable time keeping informed, monitoring the actions of my attorneys and, when necessary, actively participating in the litigation.

3.      The time I personally spent attending to this matter includes reviewing pleadings, correspondence, and other litigation documents, including the original Complaint; Amended Complaint; the Court's decision on Defendants' Motion to Dismiss; Defendants' Interrogatories and my responses to those Interrogatories; my supplemental responses to those Interrogatories; Defendant's Document Requests to me and my responses to those Requests; Defendant's Second Requests for Documents to me and my responses to those Requests; and

Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement and supporting documents.

4.     In addition, I spent time retrieving and reviewing personal documents that might have some relevance to the issues in the litigation, and provided relevant documents to my attorneys. This included working with my attorneys to download and locate relevant documents in my personal emails and blog entries as well as my Facebook and Twitter feeds. I provided 23,953 pages of documents to my attorneys.

5.     I also consulted with my attorneys about my shopping habits and provided written authorizations for my attorneys to obtain purchase history records, transaction data, and/or shopper card (loyalty card or affinity card) records from various retailers, which records I understand Defendants had requested. I then assisted in reviewing the records.

6.     In addition, I traveled to San Francisco from my home in Alameda, CA, to meet with plaintiffs' counsel to prepare for my deposition, and again the following day to give testimony in the deposition taken by Defendants' counsel on October 31, 2013. The deposition lasted approximately 4.5 hours and produced a transcript of 149 pages with 34 exhibits.

7.     I also had numerous communications (by telephone, e-mail, and in person) with my counsel, Henry J. Kelston, Ariana J. Tadler, and Meagan Keenan of Milberg LLP, regarding the case.

8.     Additionally, I conferred with counsel about the final settlement and disposition of the case and authorized them to enter into the Settlement.

9.     In connection with this lawsuit, I incurred minor out-of-pocket expenditures, such as postage costs, telephone charges, and charges relating to travel to and from my deposition. I have not been reimbursed for any of these expenses.

10.    I felt strongly about this lawsuit, and if it had not settled, I was prepared to testify at trial and would have done so.

11.    I believe that the settlement is a fair, reasonable, and adequate result for the class and is the result of my effort as a plaintiff and the efforts of plaintiffs' counsel. I was involved throughout the litigation and was kept abreast of all material discussions which led to the proposed settlement. On the basis of the efforts of counsel and the results achieved, I support the motion for final approval of the settlement and plaintiffs' counsel's application for an award of attorneys' fees and expenses.

12.    In light of my efforts on behalf of the class and the success of the lawsuit in obtaining substantial benefits for the class, I respectfully request that the Court approve the proposed settlement and award me $5,000 for acting on behalf of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25 day of September 2017.

_____
JULIE SENGO

EXHIBIT E

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | ) |
| *Frito-Lay North America, Inc. "All Natural"* | ) Case No. 1:12-MD-02413-RRM-RLM |
| *Litigation* | ) |
| | ) |
| | ) |

## DECLARATION OF PLAINTIFF VALARIE ZURO IN SUPPORT OF APPLICATION FOR CASE CONTRIBUTION AWARD

I, **VALARIE ZURO,** declare as follows pursuant to 28 U.S.C. § 1746:

1.  I am one of the named plaintiffs in the above-captioned multidistrict litigation. I submit this declaration in support of Plaintiffs' motion for an order granting: (1) final approval of the proposed settlement of this Action; (2) an award of attorneys' fees and reimbursement of counsels' expenses incurred in connection with the prosecution and settlement of the Action; and (3) a case contribution award to compensate me for the time and effort expended in assisting the prosecution of the litigation. I have personal knowledge of the matters set forth in this declaration, and, if called upon to do so, I could and would competently so testify.

2.  I have been involved in this action since its inception almost six years ago. I spent considerable time keeping informed, monitoring the actions of my attorneys and, when necessary, actively participating in the litigation.

3.  I personally spent time attending to this matter including reviewing pleadings, correspondence, court rulings and other litigation documents, including my original Complaint;

the Amended Complaint; the Court's decision on Defendants' Motion to Dismiss; Defendants' Interrogatories and my responses to those Interrogatories; my supplemental responses to those Interrogatories; Defendant's Document Requests to me and my responses to those Requests; Defendant's Second Requests for Documents to me and my responses to those Requests; and Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement and supporting documents.

4.      In addition, I spent time retrieving and reviewing personal documents that might have some relevance to the issues in the litigation, and provided relevant documents to my attorneys.

5.      In addition, I gave testimony in the deposition taken by defendants' counsel on October 30, 2013.  The deposition lasted approximately over 6 hours and and produced a transcript of 182 pages with 20 exhibits.  I spent about 3 hours preparing for the deposition.  I also took a day off from my work as a caregiver to developmentally challenged persons in order to attend the deposition.

6.      I also had numerous communications (by telephone, e-mail, and in person) with my counsel, Julio Ramos, regarding the case.

7.      In connection with this lawsuit, I incurred minor out-of-pocket expenditures, such as telephone charges, and charges relating to travel to and from my deposition. I have not been reimbursed for any of these expenses.

8.      I felt strongly about this lawsuit, and I stated so throughout my deposition.  If it had not settled, I was prepared to testify at trial and would have done so without any reservation.

10.     In light of my efforts on behalf of the class and the success of the lawsuit in obtaining substantial benefits for the class, I respectfully request that the Court approve the proposed settlement and award me $5,000 for acting on behalf of the Class. I am particularly proud of the fact that the disputed term "Natural" has been taken off Tostito Chips bags.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28 day of September, 2017.

VALARIE ZURO

- 3 -

EXHIBIT F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

_____
                                        )
*Frito-Lay North America, Inc. "All Natural"*  )   Case No. 1:12-MD-02413-RRM-RLM

*Litigation*                            )
                                        )
_____)


**DECLARATION OF PLAINTIFF CHRISTOPHER SHAKE IN SUPPORT OF**

**APPLICATION FOR SERVICE AWARD**


I, **CHRISTOPHER SHAKE,** declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am one of the named plaintiffs in the above-captioned multidistrict litigation. I submit this declaration in support of Plaintiffs' motion for an order granting:  (1) final approval of the proposed settlement of this Action; (2) an award of attorneys' fees and reimbursement of counsels' expenses incurred in connection with the prosecution and settlement of the Action; and (3) a service award to compensate me for the time and effort expended in assisting the prosecution of the litigation. I have personal knowledge of the matters set forth in this declaration, and, if called upon to do so, I could and would competently so testify.

2.      I have been involved in this action since its inception almost six years ago. I spent considerable time keeping informed, monitoring the actions of my attorneys and, when

necessary, actively participating in the litigation. in connection with my representation of the putative class.

3.      The time I personally spent attending to this matter includes reviewing pleadings, correspondence, and other litigation documents, including my original Complaint; the Amended Complaint; Defendant's Interrogatories and my responses to those Interrogatories; my supplemental responses to those Interrogatories; Defendant's Document Requests to me and my responses to those Requests; Defendant's Second Requests for Documents to me and my responses to those Requests; and Defendants' Requests for Admissions and my responses to those Requests; and Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement and supporting documents.

4.      In addition, I spent time retrieving and reviewing personal documents that might have some relevance to the issues in the litigation, and provided relevant documents to my attorneys.

5.      In addition, I traveled to New York, New York from London, England (where I was temporarily employed at the time) to meet with plaintiffs' counsel and to give testimony in the deposition taken by defendants' counsel on November 8, 2013.  The deposition lasted 7 hours and produced a transcript of  255 pages.

6.      I also had numerous communications (by telephone, e-mail, and in person) with my counsel, Michael Reese of Reese LLP,  regarding the case.

7.      In connection with this lawsuit, I incurred minor out-of-pocket expenditures, such as postage costs, telephone charges, and charges relating to travel to and from my deposition. I have not been reimbursed for any of these expenses.

8.      I felt strongly about this lawsuit, and if it had not settled, I was prepared to testify at trial and would have done so.

9.      I believe that the settlement is a fair, reasonable, and adequate result for the class and is the result of my effort as a plaintiff and the efforts of plaintiffs' counsel. I was involved throughout the litigation and was kept abreast of all material discussions which led to the proposed settlement. On the basis of the efforts of counsel and the results achieved, I support the motion for final approval of the settlement and plaintiffs' counsel's application for an award of attorneys' fees and expenses.

10.     In light of my efforts on behalf of the class and the success of the lawsuit in obtaining substantial benefits for the class, I respectfully request that the Court approve the proposed settlement and award me $5,000 for my services on behalf of the class.

I declare under penalty of perjury: under the laws of the United States of America that the foregoing is true and correct.

Executed on this  30th day of September  , 2017.

_____

CHRISTOPHER SHAKE

EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  | ) |  |
|---|---|---|
| *Frito-Lay North America, Inc. "All Natural"* | ) | Case No. 1:12-MD-02413-RRM-RLM |
| *Litigation* | ) | |
|  | ) | |
|  | ) | |

## DECLARATION OF PLAINTIFF DEBORAH LAWSON IN SUPPORT OF APPLICATION FOR CASE CONTRIBUTION AWARD

I, **DEBORAH LAWSON,** declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am one of the named plaintiffs in the above-captioned multidistrict litigation. I submit this declaration in support of Plaintiffs' motion for an order granting: (1) final approval of the proposed settlement of this Action; (2) an award of attorneys' fees and reimbursement of counsels' expenses incurred in connection with the prosecution and settlement of the Action; and (3) a case contribution award to compensate me for the time and effort expended in assisting the prosecution of the litigation. I have personal knowledge of the matters set forth in this declaration, and, if called upon to do so, I could and would competently so testify.

2.      I have been involved in this action since September 2013. I spent considerable time keeping informed, monitoring the actions of my attorneys and, when necessary, actively participating in the litigation.

3.      The time I personally spent attending to this matter includes reviewing pleadings, correspondence, and other litigation documents, including the Amended Complaint; Defendants' Interrogatories and my responses to those Interrogatories; my supplemental responses to those Interrogatories; Defendant's Document Requests to me and my responses to those Requests; my supplemental responses to those Requests; and Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement and supporting documents.

4.      In addition, I spent time retrieving and reviewing personal documents that might have some relevance to the issues in the litigation, including my personal emails.  I provided 1,462 pages of documents to my attorneys.

5.      I also consulted with my attorneys about my shopping habits and provided written authorizations for my attorneys to obtain purchase history records, transaction data, and/or shopper card (loyalty card or affinity card) records from various retailers, which Defendants had requested.

6.      In addition, I spent significant time over several days working with my attorneys to prepare for my deposition, which was scheduled for December 22, 2014.  The deposition was cancelled a few days before it was to take place.

7.      I also had numerous communications (by telephone, e-mail, and in person) with my counsel, Henry J. Kelston, Ariana J. Tadler, and Meagan Keenan of Milberg LLP, regarding the case.

8.      Additionally, I conferred with counsel about the final settlement and disposition of the case and authorized them to enter into the Settlement.

9.      In connection with this lawsuit, I incurred minor out-of-pocket expenditures, such as postage costs and telephone charges. I have not been reimbursed for any of these expenses.

10.      I felt strongly about this lawsuit, and if it had not settled, I was prepared to testify at trial and would have done so.

11.      I believe that the settlement is a fair, reasonable, and adequate result for the class and is the result of my effort as a plaintiff and the efforts of plaintiffs' counsel. I was involved throughout the litigation and was kept abreast of all material discussions which led to

the proposed settlement. On the basis of the efforts of counsel and the results achieved, I support the motion for final approval of the settlement and plaintiffs' counsel's application for an award of attorneys' fees and expenses.

12.    In light of my efforts on behalf of the class and the success of the lawsuit in obtaining substantial benefits for the class, I respectfully request that the Court approve the proposed settlement and award me $2,500 for acting on behalf of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of September, 2017.

DEBORAH LAWSON